# APPENDIX OF CASES NOT GENERALLY REPORTED
## (Per local rule 105.5.a)





Positive
As of: Jan 13, 2012

**PAUL BIRSTER AND ANGELA BIRSTER, Plaintiffs, vs. AMERICAN HOME MORTGAGE SERVICING, INC., a Delaware Corporation, Defendant.**

**CASE NO. 10-80735-CIV-DIMITROULEAS**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA**

*2011 U.S. Dist. LEXIS 75082*

**July 6, 2011, Decided**

**CASE SUMMARY:**

**OVERVIEW:** Homeowners' claim against their loan servicing company under the Fair Debt Collection Practices Act failed as a matter of law because the company's alleged actions related solely to efforts to foreclose on a mortgage, and therefore only *15 U.S.C.S. § 1692f(6)* applied. The homeowners failed to allege a claim under *§ 1692f(6)*. The homeowners' state law claims were remanded to state court.

**OUTCOME:** The court granted in part the servicer's motion for summary judgment and remanded the owners' state law claims to state court.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
[HN1] The court may grant summary judgment if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c)*.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Standards > Need for Trial*
[HN2] The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party. The court should not grant summary judgment unless it is clear that a trial is unnecessary, and any doubts in this regard should be resolved against the moving party.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Absence of Essential Element of Claim*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Scintilla Rule*
[HN3] The movant bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. To discharge this burden, the movant must point out to the court that there is an absence of evidence to support the nonmoving party's case. After the movant has met its burden under *Fed. R. Civ. P. 56(c)*, the burden of production shifts, and the nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. According to the plain language of *Fed. R. Civ. P. 56(e)*, the non-moving party may not rely merely on allegations or denials in its own pleadings, but instead must come forward with specific facts showing a genuine issue for trial. A mere scintilla of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party.

*Banking Law > Consumer Protection > Fair Debt Collection > Liability*
[HN4] Congress enacted the Fair Debt Collection Practices Act to (a) stop debt collectors from using abusive debt collection practices, (b) insure that debt collectors who refrain from such practices are not competitively disadvantaged, and (c) promote consistent state action to protect consumers from such practices.

*Banking Law > Consumer Protection > Fair Debt Collection > Liability*
[HN5] The Fair Debt Collection Practices Act (FDCPA) does not define "debt collection." However, *15 U.S.C.S. § 1692a(6)* provides that for the purpose of *§ 1692f(6)* of this title, the term debt collector also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests. Because the statute specifically says that a person in the business of enforcing security interest is a "debt collector" for the purposes of *§ 1692f(6)*, this reasonably suggests that such a person is not a debt collector for purposes of the other sections of the Act. In other words, pursuant to the express language of the FDCPA, a person in the business of enforcing a security interest is only a "debt collector" for the purposes of *§ 1692f(6)*.

*Banking Law > Consumer Protection > Fair Debt Collection > Liability*
*Real Property Law > Financing > Mortgages & Other*

*Security Instruments > Foreclosures > General Overview*
[HN6] Foreclosing on a mortgage is distinct from the collection of the obligation to pay money. The Fair Debt Collection Practices Act is intended to curtail objectionable acts occurring in the process of collecting funds from a debtor. But, foreclosing is an entirely different path. Payment of funds is not the object of the foreclosure action. Rather, the lender is foreclosing its interest in the property.

*Banking Law > Consumer Protection > Fair Debt Collection > Liability*
[HN7] See *15 U.S.C.S. § 1692a(6)*.

*Banking Law > Consumer Protection > Fair Debt Collection > Liability*
[HN8] The use of the phrase "any person" in *15 U.S.C.S. § 1692a(6)* of the Fair Debt Collection Practices Act reasonably encompasses not only the owner and holder of the note and mortgage, but also a loan servicer, so long as the purpose of the conduct is the enforcement of security interests.

*Banking Law > Consumer Protection > Fair Debt Collection > Liability*
[HN9] Congress clearly intended to treat the enforcement of security interests different then other debts by including any person in the business of enforcing security interest within the definition of a "debt collector" only with respect to *15 U.S.C.S. § 1692f(6)* of the Faird Debt Collection Practices Act (FDCPA). Thus, whether the conduct at issue is the act of filing a foreclosure action or communications and conduct subsequent to the filing of the foreclosure, so long as the purpose of the conduct is the enforcement of a security interest the only section of the FDCPA available to such claims is *§ 1692f(6)*.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims*
[HN10] While a federal district court may have authority to exercise supplemental jurisdiction over state law claims, the court may nevertheless decline to exercise supplemental jurisdiction where it has dismissed all claims over which it has original jurisdiction. *28 U.S.C.S. § 1367(c)(3)*. If the federal claims are dismissed before

trial, the state claims should be dismissed as well. This is especially true when the federal claims are dismissed before trial, because considerations of judicial economy, convenience, fairness, and comity, will point toward declining to exercise jurisdiction over the remaining state law claims.

**COUNSEL:** [*1] Angela Birster, Plaintiff, Pro se, New River, AZ.

Paul Birster, Plaintiff, Pro se, Jupiter, FL.

For American Home Mortgage Servicing, Inc., a Delaware corporation, Defendant: Eric Shaun Matthew, Lawrence Dean Silverman, LEAD ATTORNEYS, Akerman Senterfitt, Miami, FL; Kimberly A. Leary, Akerman Senterfitt & Eidson, Fort Lauderdale, FL.

**JUDGES:** WILLIAM P. DIMITROULEAS, United States District Judge.

**OPINION BY:** WILLIAM P. DIMITROULEAS

**OPINION**

**ORDER GRANTING, IN PART, DENYING, IN PART, MOTION FOR SUMMARY JUDGMENT; REMANDING STATE LAW CLAIMS**

THIS CAUSE is before the Court upon AHMSI's Motion for Summary Judgment [DE-28], filed herein on May 20, 2011. The Court has carefully considered the Motion, Defendant's Statement of Undisputed Material Facts [DE-29], Plaintiffs' Response [DE-37], Plaintiffs' Response to Defendant's Statement of Undisputed Material Facts [DE-38], [1] and is otherwise fully advised in the premises.

1  Defendant failed to file a reply in support of the instant Motion, despite that the time for doing so had passed. [DE-47, 57].

**I. BACKGROUND**

Plaintiffs, Paul and Angela Birster, commenced the instant action on May 4, 2010, in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, [*2] asserting claims for violation of the Fair Debt Collection Practices Act, *15 U.S.C. § 1692, et seq.* ("FDCPA"), the Florida Consumer Collection Practices

Act, *Fla. Stat. § 559.55, et seq.* ("FCCPA"), and intentional infliction of emotional distress. Defendant American Home Mortgage Servicing, Inc. ("AHMSI") removed the instant action to this Court on June 21, 2010 [DE-1].

The present action relates to purported conduct by AHMSI in attempting to collect on a mortgage debt obtained by Plaintiffs for a home in Jupiter, Florida. A mortgage foreclosure action was filed against Plaintiffs on February 9, 2009, relating to this mortgage debt. Thereafter, Plaintiffs filed the instant suit on May 4, 2010 [DE-1-3]. Plaintiffs allege that AHMSI repeatedly made harassing and threatening phone calls wherein false statements were made as to the date for a foreclosure sale of Plaintiffs' property and Plaintiffs being kicked out of their home, [DE-1-3, ¶¶ 21, 29, 35, 37, 40], and further allege that AHMSI repeatedly visited the property to take pictures and harass Plaintiffs, *id.* at ¶¶ 27, 33, 45. Plaintiffs concede in their Complaint that AHMSI is a "loan servicing company" [DE-1- 3, ¶ 17]. There is [*3] also no dispute that Defendant began servicing Plaintiffs' mortgage debt on July 30, 2008. [DE-29, ¶ 9; DE-38, ¶ 9].

**II. DISCUSSION**

**A. Summary Judgment Standard**

[HN1] The Court may grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c).* [HN2] The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* The Court should not grant summary judgment unless it is clear that a trial is unnecessary, *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986),* and any doubts in this regard should be resolved against the moving party, *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970).*

[HN3] The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp., 477 U.S. at 323.* To discharge this burden, the movant must point out to the

[*4] Court that there is an absence of evidence to support the nonmoving party's case. *Id. at 325.* After the movant has met its burden under *Rule 56(c)*, the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electronic Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* According to the plain language of *Fed. R. Civ. P. 56(e)*, the non-moving party "may not rely merely on allegations or denials in its own pleadings," but instead must come forward with "specific facts showing a genuine issue for trial." *Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587.* "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." *Walker v. Darby, 911 F. 2d 1573, 1577 (11th Cir. 1990).*

## B. AHMSI's Motion for Summary Judgment

AHMSI requests that the Court grant summary judgment as to each of the counts on the following grounds: (1) the FDCPA and FCCPA claims fail as a matter of law because foreclosing on a mortgage is not debt collection, AHMSI is not a debt collector, there was [*5] no harassing, abusive language, or threatening of legal rights by AHMSI, the refusal to contact an attorney is not a FCCPA violation, and Plaintiffs have provided no evidence of damages arising from the alleged FCCPA violations; and (2) the intentional infliction of emotional distress claim fails as a matter of law because the conduct complained of was not "outrageous" and it was privileged.

### 1. FDCPA Claim

#### (a) Foreclosure as Debt Collection

AHMSI argues that this lawsuit arises from communications relating to a mortgage-secured debt and AHMSI was seeking to enforce a security interest. As such, Defendant argues that summary judgment should be entered on the FDCPA and FCCPA claims on the ground that so long as the object of the communication is to enforce a security interest, rather than obtain payment of funds ancillary to the mortgage proceedings, the communication is not a debt collection practice. Plaintiffs counter that AHMSI was not seeking to enforce a security interest, but instead AHMSI's actions were taken for the sole purpose of collecting money from Plaintiffs. Consequently, Plaintiffs argue that AHMSI was engaged in debt collection activity for the purposes of the FDCPA.

In [*6] *Warren v. Countrywide Home Loans, Inc.*, the Eleventh Circuit explained that [HN4] "Congress enacted the FDCPA to (a) stop debt collectors from using abus[ive] debt collection practices, (b) insure that debt collectors who refrain from such practices are not competitively disadvantaged, and (c) promote consist[ent] state action to protect consumers from such practices." *342 Fed. Appx. 458, 460 (11th Cir. 2009).* The Eleventh Circuit pointed out that [HN5] the FDCPA does not define "debt collection." However, relying upon *section 1692a(6)* which provides that "[f]or the purpose of *section 1692f(6)* of this title, [the term debt collector] also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests," the court concluded that since "the statute specifically says that a person in the business of enforcing security interest is a 'debt collector' for the purposes of *§ 1692f(6)*" this "reasonably suggests that such a person is not a debt collector for purposes of the other sections of the Act." *Id. at 460.* In other words, the *Warren* court concluded that pursuant to the express language of [*7] the FDCPA, a person in the business of enforcing a security interest is only a "debt collector" for the purposes of *§ 1692f(6). Id.; see also Memmott v. OneWest Bank*, Case No. 10-3042-CL, 2011 U.S. Dist. LEXIS 44330, 2011 WL 1560985, at *6 (D. Ore. Feb. 9, 2011) (interpreting *Warren* to hold that "*§ 1692f(6)* 'reasonably suggests' that such a person in the business of enforcing security interests 'is not a debt collector for purposes of the other sections of the Act.'").

Here, Plaintiffs allegations clearly relate to the foreclosure action and AHMSI's activities in attempting to enforce the security interest in the form of the mortgage debt on Plaintiffs' home. There is no dispute by the parties that AHMSI is the loan servicer on Plaintiffs' mortgage debt. While Plaintiffs make the conclusory contention that AHMSI's actions were taken for the sole purpose of collecting money from Plaintiffs, the allegations of the Complaint belie such a contention. Even when accepting Plaintiffs' allegations as true, Plaintiffs allegations relate to purported false statements by AHMSI as to the date of a foreclosure sale on Plaintiffs' property and Plaintiffs being kicked out of their home. [DE-1-3, ¶¶ 21, 29, 35, 37, 40]. Such conduct [*8] relates to enforcement of a security interest, as a foreclosure sale and the subsequent loss of one's home

through a foreclosure sale are the very remedies sought in a foreclosure action. Further, Plaintiffs allege that AHMSI repeatedly visited the property to take pictures and harass Plaintiffs. *Id.* at ¶¶ 27, 33, 45. Yet, once again, even this conduct would relate to efforts to protect and enforce a security interest on a property. Far from representing attempts by AHMSI to obtain the payment of any funds ancillary to the mortgage proceedings or security interest, such conduct simply represents acts to further the foreclosure proceedings and enforce the security interest on Plaintiffs' home. *See Trent v. Mortgage Electronic Registration Systems, Inc.*, 618 F. Supp. 2d 1356, 1360 (M.D. Fla. 2007) [HN6] ("[F]oreclosing on a mortgage 'is distinct from the collection of the obligation to pay money. The FDCPA is intended to curtail objectionable acts occurring in the process of collecting funds from a debtor. But, foreclosing . . . is an entirely different path. Payment of funds is not the object of the foreclosure action. Rather, the lender is foreclosing its interest in the property.'") (internal [*9] citations omitted); *see also Rosado v. Taylor*, 324 F. Supp. 2d 917, 924 (N.D. Ind. 2004) ("Security enforcement activities fall outside the scope of the FDCPA because they aren't debt collection practices").

Contrary to Plaintiffs' assertions, the holding in *Warren* has broader implications then just the limited facts that were before the court. *Section 1692a(6)* provides that [HN7] "[f]or the purpose of *section 1692f(6)* of this title, [the term debt collector] also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests." *15 U.S.C. § 1692a(6)* (emphasis added). [HN8] The use of the phrase "any person" reasonably encompasses not only the owner and holder of the note and mortgage, but also a loan servicer, such as AHMSI, so long as the purpose of the conduct is the enforcement of security interests. As recognized by the *Warren* court, [HN9] Congress clearly intended to treat the enforcement of security interests different then other debts by including any person in the business of enforcing security interest within the definition of a "debt collector" only with respect to *section 1692f(6) of the FDCPA.* [*10] Thus, whether the conduct at issue is the act of filing a foreclosure action or communications and conduct subsequent to the filing of the foreclosure, so long as the purpose of the conduct is the enforcement of a security interest the only section of the FDCPA available to such

claims is *section 1692f(6).* Consequently, given that Plaintiffs have not asserted a claim for violation of *section 1692f(6)* [2] and Plaintiffs' allegations relate solely to efforts by AHMSI to enforce a security interest, the FDCPA fails as a matter of law. [3]

> 2 The Court points out that Plaintiffs do include a conclusory allegation for violation of *section 1692f* in their Complaint. Importantly, Plaintiffs do not allege a violation of *section 1692f(6)* and the Court has been presented with no facts that would indicate any basis for such a claim.
> 3 Having concluded that the FDCPA claim fails as a matter of law on this ground, the Court declines to reach the additional arguments raised by AHMSI.

## 2. Remaining State Law Claims

AHMSI removed this action pursuant to federal question jurisdiction under *28 U.S.C. §§ 1331* and *1441(b) [DE-1].* Plaintiffs assert only one federal count in their Complaint -- violation of the FDCPA. [*11] [HN10] While this Court may have authority to exercise supplemental jurisdiction over the remaining state law claims, the Court may nevertheless decline to exercise supplemental jurisdiction where, as here, it "has dismissed all claims over which it has original jurisdiction." *28 U.S.C. § 1367(c)(3).* "[I]f the federal claims are dismissed before trial . . . the state claims should be dismissed as well." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966); *see also Arnold v. Tuskegee Univ.*, 212 Fed. Appx. 803, 811 (11th Cir. 2006) ("When the district court has dismissed all federal claims from a case, there is a strong argument for declining to exercise supplemental jurisdiction over the remaining state law claims."); *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) (The Eleventh Circuit "encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial."); *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984) ("if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of the state claims."); *Hinkle v. Asset Acceptance, LLC*, Case No. 09-60928-CIV, 2010 U.S. Dist. LEXIS 4279, 2010 WL 298396, at *1 (S.D. Fla. Jan. 20, 2010) [*12] (declining to exercise supplemental jurisdiction over the FCCPA claim after disposing of the FDCPA on summary

judgment). This is especially true when the federal claims are dismissed before trial, because considerations of "judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 349 n.7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988)*.

When considering that the remaining claims relate solely to issues of Florida statutory and common law, comity points in favor of declining supplemental jurisdiction where no federal claims remain. Trial in this matter has not begun. Accordingly, judicial economy, convenience, fairness, and certainly comity is best served by remanding the remaining state law claims to the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida.

## III. CONCLUSION

Accordingly, based upon the foregoing, it is **ORDERED AND ADJUDGED** as follows:

1. AHMSI's Motion for Summary Judgment [DE-28] is hereby **GRANTED in part** as to count II of the Complaint, and **DENIED in part** as to the state law [*13] claims in counts I and III of the Complaint;

2. The Court shall separately enter a final summary judgment in favor of Defendant as to count II;

3. The remaining state law claims in counts I through III are hereby **REMANDED** back to the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida pursuant to *28 U.S.C. § 1367(c)(3)*.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida this 6th day of July, 2011.

/s/ William P. Dimitrouleas

WILLIAM P. DIMITROULEAS

United States District Judge



ISHIA CASON, Plaintiff, v. ERIC H. HOLDER, JR., ATTORNEY GENERAL OF
THE UNITED STATES, et al, Defendants.

Civil Action No.: ELH-11-01304

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

*2011 U.S. Dist. LEXIS 109880*

September 27, 2011, Decided
September 27, 2011, Filed

**CASE SUMMARY:**

**OVERVIEW:** Plaintiff's independent civil action, which sought an injunction ordering the return of a motor vehicle that was seized by state police and remanded to the custody of the United States Secret Service, was not properly before the court because, after plaintiff filed the complaint, the United States filed a civil forfeiture complaint in the court regarding the same property, under *18 U.S.C.S. § 983(a)(3)*. Any challenge plaintiff had must have been raised in the forfeiture case.

**OUTCOME:** Motion to dismiss granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss*
*Civil Procedure > Summary Judgment > Standards > Appropriateness*
[HN1] A court must construe the facts alleged in the light most favorable to the party opposing a motion to dismiss or for summary judgment.

*Civil Procedure > Parties > Self-Representation >*

*Pleading Standards*
[HN2] Pro se complaints are held to less stringent standards than formal pleadings drafted by lawyers.

*Evidence > Judicial Notice > Adjudicative Facts > Proceedings in Other Courts*
[HN3] A court can take judicial notice of its own records in another case if the prior case is brought into the pleadings in the case on trial or where the two cases represent related litigation.

*Civil Procedure > Remedies > Forfeitures > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Fraud > Credit Card Fraud > Penalties*
*Criminal Law & Procedure > Sentencing > Forfeitures > General Overview*
*Immigration Law > Enforcement > Criminal Offenses > Fraudulent Activity*
[HN4] Federal law provides that the proceeds traceable to violations of *18 U.S.C.S. § 1028* and *§ 1029* are subject to forfeiture. *18 U.S.C.S. §§ 1028(g)* 1029(c)(2). The rules governing civil forfeiture are found in *18 U.S.C.S. § 981 et seq.* They provide that the United States may seize property subject to forfeiture without a warrant if the property was lawfully seized by a state or local law enforcement agency and transferred to a federal agency.

Case 8:10-cv-02822-RWT   Document 57   Filed 01/13/12   Page 10 of 107

Page 2
2011 U.S. Dist. LEXIS 109880, *

*18 U.S.C.S. § 981(b)(2)(C).*

*Civil Procedure > Remedies > Forfeitures > General Overview*
*Civil Procedure > Remedies > Forfeitures > Notice Requirements*
[HN5] When property is seized by a state and then remanded to the custody of the United States, the federal agency receiving the property must provide notice of the seizure to any interested parties within 90 days of the date of the initial seizure. *18 U.S.C.S. § 983(a)(1)(A)(iv)*. It is then incumbent upon an interested party to seek return of the property by pursuing administrative remedies. *18 U.S.C.S. § 983(a)(2)*. Typically, this would take the form of filing a Claim of Ownership. If an administrative claim is filed contesting the seizure, the United States must either return the property to the claimant or file a civil forfeiture complaint in a U.S. District Court within 90 days of the filing of the Claim of Ownership. *18 U.S.C.S. § 983(a)(3)*. Once a complaint has been filed in federal district court, any interested parties must, to protect their interests, file a claim with the clerk of the court asserting their interests, within 30 days of the date of service of the complaint, or within 30 days after the date of final publication of notice of the filing of the complaint. *18 U.S.C.S. § 983(a)(4)(A). Supp. R. Adm. or Mar. Cl. F(4)*. The interested party must then file an answer to the complaint within 20 days of the filing of the claim. *18 U.S.C.S. § 983(a)(4)(B)*.

*Civil Procedure > Jurisdiction > General Overview*
[HN6] Before a federal court can decide the merits of a claim, the claim must invoke the jurisdiction of the court.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
[HN7] *Fed. R. Civ. P. 12(b)(1)* governs motions to dismiss for lack of subject matter jurisdiction. A motion to dismiss under *Rule 12(b)(1)* is nonwaivable and may be brought at any time--even on appeal--regardless of whether a litigant raised the issue in an initial pleading. *Fed. R. Civ. P. 12(h)(3)* (If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action). Once a challenge is made to

subject matter jurisdiction, the plaintiff bears the burden of proving that the court has subject matter jurisdiction. In ruling on a motion under *Fed. R. Civ. P. 12(b)(1)*, the court should regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. The court should grant a *Rule 12(b)(1)* motion only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.

*Administrative Law > Judicial Review > Reviewability > Exhaustion of Remedies*
*Civil Procedure > Remedies > Forfeitures > General Overview*
[HN8] Where administrative remedies are available, a plaintiff generally must exhaust such remedies before pursuing a judicial remedy. Courts have held that this rule encompasses the requirement that claimants seeking the return of property subject to forfeiture proceedings must first exhaust administrative remedies before filing a judicial action, or else face dismissal of a law suit seeking recovery of the property.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Civil Procedure > Remedies > Forfeitures > Hearings*
[HN9] Once the government initiates administrative forfeiture proceedings, a district court is divested of jurisdiction over a suit filed by a claimant seeking return of the subject property. Once an administrative forfeiture proceeding has been completed, district courts retain jurisdiction only to determine compliance with due process or procedural requirements. For example, district courts retain jurisdiction if a party alleges that the government failed to provide adequate notice of forfeiture, and, as a result, violated the claimant's due process rights.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Rem Actions > General Overview*
*Civil Procedure > Remedies > Forfeitures > General Overview*
[HN10] Civil forfeiture proceedings are in rem.

**COUNSEL:**  [*1]  Ishia Cason, Plaintiff, Pro se,

Baltimore, MD.

For Eric Holder, Attorney General, Tim Geithner, Shawn Bridges, Agent, Defendants: Jason Daniel Medinger, LEAD ATTORNEY, Office of the United States Attorney, Baltimore, MD.

For Rod Rosenstein, Defendant: Constantine Peter Lizas, Jason Daniel Medinger, LEAD ATTORNEYS, Office of the United States Attorney, Baltimore, MD.

**JUDGES:** Ellen Lipton Hollander, United States District Judge.

**OPINION BY:** Ellen Lipton Hollander

**OPINION**

**MEMORANDUM OPINION**

Ishia Cason, the self-represented plaintiff, has brought suit against Eric Holder, Attorney General of the United States; Rod Rosenstein, United States Attorney for the District of Maryland; Timothy Geithner, Secretary of the United States Treasury Department; [1] and Special Agent Shaun Bridges of the United States Secret Service ("USSS"), seeking an injunction ordering the return of a motor vehicle, to wit, a 2004 Porsche Cayenne, seized by the Maryland State Police in March 2011, and subsequently remanded to the custody of the USSS. *See* Complaint (ECF 1). [2] Plaintiff relies on Title *28 U.S.C. § 1355*, and also contends that the warrantless seizure of the vehicle violated her rights under the *Fourth, Fifth, and Fourteenth Amendments to the United States Constitution* [*2] and Article 26 of the Maryland Declaration of Rights. [3] In addition, she complains that the Government did not comply with the statutory procedures for forfeiture, presumably under *18 U.S.C. § 981 et seq.*

1    In her Complaint, plaintiff identifies Mr. Geithner as "Tim" Geithner.
2    Plaintiff has appended numerous exhibits to her Complaint, including a copy of the Certificate of Title for the vehicle that is the subject of the suit. *See* Complaint at 4. She has also attached a short, unnamed appendix ("Complaint Appendix," ECF 1-1) that includes a proposed Agreement to Surrender Property from the USSS ("Exhibit 1"), a letter informing her of her right to contest the

forfeiture, also from the USSS ("Exhibit 2"), and a letter to her criminal defense attorney, John Denholm, which she apparently filed with the circuit courts for Baltimore City; Baltimore County; and Harford County, Maryland, ("Exhibit 3").
3    *Section 1355 of Title 28 U.S.C* provides that the district courts shall have original jurisdiction over "any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress." In the body of her Complaint, plaintiff [*3] asserts violations of the *Fourth, Fifth,* and *Fourteenth Amendments* and Article 26 of the Maryland Declaration of Rights, as well as the procedures for forfeiture outlined in *18 U.S.C. § 981 et seq.*

Defendants have filed a "Motion To Dismiss, Or Alternatively, For Summary Judgment" ("Motion," ECF 12), as well as a "Memorandum Of Law In Support Of Motion To Dismiss, Or Alternatively, For Summary Judgment" ("Motion Memo," ECF 12-1). [4] Plaintiff has filed a "Motion To Respond To Defendants [sic] Meritless Request to Dismiss Or Alternatively For Summary Judgment" ("Response," ECF 14). In her response, plaintiff attempts to amend or supplement her Complaint to include a claim under *42 U.S.C. § 1983*. Defendants filed a "Reply Brief In Support Of Defendants' Motion to Dismiss, Or Alternatively, For Summary Judgment" ("Reply," ECF 15).

4    Defendants have also appended numerous exhibits to their Motion.

As the matter has been fully briefed, the Court now rules pursuant to *Local Rule 105.6*, no hearing being necessary.

**Factual and Procedural Background**[5]

5    [HN1] The Court must here construe the facts alleged in the light most favorable to plaintiff, as the party opposing the motion. *See Philips v. Pitt County Memorial Hosp., 572 F.3d 176, 180 (4th Cir. 2009).* [*4] As plaintiff is pro se, her pleadings will be liberally construed. *Haines v. Kerner, 404 U.S. 519, 521, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)* (stating that [HN2] pro se complaints are held "to less stringent standards than formal pleadings drafted by lawyers"),

*accord Marlar v. Warden, Tyger River Correctional Inst., No. 08-8572, 2011 U.S. App. LEXIS 10613, 2011 WL 2036507, at *9 n. 6 (4th Cir. May 25, 2011).*

At issue here is a 2004 Porsche Cayenne, VIN WP1AB29P54LA66153. Complaint at 4. The vehicle was purchased on or about January 4, 2011, for $2,000.00. Motion Memo at 4. At the time, the vehicle had a cash value of $17,000.00. *Id.* The Certificate of Title for the vehicle identified "Ishia Cason, LLC" as the registered owner, with an address of 1628 West Lexington Street, Baltimore, Maryland 21223. Complaint at 4. That address corresponds to the address plaintiff used as her address for the filing of her Complaint. *Id.* at 1. According to the Government, "there are no known records of an entity" by the name of Ishia Cason, LLC. Motion Memo at 4 (citing Exh. 2, Declaration of SA Shaun Bridges at ¶ 1n). At the time of the vehicle's purchase, plaintiff was unemployed and receiving public assistance. *Id.*

The Government explains that plaintiff was suspected [*5] of participating in a scheme in which credit cards and credit card numbers were stolen from the restrooms of rest stops along I-95 in Maryland. Motion Memo at 3. Allegedly, plaintiff and her "co-conspirator" would steal the cards and/or numbers and use them to purchase items from Nordstrom, return the items, and then return the items for cash. *Id.* at 4. The Porsche Cayenne was suspected of constituting "proceeds traceable to identity fraud and access device fraud in violation of *18 U.S.C. §§ 1028, 1029.*" *Id.* at 3. Therefore, the vehicle was subject to forfeiture, pursuant to *18 U.S.C. § 981.* Complaint Appendix, Exh. 2.

Consequently, on March 4, 2011, the Maryland State Police seized the vehicle from 1760 Carswell Street, Baltimore, Maryland. Complaint Appendix, Exh. 1. [6] The vehicle was later remanded to the custody of the USSS, which began administrative forfeiture proceedings. *Id.*

> 6   Plaintiff complains that the seizure by the Maryland State Police was made without a warrant. Complaint at 3.

On April 20, 2011, the USSS furnished plaintiff with an "Agreement to Surrender Property." Complaint Appendix, Exh. 1. The Agreement advised plaintiff that administrative forfeiture proceedings [*6] had been initiated and provided that, if plaintiff would voluntarily

relinquish ownership of the vehicle in cooperation wtih the investigation of the alleged violations of federal law related to the purchase of the vehicle, the USSS would not proceed with criminal charges for those alleged violations. *Id.* Plaintiff did not sign the Agreement. *Id.* By letter dated April 28, 2011, the USSS advised plaintiff of her right to contest the forfeiture. Complaint Appendix, Exh. 2. The letter also informed plaintiff that, if she disagreed with the USSS' claim that the property was subject to forfeiture and sought a trial of the matter in a federal district court, she would have to file a Claim of Ownership with the USSS by June 2, 2011. *Id.* However, plaintiff did not file a Claim of Ownership. Instead, she instituted this suit, on May 11, 2011. [7]

> 7   There is no dispute that plaintiff received the proposed Agreement and the letter, as she appended copies of them to her Complaint.

On July 25, 2011, the United States filed a Verified Complaint For Forfeiture in this Court regarding the Porsche. That matter is currently pending before Judge William Quarles, Jr. Motion Memo, Exh. 1. *See United States [*7] v. One 2004 Porsche Cayenne,* WDQ-11-cv-2045 (D. Md.). According to the verified complaint in that case, the vehicle was seized based on facts indicating that the vehicle constituted proceeds traceable to identify fraud and access device, in violation of *18 U.S.C. § 1028, 1029.* [8]

> 8   [HN3] This Court can take judicial notice of its own records in another case if "the prior case is brought into the pleadings in the case on trial or where the two cases represent related litigation." *Thurman v. Robinson, No. 94-6998, 1995 U.S. App. LEXIS 6459, 1995 WL 133350, at *2 (4th Cir. Mar. 28, 1995)* (quoting *United States Fidelity & Guar. Co. v. Lawrenson, 334 F.2d 464, 467 (4th Cir. 1964)).*

**Parties' Contentions**

Plaintiff contends that the initial seizure of the vehicle by the Maryland State Police was executed without a warrant, in violation of her rights under the *Fourth, Fifth,* and *Fourteenth Amendments to the United States Constitution* and Article 26 of the Maryland Declaration of Rights. Complaint at 3, Response at 2. Accordingly, she contends that the federal government has no right to the vehicle. Response at 3. Plaintiff asserts: "[W]hen the state law enforcement agencies

realized their errors they decided to compound their errors [*8] by illegally transferring the property they seized to [the USSS] even though the Secret Service did not file a complaint for forfeiture . . . nor is the U.S. Attorney General's office involved in this matter . . . ." Complaint at 3. Therefore, plaintiff asks this Court to issue an injunction commanding the return of her property. *Id.* at 5. [9]

> 9  In her Complaint, plaintiff repeatedly suggests that her criminal defense attorney, John Denholm, was "complicit" in these events. Complaint at 3; Complaint Appendix, Exh. 3. Further, plaintiff seems to suggest that Denholm rendered ineffective assistance of counsel, for which she intends to raise a *Sixth Amendment* claim. However, Denholm is not a party to this suit, nor is the case *sub judice* a criminal case.

In her Response, plaintiff also asks that the Court "Grant Relief Under the Civil Rights Act Pursuant to *42 U.S.C. Section 1983*, As A Supplemental [sic] To [The] Original Complaint." Response at 1 (caption). Claiming that "the facts clearly show that plaintiff's federal rights were violated," Response at 11, plaintiff attempts to allege a *§ 1983* claim, asserting:

> [S]he has been unconstitutionally deprived of a liberty interest by the defendants [*9] under the illegal authority of state police officers by their failure to comply with clear rights contained in the *United States Constitution's 4th, 5th,* and *14th Amendments* and the mandatory federal and state statutes and Supreme Court common law that implements those fundamental rights.

Response at 12-13.

In addition, plaintiff requests "punitive and accumulative damages." *Id.* at 14. In her Complaint, however, plaintiff had only requested the return of the vehicle. [10]

> 10  Under *FED. R. CIV. P. 15(d)*, a party cannot serve a "supplemental pleading" without leave of court, on motion and with reasonable notice. Notably, supplemental pleadings are intended to deal with "any transaction, occurrence, or event that happened after the date of the pleading to be

supplemented." *Id.* However, in light of the latitude afforded pro se litigants, the Court will construe plaintiff's Response as an attempt to amend her Complaint, pursuant to *FED. R. CIV. P. 15(a)(1)(B)*.

Defendants have moved to dismiss the Complaint on four separate grounds. They contend first that, because the USSS initiated administrative forfeiture before plaintiff filed suit, and because the United States has, subsequent to the filing [*10] of this suit, instituted filed a formal civil forfeiture complaint against the subject property, this Court has been "divested of subject matter jurisdiction" with respect to the underlying complaint. Motion at 2. Second, defendants urge dismissal on the ground that plaintiff failed to exhaust her administrative remedies, as provided by *18 U.S.C. § 983(a)(2)*. *Id.* Given that plaintiff's Complaint could be construed as a motion to compel the Government to initiate civil forfeiture proceedings, defendants also argue that the Complaint is moot, as such proceedings have been initiated. *Id.* Finally, defendants argue that, to the extent plaintiff's Complaint attempts to hold defendants liable for the initial seizure of the vehicle by the Maryland State Police, the Complaint should be dismissed for failure to state a claim. *Id.* at 3. In particular, defendants maintain that, under *18 U.S.C. § 981 (e)*, the United States cannot be held liable in any action arising out of the seizure of property by State officials, where the property is then transferred to the United States. *Id.* In addition, they argue that, under *18 U.S.C. § 981(b)(2)(C)*, the United States is expressly authorized to take custody, [*11] without a warrant, of property seized by a state. Motion Memo at 13.

Plaintiff's Response does not directly address any of the four grounds. Rather, plaintiff reaffirms her belief that the initial seizure of the vehicle was prohibited, *inter alia*, by the *Fourth Amendment, see generally* Response, and argues that the seizure of the vehicle was a taking of private property for public use without just compensation under the *Fifth Amendment*. Response at 14.

## Discussion

I.

[HN4] Federal law provides that the proceeds traceable to violations of *18 U.S.C. § 1028* and *§ 1029* are subject to forfeiture. *See 18 U.S.C. § 1028(g)*; *§ 1029(c)(2)*. The rules governing civil forfeiture are found

in *18 U.S.C. § 981 et seq.* They provide that the United States may seize property subject to forfeiture "without a warrant if the property was *lawfully* seized by a State or local law enforcement agency and transferred to a Federal agency." *18 U.S.C. § 981(b)(2)(C)* (emphasis added). The defendants do not address the gravamen of the complaint--that the property was unlawfully seized by the State, because no warrant was obtained.

[HN5] When property is seized by a state and then remanded to the custody of the United States, the federal [*12] agency receiving the property must provide notice of the seizure to any interested parties within 90 days of the date of the initial seizure. *18 U.S.C. § 983(a)(1)(A)(iv)*. Of import here, it is then incumbent upon an interested party to seek return of the property by pursuing administrative remedies. *18 U.S.C. § 983(a)(2)*. Typically, this would take the form of filing a Claim of Ownership, as plaintiff was directed to file in the letter she was sent by the USSS on April 28, 2011. Complaint Appendix, Exh. 2. If an administrative claim is filed contesting the seizure, the United States must either return the property to the claimant or file a civil forfeiture complaint in a U.S. District Court within 90 days of the filing of the Claim of Ownership. *18 U.S.C. § 983(a)(3)*.

Once a complaint has been filed in federal district court, any interested parties must, to protect their interests, file a claim with the Clerk of the Court asserting their interests, within 30 days of the date of service of the complaint, or within 30 days after the date of final publication of notice of the filing of the complaint. *18 U.S.C. § 983 (a)(4)(A)*. [11] The interested party must then file an answer to the complaint [*13] within 20 days of the filing of the claim. *18 U.S.C. § 983(a)(4)(B)*.

> 11   *See Rule F(4) of the Supplemental Rules* for Admiralty or Maritime Claims and Asset Forfeiture Actions.

Here, the defendant challenges the Court's subject matter jurisdiction. "It is well established that [HN6] before a federal court can decide the merits of a claim, the claim must invoke the jurisdiction of the court." *Miller v. Brown, 462 F.3d 312, 316 (4th Cir. 2006)*. [HN7] *Fed. R. Civ. P. 12(b)(1)* governs motions to dismiss for lack of subject matter jurisdiction. *See Khoury v. Meserve, 268 F. Supp. 2d 600, 606 (D. Md. 2003)*, *aff'd, 85 Fed. App'x 960 (4th Cir. 2004)*. "[A] motion to dismiss under *Rule 12(b)(1)* is nonwaivable and may be brought at any time--even on

appeal-regardless of whether a litigant raised the issue in an initial pleading." *Sucampo Pharms., Inc. v. Astellas Pharma, Inc., 471 F.3d 544, 548 (4th Cir. 2006)*; see *Fed. R. Civ. P. 12(h)(3)* ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

Once a challenge is made to subject matter jurisdiction, the plaintiff bears the burden of proving that the Court has subject matter jurisdiction. *See Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp., 166 F.3d 642, 647 (4th Cir.1999)*; [*14] *see also Ferdinand--Davenport, 742 F. Supp. 2d at 777; Khoury, 268 F. Supp. 2d at 606*. In ruling on a motion under *Fed. R. Civ. P. 12(b)(1)*, the court "should 'regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *Ferdinand--Davenport, 742 F. Supp. 2d at 777* (quoting *Evans, 166 F.3d at 647*); *see also Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir.1991), cert. denied, 503 U.S. 984, 112 S. Ct. 1667, 118 L. Ed. 2d 388 (1992)*. 12 The court should grant a *Rule 12(b) (1)* motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans, 166 F.3d at 647*. I will construe the motion as a motion to dismiss.

> 12   Defendants advise that they have only "moved in the alternative for summary judgment to the extent the Court is inclined to convert the motion into one for summary judgment." Motion Memo at 8 n. 3.

II.

Defendants argue correctly that, [HN8] where administrative remedies are available, a plaintiff generally must exhaust such remedies before pursuing a judicial remedy. *See Ancient Coin Collectors Guild v. U.S. Customs and Border Protection, No. 10-322, 2011 U.S. Dist. LEXIS 87363, 2011 WL 3444343, at *26 (D. Md. Aug. 08, 2011)* [*15] ("When a party seeks judicial review of an agency decision, the party is generally required to 'exhaust prescribed administrative remedies before seeking relief from the federal courts.'" (quoting *Volvo GM Heavy Truck Corp. v. U.S. Dept. of Labor, 118 F.3d 205, 209 (4th Cir.1997)*). Courts have held that this rule encompasses the requirement that claimants seeking the return of property subject to forfeiture proceedings

must first exhaust administrative remedies before filing a judicial action, or else face dismissal of a law suit seeking recovery of the property. *See Malladi Drugs & Pharmaceuticals, Ltd. v. Tandy, 552 F.3d 885, 889-891, 384 U.S. App. D.C. 232 (D.C. Cir. 2009); Cole v. United States (In re U.S. Currency, $844,520.00), 136 F.3d 581, 582 (8th Cir. 1998); Mesa Valderrama v. United States, 417 F.3d 1189, 1197 (11th Cir. 2005).*

Here, plaintiff did not exhaust the administrative remedies available to her before filing suit. On April 28, 2011, plaintiff was informed by letter from the USSS, that the USSS was initiating administrative forfeiture proceedings, and that she had until June 2, 2011, to file a Claim of Ownership, contesting the forfeiture. Plaintiff never filed a Claim of Ownership. Instead, [*16] on May 11, 2011, she instituted this suit. Consequently, plaintiff's failure to exhaust is grounds for dismissal.

Defendants also argue correctly that, [HN9] "once the Government initiates [administrative] forfeiture proceedings, the district court is divested of jurisdiction" over a suit filed by a claimant seeking return of the subject property. *See Ibarra v. United States, 120 F.3d 472, 476 (4th Cir. 1997)* (dismissing plaintiff's suit to recover $153,279.00 in currency she alleged was seized by the Drug Enforcement Administration without probable cause, holding that the court lacked subject matter jurisdiction over claims related to the subject property because administrative forfeiture proceedings had commenced). "Once an administrative forfeiture proceeding has been completed, district courts retain jurisdiction only to 'determine compliance with due process or procedural requirements.'" *Harris v. Drug Enforcement Admin., No. JFM-00-3716, 2001 U.S. Dist. LEXIS 8242, 2001 WL 310974, at *1 (D. Md. Mar. 29, 2001)* (quoting *Ibarra, 120 F. 3d at 475 n. 4).* For example, district courts retain jurisdiction if "a party alleges that the government failed to provide adequate notice of forfeiture, and, as a result, violated [*17] the claimant's due process rights." *Tillman v. U.S., No. AW-08-3362, 2009 U.S. Dist. LEXIS 60314, 2009 WL 2151201, at *1 (D. Md. July 14, 2009).* [13] *See Linarez v. United States Dep't of Justice, 2 F.3d 208, 211-212 (7th Cir. 1993)* ("By initiating administrative forfeiture proceedings pursuant to *19 U.S.C. § 1607* [pertaining to the seizure of property by customs officers], the agency that seized the property divest[ed] the district court of its jurisdiction over the forfeiture proceedings."); *United States v. One Jeep Wrangler, 972 F.2d 472, 479 (2d Cir.*

*1992)* (concluding that, "once the administrative process has begun, the district court loses subject matter jurisdiction to adjudicate the matter in a peripheral setting . . . ."); *United States v. Price, 914 F.2d 1507, 1511, 286 U.S. App. D.C. 249 (D.C. Cir. 1990)* ("[W]e now hold that once the Government initiates an administrative forfeiture proceeding and the property is not the subject of an ongoing criminal proceeding, the District Court has no jurisdiction to resolve the issue of return of property.").

> 13   Plaintiff does not assert here that she was denied due process. Rather, she challenges the seizure of the vehicle. Indeed, plaintiff was notified of the administrative forfeiture [*18] proceedings, based on the copy of the letter she received from the USSS, appended to her Complaint, which informed her of the pendency of the administrative forfeiture proceedings.

On July 25, 2011, after plaintiff filed the underlying Complaint, the United States filed a civil forfeiture complaint in this Court regarding the same property. As noted, that matter is currently pending before Judge Quarles. *See United States v. One 2004 Porsche Cayenne, WDQ-11-cv-2045 (D. Md.).* Defendants posit that the filing of that action "effectively terminated the administrative process." Motion Memo at 11.

The federal district court is, of course, competent to hear the civil forfeiture case assigned to Judge Quarles, as well as "matters directly or collaterally concerning the property." *Tillman, 2009 U.S. Dist. LEXIS 60314, 2009 WL 2151201 at *1.* But, any matters concerning the vehicle must be addressed in that case. [HN10] Civil forfeiture proceedings are *in rem.* Permitting competing actions to each lay claim to the right to adjudicate title to the *res* opens the door to inconsistent results and clouded title.

*Wada v. U.S. Secret Service, 525 F. Supp. 2d 1 (D.D.C. 2007),* offers guidance. There, plaintiff's Bank of America account was [*19] closed and taken into the custody of the USSS pursuant to a warrant issued by the United States District Court for the Eastern District of Michigan (the "Eastern District"). *Id. at 5.* The account was seized after the USSS came to suspect that funds in the account were subject to civil forfeiture because of their relationship to a wire-fraud crime. *Id. at 6.* The USSS initiated administrative forfeiture proceedings and, unlike the plaintiff here, Wada timely filed a claim of

ownership. *Id.* In addition to participating in the administrative forfeiture proceedings, on March 6, 2007, Wada filed suit in federal court in the District of Columbia. The gravamen of her complaint was a demand for the return of the funds in her Bank of America account. *Id.* Thereafter, on May 25, 2007, the United States, in response to Wada's filing of a claim of ownership in the administrative forfeiture proceedings, filed a civil forfeiture complaint regarding the property in the federal court in Michigan. *Id. at 7.* On June 19, 2007, the USSS moved to dismiss the case Wada had filed in federal court in the District of Columbia, arguing that all claims should be heard in the civil forfeiture case in Michigan, [*20] even though that action was commenced after plaintiff initiated her claim in the District of Columbia. *Id.*

The federal court in the District of Columbia noted that D.C. Circuit precedent made clear that, once the USSS has commenced administrative forfeiture proceedings, the district courts are stripped of jurisdiction. Accordingly, the court determined that it

> lacked jurisdiction over Plaintiff's challenge to the forfeiture once the administrative proceeding was initiated, and continues to lack jurisdiction over Plaintiff's challenge now that the civil forfeiture action has been commenced in the Eastern District of Michigan. . . . To the extent that Plaintiff wants to assert such a challenge, she must do so . . . via the ongoing civil forfeiture action in the Eastern District of Michigan, as provided for in *18 U.S.C. § 983*. The Court shall therefore dismiss the instant action for lack of subject matter jurisdiction, insofar as it challenges the forfeiture of assets seized from the [Bank of America] account.

*Id. at 11-12. See also Vega v. U.S., No. 00 Civ. 8920, 2001 U.S. Dist. LEXIS 10207, 2001 WL 823874, at *2 (S.D.N.Y. July 20, 2001)* (Petitioner sought return of property seized by the Government in an independent [*21] civil action pursuant to *FED. R. CRIM. P. 41(e)*; the

Court noted that a civil forfeiture proceeding regarding the same property had been initiated before another judge within the same jurisdiction and dismissed the claim, instructing plaintiff that "[a]ny objections to the civil forfeiture action may be raised in that action").

Although here we are talking about two cases pending before two different judges in the same federal district court, the situation is analogous. It follows that plaintiff's independent civil action is not properly before this Court. Rather, any challenge she has must be raised in the forfeiture case now pending before Judge Quarles. [14]

> 14   Having found adequate grounds to dismiss, the Court will not address the remainder of defendants' arguments. This opinion is without prejudice to plaintiff's entitlement to pursue any rights available to her in the action pending before Judge Quarles. The Court expresses no opinion, however, on the availability to plaintiff of any such rights or remedies.

**Conclusion**

For the foregoing reasons, the Court will grant Defendants' Motion To Dismiss. A separate Order consistent with this Opinion follows.

Date: September 27, 2011

/s/ Ellen Lipton Hollander [*22]

United States District Judge

**ORDER**

For the reasons set forth in the accompanying Memorandum Opinion, it is this 27th day of September, 2011, by the United States District Court for the District of Maryland, ORDERED:

Defendants' Motion To Dismiss (ECF 12) is GRANTED. The Clerk is directed to Close the Case.

/s/ Ellen Lipton Hollander

United States District Judge





Analysis
As of: Jan 13, 2012

**Don Hamrick, Appellant v. George W. Bush, Jr., et al., Appellees**

**No. 02-5334**

**UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

*2003 U.S. App. LEXIS 8364*

**April 30, 2003, Filed**

**NOTICE:** [*1] RULES OF THE DISTRICT OF COLUMBIA CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Subsequent appeal at *Hamrick v. Bush, 63 Fed. Appx. 518, 2003 U.S. App. LEXIS 9428 (D.C. Cir., 2003)*
Related proceeding at *Hamrick v. Brusseau, 2003 U.S. App. LEXIS 10396 (D.C. Cir., May 22, 2003)*
Related proceeding at *Hamrick v. Bush, 2005 U.S. App. LEXIS 4638 (D.C. Cir., Mar. 11, 2005)*
Related proceeding at *Hamrick v. United Nations, 2007 U.S. Dist. LEXIS 77560 (D.D.C., Oct. 19, 2007)*
Related proceeding at *Hamrick v. United States, 2009 U.S. Dist. LEXIS 130874 (D.D.C., Jan. 30, 2009)*
Related proceeding at *Hamrick v. United States, 2010 U.S. Dist. LEXIS 86694 (D.D.C., Aug. 24, 2010)*

**DISPOSITION:** Motion for appointment of counsel denied. Motions for judicial notice denied. Motions to amend record, to submit evidence, and for issuance of subpoenas denied. Motion for leave to file appendix

denied. Motion to substitute party denied. Motion for leave to file petition for writ of certiorari denied. Motions to invite amicus curiae briefs, for rulings on motions dismissed as moot by district court, and for publication denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** On appeal from the United States District Court, appellant seaman moved for appointment of counsel, for judicial notice of adjudicative facts, to amend the record, to submit evidence, for the issuance of subpoenas, for leave to file an appendix, to substitute a party, for leave to file a petition for a writ of certiorari, to invite amicus curiae briefs, for rulings on motions dismissed as moot by the district court, and for publication.

**OVERVIEW:** With the exception of defendants in criminal cases, appellants were not entitled to appointment of counsel when they had not demonstrated any likelihood of success on the merits. The instant court could have only taken judicial notice of facts. Moreover, to the extent the seaman argued that he should not have

2003 U.S. App. LEXIS 8364, *1

been required to pay the appellate filing fee because the district court did not require him to pay its filing fee pursuant to *28 U.S.C.S. § 1916*, the instant court was not bound by the actions of the district court. The seaman provided no reason for the instant court to depart from its general rule not to consider evidence or theories not presented to the district court, nor did he assert that anything material had been omitted, or that the record did not truly disclose what occurred. The seaman's lodged appendix primarily contained legal argument. As to the motion to substitute a party, the seaman had not shown that jurisdiction over the Merchant Marine had been transferred from the Department of Transportation to the Department of Homeland Security. Finally, the seaman did not need the instant court's permission to file a petition for a writ of certiorari.

**OUTCOME:** The motions were denied.

**LexisNexis(R) Headnotes**

*Civil Procedure > Counsel > General Overview*
*Criminal Law & Procedure > Counsel > Assignment*
*Criminal Law & Procedure > Counsel > Right to Counsel > General Overview*
[HN1] With the exception of defendants appealing or defending in criminal cases, appellants are not entitled to appointment of counsel when they have not demonstrated any likelihood of success on the merits.

*Evidence > Judicial Notice > General Overview*
[HN2] A court may only take judicial notice of facts, not legal arguments. *Fed. R. Evid. 201(b)(2)*.

*Evidence > Judicial Notice > Adjudicative Facts > Facts Generally Known*
*Evidence > Judicial Notice > Adjudicative Facts > Verifiable Facts*
[HN3] Pursuant to *Fed. R. Evid. 201(b)(2)*, judicial notice may be taken of a fact that is not subject to reasonable dispute and is generally known within the territorial jurisdiction of the trial court or is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

*Governments > Courts > Judicial Precedents*

[HN4] An appellate court is not bound by the actions of the district court.

*Civil Procedure > Appeals > Reviewability > Preservation for Review*
[HN5] An appellate court's general rule is not to consider evidence or theories not presented to the district court.

*Civil Procedure > U.S. Supreme Court Review > Federal Court Decisions*
[HN6] An appellant does not need permission from the court of appeals to file a petition for a writ of certiorari with the United States Supreme Court.

**COUNSEL:** DON HAMRICK, Appellant, Pro se, Wilburn, AR.

**JUDGES:** BEFORE: Edwards, Sentelle, and Garland, Circuit Judges.

**OPINION**

*ORDER*

Upon consideration of the motion for appointment of counsel; the motions for judicial notice of adjudicative facts and the supplement thereto; the motion to amend the record; the motions to submit evidence; the motion for the issuance of subpoenas; the motion for leave to file an appendix; the motion to substitute a party; the motion for leave to file a petition for a writ of certiorari; the motion to invite [*2] *amicus curiae* briefs; the motion for rulings on motions dismissed as moot by the district court; and the motion for publication; it is

**ORDERED** that the motion for appointment of counsel be denied. [HN1] With the exception of defendants appealing or defending in criminal cases, appellants are not entitled to appointment of counsel when they have not demonstrated any likelihood of success on the merits. It is

**FURTHER ORDERED** that the motions for judicial notice be denied. [HN2] This court may only take judicial notice of facts, not legal arguments. *See Fed. R. Evid. 201(b)(2)* [HN3] (judicial notice may be taken of a fact that is "not subject to reasonable dispute" and is "generally known within the territorial jurisdiction of the trial court" or is "capable of accurate and ready

determination by resort to sources whose accuracy cannot reasonably be questioned"). Moreover, to the extent appellant argues that he should not be required to pay the appellate filing fee because the district court did not require him to pay its filing fee pursuant to *28 U.S.C. § 1916*, [HN4] this court is not bound by the actions of the district court. It is

**FURTHER ORDERED** that the [*3] motions to amend the record, to submit evidence, and for the issuance of subpoenas be denied. Appellant provides no reason for this court to depart from [HN5] its general rule not to consider evidence or theories not presented to the district court, *see Frito-Lay v. Willoughby, 274 U.S. App. D.C. 340, 863 F.2d 1029, 1036 (D.C. Cir. 1988)*; *District of Columbia v. Air Florida, Inc. 243 U.S. App. D.C. 1, 750 F.2d 1077, 1084 (D.C. Cir. 1984)*, nor does he assert that anything "material" has been omitted from the record as it now stands, or that the record does not "truly disclose[] what occurred in district court." *Fed. R. App. P. 10(e)(1), (2)*. It is

**FURTHER ORDERED** that the motion for leave to file an appendix be denied. Appellant's lodged "appendix" primarily contains legal argument, which is properly included in a brief, not an appendix. Because appellant has not sought leave to exceed the word limits on his brief, this motion will be denied. It is

**FURTHER ORDERED** that the motion to substitute a party be denied. Appellant has not shown that jurisdiction over the Merchant Marine has been transferred from the Department of Transportation to [*4] the Department of Homeland Security. *See 46 U.S.C. § 2103*. It is

**FURTHER ORDERED** that the motion for leave to file a petition for a writ of certiorari be denied. [HN6] Appellant does not need permission from this court to file a petition for a writ of certiorari with the Supreme Court. It is

**FURTHER ORDERED** that the motions to invite *amicus curiae* briefs, for rulings on motions dismissed as moot by the district court, and for publication be denied. It is

**FURTHER ORDERED,** on the court's own motion, that the court will dispose of the appeal without oral argument on the basis of the record and the presentation in appellant's brief and the supplement thereto. The court has determined that oral argument will not assist it in this case. *See Fed. R. App. P. 34(a)(2)*; *D.C. Cir. Rule 34(j)*.

*Per Curiam*





Analysis
As of: Jan 13, 2012

### ROGER E. HERST REVOCABLE TRUST, et al., Plaintiffs, v. BLINDS TO GO (U.S.) INC., et al., Defendants.

### Civil Action No. ELH-10-3226

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

### 2011 U.S. Dist. LEXIS 124430

### October 26, 2011, Decided
### October 26, 2011, Filed

**SUBSEQUENT HISTORY:**   As Amended December 20, 2011
Costs and fees proceeding at, Motion granted by *Roger E. Herst Revocable Trust v. Blinds to Go (U.S.) Inc., 2011 U.S. Dist. LEXIS 147032 (D. Md., Dec. 20, 2011)*

**CASE SUMMARY:**

**OVERVIEW:** Although a tenant conceded that it breached a commercial property lease and guaranty when it abandoned the premises, the parties disputed the landlord's claim for damages. After a bench trial, the court found that based on the legal interpretation of the lease, where the landlord relet the property, the tenant was entitled to offset any surplus rent against its "total indebtedness" to the landlord. However, the surplus had to be adjusted due to the "triple net" nature of the lease, and reduced to present value. Many other damage considerations were addressed.

**OUTCOME:** Damages determined.

**LexisNexis(R) Headnotes**

*Real Property Law > Landlord & Tenant > Lease Agreements > Lease Provisions*
[HN1] Under Maryland law, a lease is both a contract and a conveyance of a leasehold estate in land. As such, a lease creates between the parties both privity of contract and privity of estate, and as a result, the obligations which the parties bear to each other may arise out of contract or from the real covenants of the leasehold estate, or sometimes from both.

*Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > General Overview*
*Real Property Law > Landlord & Tenant > Lease Agreements > Commercial Leases > General Overview*
[HN2] At common law, a landlord had three options when a tenant abandoned a commercial lease prior to its expiration. One was to accept a surrender of the lease and thereby terminate the tenancy. An abandonment of the premises may be treated as an offer by the tenant to surrender the lease, which the landlord may accept by

Case 8:10-cv-02822-RWT   Document 57   Filed 01/13/12   Page 23 of 107

Page 2
2011 U.S. Dist. LEXIS 124430, *

reentering the premises for the landlord's own benefit. If the landlord, expressly or by its conduct, accepts the implied offer and effects a surrender, the tenancy is terminated and the tenant's obligation to pay further rent is also terminated. The landlord may, as a second option, reenter the premises for the account of the tenant, attempt to re-let the property for the tenant's benefit, and hold the tenant liable for any rent that had accrued at the time of the reentry as well as any future deficiency if the premises were unable to be re-let or were re-let at a lower rent than was reserved under the lease. Finally, under the traditional common law rule, the landlord could do nothing and hold the tenant liable for the entire amount of rent payable during the remaining term of the lease.

*Real Property Law > Landlord & Tenant > Lease Agreements > Commercial Leases > General Overview*
*Real Property Law > Landlord & Tenant > Lease Agreements > Damages > Mitigation*
*Real Property Law > Landlord & Tenant > Lease Agreements > Residential Leases*
[HN3] The common law option for a landlord to do nothing and hold the tenant liable for the entire amount of rent has been statutorily abrogated for residential leases in Maryland, and the more contemporary common law has sought to achieve the same result with respect to commercial leases. In other words, under the modern rule a landlord may not remain idle when the tenant abandons the premises without legal excuse for so doing. He must make an effort to mitigate his damages as a condition of recovery against the tenant.

*Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > General Overview*
*Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > Rent Recovery*
*Real Property Law > Landlord & Tenant > Lease Agreements > Damages > Mitigation*
[HN4] With respect to a landlord's option to accept a tenant's surrender of the lease, the landlord becomes free of the tenancy and may again deal with the property unfettered by it, but the tenant's obligation to pay rent ceases. To gain the advantage of a surrender but avoid that consequence of termination of the tenant's monthly rent obligation, landlords began to insert in leases provisions making the tenant liable for the amounts of rent reserved in the lease, notwithstanding any entry or termination by the landlord upon the tenant's default, and to rely on contract law, rather than property law, for the

enforcement of that obligation. That, in turn, rests on the proposition that a lease is both a contract and a conveyance of a leasehold estate in land. The inclusion of such a provision often shifts the focus away from whether a completed surrender occurred, because, even if it did, the tenant may remain liable for the amount of rent reserved in the lease as a matter of contract law. The difference is that the claim is not for the post-surrender rent itself which, under property law, is no longer owed, but for damages arising from breach of the contract.

*Contracts Law > Remedies > Avoidable Consequences*
*Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > Power to Reenter & Terminate*
*Real Property Law > Landlord & Tenant > Lease Agreements > Damages > Mitigation*
[HN5] Whether seeking to recover rent under property covenants on the theory that a surrender has not occurred or to recover contract damages under contract law, a landlord has its own obligation to mitigate damages. When one party breaches a contract, the other party is required by the "avoidable consequences" rule of damages to make all reasonable efforts to minimize the loss sustained from the breach and can charge the defaulting party only with such damages as, with reasonable endeavors and expense and without risk of additional substantial loss or injury, he could not prevent. That principle applies as well to damages resulting from a tenant's abandonment of leased premises.

*Evidence > Procedural Considerations > Weight & Sufficiency*
*Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > General Overview*
*Real Property Law > Landlord & Tenant > Lease Agreements > Damages > Mitigation*
[HN6] In Maryland, after a tenant's surrender, which a tenant tenders by abandoning the premises, a landlord's reletting beyond the original term is evidence of an intent to accept the surrender, although it is not conclusive of that intent, as a matter of law, in the face of other evidence from which a contrary intent can be inferred. In other words, a reletting beyond the original term is not the acceptance of a surrender as a matter of law where there is evidence from which the trier of fact could find that the landlord did not intend that result.

*Contracts Law > Remedies > Avoidable Consequences*

*Contracts Law > Remedies > Compensatory Damages > General Overview*

*Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > Rent Recovery*

*Real Property Law > Landlord & Tenant > Lease Agreements > Damages > Compensatory Damages*

[HN7] Because a tenant is contractually obligated to pay rent even after acts that could be considered a termination of the lease as a matter of real property common law, it is plain that damage principles under contract law apply. In particular, plaintiffs have the "obligation to mitigate damages." It is also salient that, in most contract cases, the law of compensatory damages applies, providing a standard measure of compensation limited to the amount of injury incurred under a breach of the contract. The measure of damages for breach of contract is that the injured party has a right to damages based on his expectation interest as measured by: (a) the loss in the value to him of the other party's performance caused by its failure or deficiency; plus (b) any other loss, including incidental or consequential loss, caused by the breach; less (c) any cost or other loss that he has avoided by not having to perform.

*Evidence > Judicial Admissions > Admissions During Trials*

[HN8] Under federal law, stipulations are generally binding on the parties and a court. Having agreed on a set of facts, the parties who adopted the stipulation, and the court, must be bound by them; courts are not free to pick and choose at will. However, a district court is entitled to disregard a stipulation if to accept it would be manifestly unjust or if the evidence contrary to the stipulation is substantial.

*Civil Procedure > Remedies > Costs & Attorney Fees > Costs > General Overview*

*Contracts Law > Remedies > Compensatory Damages > General Overview*

[HN9] It is the "general rule" in Maryland that costs and expenses of litigation, other than the usual and ordinary court costs, are not recoverable in an action for damages, in the absence of a contractual provision to the contrary.

*Evidence > Procedural Considerations > Weight & Sufficiency*

*Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > General Overview*

*Real Property Law > Landlord & Tenant > Lease Agreements > Mitigation*

[HN10] A reletting beyond the original term of a lease is not the acceptance of a surrender as a matter of law where there is evidence from which the trier of fact could find that a landlord did not intend that result.

*Contracts Law > Remedies > Compensatory Damages > General Overview*

*Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > Rent Recovery*

*Real Property Law > Landlord & Tenant > Lease Agreements > Damages > Mitigation*

[HN11] Courts have held that a defaulting tenant is not entitled to credit for excess rent. If there is an inequity that must fall on either of the parties, it should fall on the party who breached the lease. The defaulting tenant should not get the benefit of his breach. In contrast, other decisions have taken the view that a landlord is required to credit the first tenant with the amount of the excess rent realized from a substitute tenant to whom landlord had relet the abandoned property. Once a landlord does relet the abandoned premises, he can no longer hold the original tenant for the full amount of the rent, rather only for the deficiency; he must credit him with the amount received from the reletting. In fixing the amount of damages, the general purpose of the law is, and should be, to give compensation, that is, to put the plaintiff in as good a position as he would have been had the defendant kept his contract. In its view, fair compensation involves not only assessment of gains prevented by the breach but also of losses ensuing which would not have occurred had the contract been performed. From these must be deducted any saving to the plaintiff due to the non-performance of the contract.

*Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > Power to Reenter & Terminate*

*Real Property Law > Landlord & Tenant > Lease Agreements > Damages > Mitigation*

*Real Property Law > Landlord & Tenant > Lease Agreements > Lease Provisions*

[HN12] In the absence of a lease provision to the contrary, a defaulting tenant is entitled to the benefit of any excess rent realized from reletting, but contract damages for breach of a lease can only be ascertained when the term is at an end, resulting in a judgment that is single and entire, not multiple and several. A damage clause can be drawn in such a way as to make a tenant

2011 U.S. Dist. LEXIS 124430, *

responsible for monthly deficits after the re-entry of his landlord without charging the landlord with a duty to account for a surplus in other seasons, but a liability so heavy may not rest upon uncertain inference. A tenant is entitled to the benefit of surpluses from reletting in the absence of a provision that points with reasonable clearness to a different construction.

*Civil Procedure > Judgments > Entry of Judgments > General Overview*
[HN13] Once a court enters judgment, an underlying contract will be merged into final judgment and will cease to exist as an independent cause of action.

*Civil Procedure > Remedies > Judgment Interest > Postjudgment Interest*
[HN14] The federal post-judgment interest rate, established by *28 U.S.C.S. § 1961*, is a rate equal to the weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment, *§ 1961(a)*, and is "compounded annually." *§ 1961(b)*.

*Real Property Law > Landlord & Tenant > Lease Agreements > Damages > General Overview*
[HN15] Discounting to present value the sums of money that are anticipated to accrue in the future is a familiar methodology for determination of damages. In Maryland, discounting to present value is most commonly at issue in wrongful death and personal injury cases, in which the amounts that must be discounted to present value include the loss of the earning capacity of the decedent or the plaintiff. In the landlord-tenant context, discounting to present value has been endorsed by the Supreme Court, which held, in the context of a proceeding between a landlord and a tenant's trustee in bankruptcy, that the amount of the landlord's claim for the loss of his lease necessarily is the difference between the rental value of the remainder of the term and the rent reserved, both discounted to present worth. This is a method of liquidation familiar and fair. In order to discount a future amount to present value, an appropriate discount rate must be selected. Reduction to present value requires a mathematical computation. Its aim is to find and award a sum of money which, when invested safely, will suffice to pay all of the future damages as they occur by using both the award itself and the interest it earns.

*Evidence > Judicial Notice > Scientific & Technical Facts*
*Real Property Law > Landlord & Tenant > Lease Agreements > Damages > General Overview*
[HN16] The mathematical formula for discounting to present value, such as in the case of damages in a landlord-tenant context, is a proper subject of judicial notice.

*Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest*
[HN17] The Fourth Circuit has held that state law applies to questions involving prejudgment interest in diversity cases. In Maryland, prejudgment interest accrues at the constitutionally established "legal rate" of six percent simple interest per annum, *Md. Const. art. III, § 57*, unless otherwise specified in the parties' contract or a superseding statute.

*Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Real Property Law > Landlord & Tenant > Lease Agreements > Damages > General Overview*
[HN18] There are three basic rules governing the allowance of pre-judgment interest in Maryland. First, prejudgment interest is allowable as a matter for right in cases where the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment. This category of cases in which prejudgment interest is awarded as of course includes cases involving written contracts to pay money on a day certain, as well as actions for sums payable under leases as rent. Second, prejudgment interest is not allowed in tort cases where the recovery is for bodily harm, emotional distress, or similar intangible elements of damage not easily susceptible of precise measurement. Finally, between these poles of allowance as of right and non-allowance is a broad category of contract cases in which the allowance of pre-judgment interest is within the discretion of the trier of fact. However, within the third category of case, it is an abuse of discretion to award prejudgment interest where the "precise damages" are unpredictable and incapable of estimation prior to verdict.

*Civil Procedure > Remedies > Costs & Attorney Fees >*

*Attorney Expenses & Fees > General Overview*
*Contracts Law > Remedies > Compensatory Damages >*
*General Overview*
[HN19] Attorney's fees recoverable pursuant to a contract are part of the damages claim.

**COUNSEL:** [*1] For Roger E. Herst Revocable Trust, dated February 2, 2000, Roger E. Herst, Trustee of the Roger E. Herst Revocable Trust, dated February 2, 2000, Joshua R. Herst, Plaintiffs: Thomas E Lynch, III, LEAD ATTORNEY, Miles and Stockbridge, Frederick, MD; G Randall Whittenberger, Miles and Stockbridge PC, Frederick, MD.

For Blinds to Go (U.S.) Inc., Defendant: Christopher Curtis Fogleman, LEAD ATTORNEY, Gleason Flynn Emig and Fogleman, Rockville, MD; William J Chen, III, Gleason Flynn Emig and Fogleman Chartered, Rockville, MD.

For Blinds to Go Inc., Defendant: Christopher Curtis Fogleman, LEAD ATTORNEY, Gleason Flynn Emig and Fogleman, Rockville, MD.

**JUDGES:** Ellen Lipton Hollander, United States District Judge.

**OPINION BY:** Ellen Lipton Hollander

**OPINION**

**AMENDED MEMORANDUM OF DECISION**

Plaintiffs, Roger E. Herst Revocable Trust; Dr. Roger E. Herst, Trustee of the Roger E. Herst Revocable Trust; and Joshua R. Herst, filed suit in the Fall of 2010 against Blinds to Go (U.S.) Inc. and Blinds to Go Inc. (collectively, "BTG" or "Tenant"). [1] As to Blinds to Go (U.S.) Inc., plaintiffs alleged in Count I that defendant breached a commercial lease agreement (the "Lease" or the "BTG Lease"), dated September 21, 2000, for real property located [*2] at 5525 Urbana Pike, in Frederick, Maryland (the "Property"). The Lease had a fifteen-year term, and BTG utilized the Property as a retail store. In Count II, plaintiffs claimed that Blinds to Go Inc., the Canadian parent company of Blinds to Go (U.S.) Inc., breached its Guaranty of Lease, also dated September 21, 2000 (the "Guaranty"). Defendants concede that they breached both the Lease and the Guaranty when the Tenant abandoned the Property. However, they dispute

plaintiffs' claim for damages.

1   Suit was filed in the Circuit Court for Frederick County, Maryland. BTG removed the case to federal court on the basis of diversity jurisdiction. *See 28 U.S.C. §§ 1332(a), 1441.*

The case was tried to the Court, without a jury, on October 3 and 4, 2011. The Court issued its original Memorandum of Decision, including findings of fact and conclusions of law, in compliance with *Rule 52(a) of the Federal Rules of Civil Procedure.* [2] See ECF 53, 59.

2   Both the original Memorandum of Decision and this Amended Memorandum of Decision were prepared without the benefit of a trial transcript.

**Factual Background**

At trial, plaintiffs presented the testimony of Dr. Roger Herst, plaintiff; Lee Engle and Jeffrey Banks of StreetSense Retail Advisors, LLC; and Scott Manhoff. Defendants presented [*3] the testimony of Lynda Tanguay, BTG's Director of Legal Affairs; and Rory S. Coakley. Mr. Manhoff was received as an expert witness in the field of commercial real estate and leasing, and Mr. Coakley was received as an expert in commercial leasing and management. Mr. Engle and Mr. Banks testified as hybrid fact/expert witnesses; Mr. Engle and Mr. Banks both worked for the company hired by Dr. Herst to relet the Property after the breach, and both testified as experts in commercial real estate and leasing. The parties introduced numerous exhibits and stipulated to several facts, some of which were memorialized in the Revised Pretrial Order (ECF 42). The following findings of fact are drawn from the evidence presented at trial.

A. The Property and the BTG Lease

The Property is a free-standing building consisting of approximately 3,500 square feet. *See* Plaintiffs' Exhibits 45A -- 45R (photos depicting the premises). It is located in the Riverview Plaza shopping mall, which contains several other retail establishments, including some large "box" or anchor stores, such as Home Depot.

On or about September 21, 2000, Crest Net Lease, Inc. ("Crest Net"), as the landlord, and Blinds to Go (U.S.) [*4] Inc., as the tenant, executed the Lease (Plaintiffs' Exhibit 1). On the same date, Blinds to Go

Inc. executed the Guaranty. On August 21, 2001, Crest Net assigned its rights under the Lease and the Guaranty to plaintiffs, who became the fee owners of the Property (hereinafter, plaintiffs are sometimes referred to collectively as "Landlord"). [3] See Plaintiffs' Exhibit 3. The validity of the Lease, the Guaranty, and the assignment are undisputed.

> 3    Plaintiffs do not own any of the other properties located in the Riverview Plaza.

Although the Lease was dated September 21, 2000, its "effective date" (also characterized as the "Commencement Date") is defined as the "date upon which escrow is deemed closed pursuant to [a] certain Purchase Agreement and Escrow Instructions" executed contemporaneously with the Lease. BTG Lease § 3.1. [4] But, the term of the Lease and the rental obligation are based on the "Rent Commencement Date." It is defined to occur on the earlier of 180 days after the Commencement Date or upon the issuance of a certificate of occupancy for the Property, but in no event later than July 29, 2001. See BTG Lease § 4.2. The parties agree that the Rent Commencement Date under the [*5] Lease occurred on July 29, 2001.

> 4    The "Purchase Agreement and Escrow Instructions" were not placed in evidence, and the parties did not make the Court aware of the actual Commencement Date of the Lease. However, neither the term of the Lease nor the onset of Tenant's rental obligation is directly dependent upon the Commencement Date.

The "Primary Term" of the Lease is defined as a term expiring on the last day of the month fifteen years after the Rent Commencement Date. See BTG Lease § 3.1. [5] Thus, the fifteen-year Primary Term expires on July 31, 2016. The Lease also contains three options to extend the term by five years each. See BTG Lease §§ 3.2 - 3.4.

> 5    The Lease specified that the Primary Term would run from the date that a certificate of occupancy was issued, if that date was later than the Rent Commencement Date. But, it does not appear that that eventuality occurred.

Under the Lease, Tenant was obligated to pay monthly rent on the "first day of each calendar month" following the Rent Commencement Date. See BTG Lease § 4.2. Thus, defendants' rent obligation began on August 1, 2001. Moreover, the monthly rent was scheduled to increase on an "Adjustment Date" set for the first day [*6] of the month following each five-year anniversary of the Rent Commencement Date. See BTG Lease § 5.1.1. The amount of this increase was to be calculated via a formula based, in part, upon the Consumer Price Index, as published by the Bureau of Labor Statistics, United States Department of Labor. See BTG Lease §§ 5.1 & 5.1.3. [6] The parties agree that the amount of the monthly rent at the time of BTG's breach (which occurred during the second five years of the Primary Term) was $ 8,428.33. It is also undisputed that, as of the rental payment due on August 1, 2011 (the ten-year Adjustment Date under the Lease), the Tenant's monthly rental obligation increased to $ 9,271.16.

> 6    The original amount of the monthly rent was calculated according to a formula based on the "Total Investment" by the original landlord, Crest Net, as defined in a "Development Agreement" that is not contained in the record. See BTG Lease § 4.2.

The Lease is "triple net," meaning that the Landlord was not obligated to make any payments in connection with expenses associated with the Property. Rather, the Tenant was responsible for payment of all utilities, taxes, maintenance, and repair of the Property. As a result, the [*7] entire amount of rent was "net" to the Landlord. See BTG Lease § 4.1.

Section 17.3 of the Lease provides for a "Late Charge" of 3% of the monthly rent on any occasion that the rent was not paid when due. Three percent of the $ 8,428.33 monthly rent in effect at the time of defendants' breach amounts to a late charge of $ 252.85 for each month in which the rent was not timely paid. "In addition to the late charge," the Lease makes explicit that Tenant would incur interest on "any and all rent or other charges which Tenant is obligated to pay to Landlord." Id. In particular, the Lease states that any "amount not paid by one party to the other when due to the other party will bear interest from the date due" at a rate equal to the prime commercial rate being charged by Bank of America N.A. on the date due, plus 2% per annum. BTG Lease § 17.6. The parties stipulated that, throughout the relevant period, the applicable interest rate charged by Bank of America has been 3.25%. Thus, they agree that the contractual rate of interest under the Lease is 5.25%

per annum for purposes of this case. With respect to the interest rate, § 17.3 of the Lease specifically provides that "Landlord and Tenant [*8] agree that this sum is reasonable to compensate Landlord for the loss of the use of funds."

The Lease contains a choice of law provision, which states: "This Lease shall be construed and enforced in accordance with the laws of the state in which the Premises are located." BTG Lease § 28.8. Accordingly, the Lease is governed by Maryland law.

The Lease also contains several detailed provisions concerning the rights of the parties in the event of Tenant's default. I will address those provisions in the discussion, *infra*.

B. Breach of the BTG Lease

On or about August 31, 2009, BTG abandoned and vacated the premises, in breach of the Lease. By letter dated September 1, 2009 (Plaintiffs' Exhibit 4), BTG notified plaintiffs of the decision to vacate. The letter was signed by Lynda Tanguay on behalf of Stephen Shiller, the president of Blinds to Go (U.S.) Inc. In the letter, BTG advised that, effective immediately, it would "cease paying any and all rent and additional rent otherwise payable under the lease, including, without limitation, utility costs, service costs and/or fees payable under maintenance contracts applicable to the Store." Ms. Tanguay explained that the action was part of an overall [*9] business restructuring plan, in which BTG had determined that it was necessary to close the Riverview Plaza store, as well as several others across the United States and Canada. [7] She also observed that "the rental rate currently paid by Blinds To Go under the Lease is well below the rates being paid by tenants of similar properties under new leases in the market area in which the store is located." Therefore, she suggested that it is in "the parties' best interests to terminate the Lease (and the obligations of the parties thereunder) and permit Landlord to directly recover the entirety of such excess rent." For this reason, Ms. Tanguay maintained that "the Landlord will not suffer any damages." Defendants enclosed the keys to the Property with the letter.

7 Ms. Tanguay testified that, since 2009, BTG has closed approximately 25 stores.

Since the date that BTG vacated (August 31, 2009), defendants have not satisfied any of their financial

obligations under the Lease. Ms. Tanguay conceded in her testimony that BTG breached the Lease by failing to pay rent after August 2009.

By letter of September 2, 2009, Dr. Herst responded to Ms. Tanguay. *See* Plaintiffs' Exhibit 5. He stated: "This is [*10] to notify Blinds to Go that the Owners fully reject the unilateral termination set forth in your letter of September 1, 2009 of your lease for store 315 in Frederick, Maryland." Further, he stated: "The Owners will hold Blinds to Go responsible for payment of all rent and expenses as described in the lease through February 2, 2016." [8]

8 At trial, Dr. Herst explained that, at the time he wrote the letter, he had miscalculated the expiration date of the Lease term. There was no dispute at trial that the initial term of the Lease actually extends until the end of July 2016, and that the monthly rent under the Lease was scheduled to increase beginning in August 2011.

C. Procurement of Replacement Tenant

Promptly after receipt of Ms. Tanguay's letter, Dr. Herst inspected the Property and, on September 15, 2009, he executed an Exclusive Leasing/Sales Agreement (Plaintiff's Exhibit 6) with StreetSense Retail Advisors, LLC ("StreetSense"), by which StreetSense would act as plaintiffs' agent in procuring a new tenant for the Property. Pursuant to Exhibit A of the Exclusive Leasing/Sales Agreement, plaintiffs agreed to pay StreetSense a commission, to be "split equally" between StreetSense and the [*11] "cooperating broker" representing the new tenant. Plaintiffs agreed that the total amount of the commission would be "equal to Five Percent (5%) of the total value of the minimum guaranteed rental price . . . for the Initial Lease Term not to exclude ten (10) years." The evidence indicated that, at that time, StreetSense's standard commission rate was at least 6%, but Dr. Herst convinced StreetSense to accept the lower rate of 5%, by which the two opposing brokers would each receive a commission equal to 2.5% of the total rent anticipated during the initial term of the new tenant's lease.

In the Fall of 2009, Dr. Herst and StreetSense explored a number of potential tenants for the Property. In particular, Mr. Engle of StreetSense testified that he contacted Ryan Wilner, an agent with the real estate brokerage firm KLNB, to determine whether any of

KLNB's clients would be interested in the Property. Among KLNB's clients was Vitamin Shoppe Industries, Inc. ("Vitamin Shoppe"), a national retailer of vitamins and nutritional supplements.

According to Ms. Tanguay, BTG was also attempting to procure a replacement tenant for the Property. She testified that she corresponded with Corey Bialow [*12] ("Mr. Bialow") of Bialow Real Estate, LLC ("Bialow"), who had worked as a real estate agent for BTG in the past, and advised him that the Property was available for lease. She asked him to contact Dr. Herst if any of Bialow's clients were interested. Vitamin Shoppe was also one of Bialow's clients.

It is not entirely clear from the evidence (and I need not resolve) whether Bialow or KLNB was primarily responsible for kindling Vitamin Shoppe's interest in the Property; it is clear that both Bialow and KLNB became involved in the transaction on behalf of Vitamin Shoppe. On November 30, 2009, an officer of Vitamin Shoppe, acting on behalf of Vitamin Shoppe, sent a letter of intent to Wilner of KLNB, see Defendants' Exhibit 1, expressing Vitamin Shoppe's interest in the Property and outlining the terms on which Vitamin Shoppe would agree to lease it. Notably, the letter of intent stated that it was "anticipated that delivery of the premises will occur on or about January 3, 2011." [*13] Defendant's Exhibit 1, at 2. The letter of intent ultimately was transmitted to Dr. Herst, who countersigned it on December 7, 2009. Thereafter, plaintiffs and Vitamin Shoppe proceeded to negotiate the terms of a lease.

On or about August 3, 2010, plaintiffs and Vitamin Shoppe executed a lease agreement for the Property (the "Vitamin Lease," Plaintiffs' Exhibit 7). [9] The initial term of the Vitamin Lease was ten years, beginning on the Commencement Date, with two options to renew for subsequent five-year terms. The Vitamin Lease provides, in paragraph D of the Preamble, for a "Projected Delivery Date" no earlier than September 1, 2010. Under paragraph F of the Preamble, the "Commencement Date" was set at 90 days after the Delivery Date, or on the date when Vitamin Shoppe opened for business to the public, whichever occurred earlier. The parties' experts described this maximum-90-day period as a "build-out" period. Both parties' experts agreed that such a period is common in the leasing of retail property. During the build-out period, Vitamin Shoppe was not obligated to pay rent. [10]

9   The provisions of the Vitamin Lease with

respect to the duration of the lease term, the monthly rental [*14] rate, the build-out period, and the tenant improvement allowance were all consistent with terms that Vitamin Shoppe originally proposed in its letter of intent. These terms are discussed in more detail, infra.

10   Indeed, BTG enjoyed a similar 180-day build-out period between the Commencement Date and the Rent Commencement Date under the BTG Lease.

Paragraph I of the Preamble establishes the "Fixed Rent" as $ 126,000 per year, payable in monthly installments of $10,500, for the first five years of the term; and $ 138,600 per year for the second five years of the term, payable in monthly installments of $ 11,550.

Under paragraph P of the Preamble, the Vitamin Lease provides for a "tenant improvement allowance of $ 87,500." However, rather than requiring plaintiffs to pay $ 87,500 directly to Vitamin Shoppe, Section 2.05 of the Vitamin Lease established that the tenant improvement allowance would be disbursed "in the form of a credit reduction to be applied towards Fixed Rent due and payable . . . to reimburse Tenant for certain of the actual, out-of-pocket costs . . . incurred by Tenant in connection with Tenant's Work." The tenant improvement allowance of $ 87,500 was worth 8 1/3 months of Vitamin [*15] Shoppe's rent at the initial rate of $ 10,500 per month. Thus, the parties agree that the tenant improvement allowance permitted Vitamin Shoppe to occupy the Property for 8 1/3 months after the Commencement Date, before it had to pay rent to plaintiffs.

In contrast to the BTG Lease, the Vitamin Lease was not a "triple net" lease. Article 5 of the Vitamin Lease obligates Landlord to pay all real estate taxes applicable to the Property, and Landlord is also required to pay the cost of repair and maintenance of the Property under Article 12 of the Vitamin Lease, except for certain specific maintenance obligations that Vitamin Shoppe assumed. Under Article 8, Vitamin Shoppe is responsible for payment for utilities.

Nevertheless, Article 5 of the Vitamin Lease requires Vitamin Shoppe to reimburse the Landlord for the "Tenant's Pro Rata Share" of all "Real Estate Taxes" that accrue during the real estate tax fiscal year, in equal monthly installments. See Vitamin Lease, art. 5B-E. In turn, the Vitamin Lease defines the "Tenant's Pro Rata Share" as 100%. See id., Preamble, Paragraph J. Dr. Herst

testified at trial, and the bank statements entered into evidence reflect, *see* Plaintiffs' Exhibit 46, that Vitamin Shoppe has paid its monthly real estate obligation to the Landlord.

The evidence showed, and the parties agree, that the Delivery Date of the Vitamin Lease actually occurred on September 1, 2010, as projected, and that the lease's Commencement Date was December 1, 2010. Thus, based on the tenant improvement allowance and the build-out period, Vitamin Shoppe did not pay any rent to plaintiffs until August 2011, when it made its first rental payment in the amount of $ 7,000, representing 2/3 of its monthly rental obligation. Vitamin Shoppe paid the [*16] full monthly rent of $ 10,500 for September 2011. 11 Pursuant to the Vitamin Lease, Vitamin Shoppe's monthly rental obligation will increase to $ 11,550 as of the payment due on December 1, 2015, which is five years after the Commencement Date. The initial ten-year term of the Vitamin Lease will expire on November 30, 2020.

> 11    Trial began on Monday, October 3, 2011, which was the first business day in October 2011, and presumably was the date when Vitamin Shoppe's October rent would have been paid. There was no testimony that Vitamin Shoppe failed to pay its rent for October 2011.

Notably, although Dr. Herst agreed, at the outset of the search for a replacement tenant, to pay a broker's commission of 5% of the anticipated rent for the initial term of the lease, two subsequent developments affected the amount of the commission that plaintiffs ultimately paid. First, the involvement of both KLNB and Bialow as brokers for Vitamin Shoppe resulted in an increase in the percentage rate of the brokers' commission. Second, Dr. Herst negotiated with the brokers regarding the effect on the amount of the commission of the tenant improvement allowance and the "build-out" period.

As noted, with respect [*17] to the percentage rate of the commission, Dr. Herst had originally agreed to pay a commission of 5%, with the understanding that StreetSense and the tenant's broker would share equally the 5% payment. However, the testimony of Dr. Herst and Messrs. Engle and Banks of StreetSense indicated that KLNB and Bialow, Vitamin Shoppe's brokers, were unwilling to split the 2.5% commission allocated to the tenant's broker. Moreover, StreetSense was unwilling to accept any less than 2.5% for its own efforts.

Accordingly, Dr. Herst orally agreed to increase the commission to 6.5%, with 2.5% to be paid to StreetSense and the remaining 4% to be split between Vitamin Shoppe's two brokers.

With respect to the tenant improvement allowance and the build-out period, Dr. Herst argued to the brokers that because he would not actually receive rent from Vitamin Shoppe until after the expiration of the 90-day build-out period and the 8-1/3-month period covered by the tenant improvement allowance, the commission should be reduced. In Dr. Herst's view, the build-out period and the tenant improvement allowance amounted to Vitamin Shoppe receiving 11 1/3 months of "free rent." Thus, for purposes of calculating [*18] the 6.5% brokers' commission, Dr. Herst asked the brokers to "back out" or deduct 11 1/3 months from the total rent to be received over the ten-year term. The brokers were unwilling to do so, but agreed instead, as a "compromise," in Mr. Engle's words, to deduct seven months of rent. 12

> 12    According to Mr. Engle, the seven-month figure was arrived at by summing the three-month build-out period with four more months, representing approximately half of the tenant improvement allowance period. Notably, Mr. Engle was of the view that Dr. Herst's request to deduct the build-out period was "atypical." Plaintiffs' expert, Mr. Manhoff, also agreed that it made little sense to "back out" the build-out period from the total rent, because the build-out period was "not commissionable" in the first place. In other words, because Vitamin Shoppe's ten-year rental obligation did not begin until after the conclusion of the build-out period, rent for the build-out period would never have been included in the commission calculation in any event.

According to Dr. Herst and Mr. Engle, the end result of the two changes to the calculation of the commission was that Dr. Herst and the brokers ultimately agreed [*19] to calculate the commission based on 6.5% of the total amount of rent to be received over the ten-year initial term of the Vitamin Lease, less seven months' worth of rent. The evidence showed that Dr. Herst, in fact, paid a commission totaling $ 81,218 to StreetSense, in two equal installments. It is apparent that the amount of $ 81,218 was derived in the following manner, consistent with the agreement between plaintiffs and the

brokers:

| | |
|---|---|
| $ 126,000 (annual Vitamin Shoppe rent in 1st 5 yrs.) × 5 yrs | = $ 630,000 |
| $ 138,600 (annual Vitamin Shoppe rent in 2nd 5 yrs.) × 5 yrs | = + $ 693,000 |
| Total Ten Year Rental Income | = $ 1,323,000 |
| Less 7 months × $ 10,500 (initial monthly rental rate) | = - $ 73,500 |
| | $ 1,249,500 |
| | × 6.5% |
| Total Commission (rounded to nearest dollar) [13] | = $ 81,218 |

13   The result of the calculation is actually $ 81,217.50. Notably, the invoices Dr. Herst received from StreetSense specified a "Commission Factor" of "2.75," rather than the 2.5% that Dr. Herst and Mr. Engle testified StreetSense was to receive. Mr. Engle could not explain the 2.75 figure as anything other than a misprint, and it is apparent that a 2.75% figure was not used in the calculation of the actual amount paid by plaintiffs.

Additional facts [*20] will be included in the discussion.

## Discussion

As noted, defendants concede that they breached the Lease and the Guaranty. Indeed, the parties agree as to many of the underlying facts, although they disagree as to the amount of plaintiffs' damages. The resolution of their disputes turns on the legal interpretation of the BTG Lease, and the reasonableness, recoverability, and accuracy, vel non, of certain items of damages sought by plaintiffs. Because the Lease is governed by Maryland law, I will begin with a brief review of Maryland law regarding leases of commercial property, as well as the provisions of the BTG Lease that govern the parties' remedies in the event of a breach. I will then turn to the particular areas of dispute.

A. Maryland Law Regarding Commercial Leases

[HN1] Under Maryland law, "a lease is both a contract and a conveyance of a leasehold estate in land." *Circuit City Stores, Inc. v. Rockville Pike Joint Venture*

*Ltd. P'ship, 376 Md. 331, 355, 829 A.2d 976, 989 (2003).* As such, a lease "creates between the parties both privity of contract and privity of estate, and . . . as a result, 'the obligations which the parties bear to each other may arise out of contract or from the [*21] real covenants of the leasehold estate, or sometimes from both.'" *Id.* (quoting *Arthur Treacher's Fish & Chips of Fairfax, Inc. v. Chillum Terrace Ltd. P'ship, 272 Md. 720, 727, 327 A.2d 282, 286 (1974)).*

In *Circuit City*, the Maryland Court of Appeals reviewed the traditional common law doctrines, deriving from property law, governing a landlord's options when a tenant breached a lease, and discussed the trend, particularly in commercial leasing, toward the use of contractual provisions to augment or supplant the parties' rights at common law. With respect to the common law, the court explained, *id. at 353, 829 A.2d at 988-89:*

> [HN2] At common law, a landlord had three options when a tenant abandoned a commercial lease prior to its expiration. One was to accept a surrender of the lease and thereby terminate the tenancy. The RESTATEMENT (SECOND) OF PROPERTY § 12.1 notes that an abandonment of the premises may be treated as an offer by the tenant to surrender the lease, which the landlord may accept by reentering the premises for the landlord's own benefit. If the landlord, expressly or by its conduct, accepts the implied offer and effects a surrender, the tenancy is terminated and the tenant's [*22] obligation to pay further rent is also terminated. The landlord may, as a second option, reenter the premises

for the account of the tenant, attempt to re-let the property for the tenant's benefit, and hold the tenant liable for any rent that had accrued at the time of the reentry as well as any future deficiency if the premises were unable to be re-let or were re-let at a lower rent than was reserved under the lease. Finally, under the traditional common law rule, the landlord could do nothing and hold the tenant liable for the entire amount of rent payable during the remaining term of the lease. [14]

14 The *Circuit City* Court noted that [HN3] this third common law option, for the landlord to "do nothing and hold the tenant liable for the entire amount of rent," has been statutorily abrogated for residential leases in Maryland, and that the "[m]ore contemporary common law has sought to achieve the same result with respect to commercial leases." *Id. at 353, 829 A.2d at 989.* In other words, "'under the modern rule [a] landlord may not remain idle when the tenant abandons the premises without legal excuse for so doing. He must make an effort to mitigate his damages as a condition of recovery against [*23] the tenant, in this case by endeavoring to relet.'" *Id.* (quoting 2 MILTON R. FRIEDMAN, FRIEDMAN ON LEASES § 16.3, at 1084 (4th ed. 1997)).

[HN4] With respect to the landlord's first option, to accept a tenant's surrender of the lease, the *Circuit City* Court observed that "the landlord becomes free of the tenancy and may again deal with the property unfettered by it," but "the tenant's obligation to pay rent ceases." *Id. at 354, 829 A.2d at 989.* The court recounted, *id. at 354-55, 829 A.2d at 989-90* (internal citations omitted):

> To gain the advantage of a surrender but avoid that consequence [of termination of the tenant's monthly rent obligation], landlords began to insert in leases provisions . . . making the tenant liable for the amounts of rent reserved in the lease, notwithstanding any entry or termination by the landlord upon the tenant's default, and to rely on contract law, rather than property law, for the enforcement of that

obligation. That, in turn, rests on the proposition . . . that a lease is both a contract and a conveyance of a leasehold estate in land . . . .

> The inclusion of such a provision often shifts the focus away from whether a completed surrender occurred, because, [*24] even if it did, the tenant may remain liable for the amount of rent reserved in the lease as a matter of contract law. The difference is that the claim is not for the post-surrender rent itself which, under property law, is no longer owed, but for damages arising from breach of the contract.

> In either case, [HN5] whether seeking to recover rent under property covenants on the theory that a surrender has not occurred or to recover contract damages under contract law, the landlord has its own obligation to mitigate damages. We have recognized generally that, "when one party breaches a contract, the other party is required by the "avoidable consequences" rule of damages to make all reasonable efforts to minimize the loss sustained from the breach and can charge the defaulting party only with such damages as, "with reasonable endeavors and expense and without risk of additional substantial loss or injury, he could not prevent." That principle applies as well to damages resulting from a tenant's abandonment of leased premises.

With [*25] this background, I turn to consider the provisions of the Lease regarding Tenant's default, and will address additional legal points in the context of the disputed issues.

B. Default Provisions of the BTG Lease

The Lease, a comprehensive agreement, sets forth in Section 17.2 the Landlord's remedies in the event of a default by the Tenant. Several provisions are triggered by the Tenant's default. Section 17.2 recites: "Landlord shall have any one or more of the following remedies after the occurrence of a default by Tenant. These remedies are not

exclusive; they are cumulative in addition to any remedies now or later allowed by law, in equity, or otherwise[.]" In addition, Section 17.2.6 states:

> Pursuit of any of the [Landlord's] remedies [set forth in Section 17.2] does not constitute an irrevocable election of remedies nor preclude pursuit of any other remedy provided elsewhere in this Lease or by applicable law, and none is exclusive of another unless so provided in this Lease or by applicable law. Likewise, forbearance by Landlord to enforce one or more of the remedies available to it on an Event of Default does not constitute a waiver of that default or of the right to exercise that [*26] remedy later or of any rent, damages, or other amounts due to Landlord hereunder.

Landlord's various remedies are set forth in Section 17.2.1 through 17.2.5. First, Section 17.2.1 permits Landlord to "[t]erminate this Lease by giving written notice of termination to Tenant, in which event Tenant immediately shall surrender the Premises to Landlord." Section 17.2.1 also authorizes Landlord to "re-enter and take possession of the Premises and expel or remove Tenant and any other person occupying the Premises" if Tenant fails to surrender the Property upon written notice of termination.

However, Section 17.2.2 provides that "[*n*]*o act by Landlord other than giving notice of termination to Tenant shall terminate this Lease.*" (Emphasis added.) By way of example, the section provides: "Acts of maintenance, efforts to relet the Premises, or the appointment of a receiver on Landlord's initiative to protect Landlord's interest under this Lease shall not constitute a termination of this Lease."

The evidence demonstrated that plaintiffs never transmitted written notice of termination to defendants. To the contrary, plaintiffs strenuously insisted on several occasions that they rejected BTG's unilateral [*27] attempt to terminate the Lease. Nevertheless, the Landlord's remedies upon termination, which are enumerated in the balance of Section 17.2.2, remain relevant. Section 17.2.2 states:

On termination of the Lease, Landlord shall have the right to recover from Tenant:

> (i) The worth at the time of the award of the unpaid rent that had been earned at the time of termination of this Lease; and

> (ii) The worth at the time of the award of the amount by which the unpaid rent that would have been earned after the date of termination of this Lease until the time of award exceeds the amount of the loss of rent that Tenant proves reasonably could have been avoided; and

> (iii) The worth at the time of the award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of the loss of rent that Tenant proves reasonably could have been avoided; and

> (iv) Any other amount, including, without limitation, reasonable attorneys' fees and court costs, necessary to compensate Landlord for all detriment proximately caused by Tenant's default.

The phrase "worth at the time of the award" as used in clauses (i) and (ii) above is to be computed by allowing interest at [*28] the rate of twelve percent (12%) per annum, but not to exceed the then legal rate of interest. The same phrase as used in clause (iii) above is to be computed by discounting the amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award, plus one percent (1%).

The term "rent" as used in this Section 17.2.2 means all sums payable by Tenant pursuant to the Lease, including, without limitation, all rent, additional rent, Taxes, and insurance.

Section 17.2.3 of the Lease provides that "Landlord may re-enter and take possession of the Premises without terminating this lease," and that "Landlord may relet the

premises, or any part of them, to third parties, but has no obligation to do so." With respect to reletting, Section 17.2.3 states: "Landlord may relet the Premises on whatever terms and conditions Landlord, in its sole discretion, deems advisable. Reletting can be for a period shorter or longer than the remaining term of this Lease." The section also reiterates: "Landlord's action under this Subsection is not considered an acceptance of Tenant's surrender of the Premises unless Landlord so notifies Tenant in writing." The balance of Section 17.2.3 [*29] sets forth provisions related to Tenant's liability to Landlord if Landlord relets the Property, and the allocation of rent from any reletting:

> Tenant shall be immediately liable to Landlord for all costs Landlord incurs in reletting the Premises, *including brokers' commissions, expenses of remodeling the Premises required by the reletting, and like costs.* Tenant shall pay to Landlord the rent due under this Lease on the dates the rent is due, less the rent Landlord receives from any reletting.

> *If Landlord elects to relet the Premises without terminating this Lease, any rent received will be applied to the account of Tenant, not to exceed Tenant's total indebtedness to Landlord; no reletting by Landlord is considered to be for its own account unless Landlord has notified Tenant in writing that the Lease has been terminated.* If Landlord elects to relet the Premises, rent that Landlord receives from reletting will be applied to the payment of: (i) first, any indebtedness from Tenant to Landlord other than rent due from Tenant; (ii) second, all costs, including maintenance, incurred by Landlord in reletting; and (iii) third, rent due and unpaid under the Lease. After deducting the payments [*30] referred to in this Subsection, any sum remaining from the rent Landlord receives from reletting will be held by Landlord and applied in payment of future rent as rent becomes due under this Lease. If, on the date rent is due under this Lease, the rent received from the reletting is less than the rent due on that date, Tenant will pay to

Landlord, in addition to the remaining rent due, all costs, including maintenance, Landlord incurred in reletting which remain after applying the rent received from the reletting. *Tenant shall have no right to or interest in the rent or other consideration received by Landlord from reletting to the extent it exceeds Tenant's total indebtedness to Landlord.* (Emphasis added.)

Finally, Section 17.2.5 makes further provision for Tenant' liability to Landlord for damages under any of the foregoing provisions. [15] It states:

> In all events, Tenant is liable for all damages of whatever kind of nature, direct or indirect, suffered by Landlord as a result of the occurrence of an Event of Default. If Tenant fails to pay Landlord in a prompt manner for the damages suffered, Landlord may pursue a monetary recovery from Tenant. Included among these damages are all [*31] expenses incurred by Landlord in repossessing the Premises (including, but not limited to, increased insurance premiums resulting from Tenant's vacancy), all expenses incurred by Landlord in reletting the Premises (including, but not limited to, those incurred for advertisements, brokerage fees, repairs, remodeling, and replacements), all concessions granted to a new tenant on a reletting, all losses incurred by Landlord as a result of Tenant's default (including, but not limited to, any unamortized commissions paid in connection with this Lease), a reasonable allowance for Landlord's administrative costs attributable to Tenant's default, and all attorneys' fees incurred by Landlord in enforcing any of Landlord's rights or remedies against Tenant.

15   Section 17.2.4 of the Lease permits Landlord to "[r]e-enter the Premises without terminating this Lease . . . and do whatever Tenant is

obligated to do under the terms of this Lease." However, no party contends that this section is applicable.

It is plain that Section 17.2.3, which permits the Landlord to relet the premises without terminating the Lease, is applicable here. Notably, this provision is a departure from the common law standard [*32] that otherwise would apply. [HN6] In Maryland, after a tenant's "surrender, which a tenant tenders by abandoning the premises," a landlord's "reletting beyond the original term," as occurred here when plaintiffs executed the Vitamin Lease, "is evidence of an intent to accept the surrender," although it "is not conclusive of that intent, as a matter of law, in the face of other evidence from which a contrary intent can be inferred." *Millison v. Clarke, 287 Md. 420, 426, 413 A.2d 198, 201 (1980)*. In other words, "a reletting beyond the original term is not the acceptance of a surrender as a matter of law where there is evidence from which the trier of fact could find that the landlord did not intend that result." *Id. at 436, 413 A.2d at 206.* Here, the parties bargained that Landlord could relet "for a period shorter or longer than the remaining term of this Lease," BTG Lease § 17.2.3, and that nothing other than written notice by the Landlord would effect termination.

[HN7] Because Tenant is contractually obligated to pay rent even after acts that could be considered a termination of the Lease as a matter of real property common law, it is plain that damage principles under contract law apply here. [*33] In particular, plaintiffs have the "obligation to mitigate damages." *Circuit City, supra, 376 Md. at 355, 829 A.2d at 990.* It is also salient that, "[i]n most contract cases, the law of compensatory damages applies, providing a standard measure of compensation limited to the amount of injury incurred under a breach of the contract." *Willard Packaging Co. v. Javier, 169 Md. App. 109, 122, 899 A.2d 940, 947 (2006)*. In *David Sloane, Inc. v. Stanley G. House & Assocs. Inc., 311 Md. 36, 42, 532 A.2d 694, 697 (1987)*, the Maryland Court of Appeals set forth the "measure of damages for breach of contract," adopting the standard stated in the Restatement (Second) of Contracts:

> [T]he injured party has a right to damages based on his expectation interest as measured by
>
> (a) the loss in the value to him of the other party's

> performance caused by its failure or deficiency, plus
>
> (b) any other loss, including incidental or consequential loss, caused by the breach, less
>
> (c) any cost or other loss that he has avoided by not having to perform.

**C. Areas in Dispute**

Plaintiffs' claim for damages is composed of several elements. Plaintiffs seek unpaid rent from defendants for a total of 23 1/3 months, representing [*34] the time from defendants' breach in September 2009 until one third of the way through August 2011, when Vitamin Shoppe's tenant improvement allowance was exhausted and Vitamin Shoppe began paying rent to plaintiffs. Plaintiffs also seek late charges of 3% of the rent for each of the 23 1/3 months of unpaid rent, and repayment of real estate taxes and utilities, for which Tenant was responsible under the BTG Lease. Moreover, plaintiffs contend they are entitled to recoup several other costs they incurred due to BTG's breach. Specifically, they seek reimbursement for the brokers' commission; the cost of a title search for the Property, performed at Vitamin Shoppe's insistence; attorneys' fees incurred in negotiating the Vitamin Lease (including an unsuccessful attempt to change the zoning of the Property with respect to signage limitations); [16] and "administrative costs" incurred by Dr. Herst, in the form of compensation for his time spent managing the Property, securing the new tenant, and attending to matters connected to this litigation, at the rate of $ 250 per hour. Finally, plaintiffs seek prejudgment interest on all unpaid sums at the rate of 5.25% per annum, as specified in the [*35] BTG Lease.

16 Plaintiffs also seek to recover their attorneys' fees incurred in prosecuting this litigation. In a pretrial ruling (ECF 40), with the consent of the parties, I reserved as to the issue of counsel fees for the litigation until after the trial as to liability and damages. Accordingly, this Memorandum of Decision does not address plaintiffs' entitlement to litigation attorneys' fees, which remains to be

resolved.

Defendants assert a number of challenges to plaintiffs' claim for damages. First, defendants broadly challenge the reasonableness of plaintiffs' efforts to relet the Property and thereby mitigate their losses, claiming that plaintiffs did not move expeditiously enough to execute a lease with Vitamin Shoppe, and that certain concessions plaintiffs made to Vitamin Shoppe were unreasonable. In particular, they challenge the following: the necessity of the 90-day "build-out" period, during which no rent was due; the tenant improvement allowance, which, although calculated on the basis of Vitamin Shoppe's anticipated improvement cost per square foot of the Property, was the practical equivalent of a concession of 8 1/3 months' "free rent"; Dr. Herst's charge for administrative [*36] costs, both in terms of the hourly rate and the total number of hours allegedly expended by Dr. Herst; the reasonableness of the 6.5% rate of the brokers' commission; and the attorneys' fees expended concerning the signage zoning issue.

Defendants also argue that the Court should amortize (or prorate) various items of damages claimed by defendants, to account for the fact that the ten-year term of the Vitamin Lease extends 52 months beyond the end of the BTG Lease. [17] Specifically, they seek proration of the brokers' commission, the tenant improvement allowance, the attorneys' fees, and the title search. In addition, defendants contend that they are entitled to the benefit of the difference between the rent for which they are obligated under the remainder of the Lease term and the higher rent that plaintiffs will receive from Vitamin Shoppe during that same period. In their view, this "surplus" rent should offset their liability to plaintiffs.

[17] Defendants use the term "amortization" to describe what they are seeking, but the more appropriate term for the concept is proration. *Compare* BLACK'S LAW DICTIONARY 99 (9th ed. 2009) (defining "amortization" as the "act or result of gradually [*37] extinguishing a debt, such as a mortgage, usu. by contributing payments of principal each time a periodic interest payment is due") *with id.* at 1340 (defining "prorate" as to "divide, assess, or distribute proportionately").

Defendants do not challenge the reasonableness or necessity of the other non-litigation attorneys' fees or the tax and utility bills for which plaintiffs seek reimbursement. But, they ask the Court to scrutinize the amounts alleged by plaintiffs for accuracy.

*1. Unpaid Rent and Late Fees*

In the Revised Pretrial Order (ECF 42), the parties stipulated that the total amount of BTG's unpaid rent for 23 1/3 months was $ 196,661.03, derived by multiplying the monthly rent of $ 8,428.33 by 23 1/3. Similarly, the parties stipulated that the total amount of late charges owed by BTG for the unpaid monthly rent was $ 5,899.83, derived in two steps: first, a monthly 3% late fee of $ 252.85 was derived by taking 3% of the monthly rent of $ 8,428.33; then, that monthly late fee of $ 252.85 was multiplied by 23 1/3.

[HN8] "Under federal law, stipulations . . . are generally binding on the parties and the Court." *Brown v. Tennessee Gas Pipeline Co.,* 623 F.2d 450, 454 (6th Cir. 1980). *See Richardson v. Director, Office of Workers' Compensation Programs,* 94 F.3d 164, 167 (4th Cir. 1996) [*38] ("stipulations and admissions are binding on the parties and the court . . . at trial") (citing *Am. Title Ins. Co. v. Lacelaw Corp.,* 861 F.2d 224, 226 (9th Cir. 1988)). "Having agreed on a set of facts, the parties [who adopted the stipulation], and th[e] Court, must be bound by them; we are not free to pick and choose at will." *Stanley Works v. FTC,* 469 F.2d 498, 506 (2d Cir.), *cert. denied,* 412 U.S. 928, 93 S. Ct. 2750, 37 L. Ed. 2d 155 (1973). However, a "district court is entitled to disregard a stipulation if to accept it would be 'manifestly unjust or if the evidence contrary to the stipulation [is] substantial.'" *PPX Enters., Inc. v. Audiofidelity, Inc.,* 746 F.2d 120, 123 (2d Cir. 1984) (quoting *Loftin and Woodard, Inc. v. United States,* 577 F.2d 1206, 1232 (5th Cir. 1978)); *see also Hoodho v. Holder,* 558 F.3d 184, 191 (2d Cir. 2009) (stating that "[a]dmissions by parties are not subject to judicial scrutiny to ensure that the admissions are fully supported by the underlying record," although the court may disregard a stipulation "[i]n rare cases" of manifest injustice or substantial contrary evidence). [18]

[18] The evidence at trial appeared inconsistent with the parties' stipulation in two respects, both pertaining [*39] to the 1/3 of a month at the end of the calculation, which represents partial rent (and a partial late fee) for the month of August 2011. First, the undisputed evidence at trial made plain that August 1, 2011, was the ten-year rent Adjustment Date of the BTG Lease. Therefore,

BTG's rent for August 2011 was $ 9,271.16, not $ 8,428.33. Second, the parties' stipulation that 1/3 of the month's rent for August 2011 was unpaid appears to stem from the fact that Vitamin Shoppe's tenant improvement allowance of $ 87,500 represented 8 1/3 months' worth of rent at the monthly rental rate of $ 10,500 per month; in August 2011, Vitamin Shoppe made its first rental payment of $ 7,000, representing 2/3 of Vitamin Shoppe's monthly rent. It was more than 2/3 of BTG's monthly obligation, however. In light of these discrepancies, perhaps a more appropriate method of calculating BTG's unpaid August 2011 rent would be to credit Vitamin Shoppe's payment of $ 7,000 against the $ 9,271.16 monthly rent owed by BTG, making BTG responsible for the difference of $ 2,271.16 (plus a late fee of $ 68.13, representing 3% of $ 2,271.16, for a total of $ 2,339.29), rather than the parties' stipulated partial rent of $ 2,809.44, [*40] *i.e.*, 1/3 of $ 8,428.33 (plus a late fee of $ 84.28, representing 3% of $ 2,809.44, for a total of $ 2,893.72). However, neither of these discrepancies presents a manifest injustice or a substantial contradiction sufficient to disregard the parties' stipulation. The bottom line difference is only about $ 554, which is a small sum in the context of the case.

*2. Delay in Executing Lease & Reasonableness of Terms*

Claiming that the Landlord had a duty to mitigate, defendants complain that an unreasonable amount of time passed between the date that Dr. Herst signed the letter of intent (December 7, 2009), the date that the Vitamin Lease was signed (August 3, 2010), and the date of the Vitamin Lease's commencement (December 1, 2010). Defendants point to Defendants' Exhibit 12, a letter of May 15, 2010, from Vitamin Shoppe to Robert McCarthy, Esquire, counsel for the Landlord, enclosing four originals of the proposed Vitamin Shoppe lease agreement. Defendants suggest that it took too long--from May 15 until August 3, 2010--for the execution of the Vitamin Lease. However, the defendants did not introduce any evidence indicating whether those four execution originals were the same in content as the [*41] lease that was ultimately executed by Dr. Herst in August 2010. In any event, even if it was the exact lease that was ultimately signed, the Vitamin Lease provided for a projected delivery date of September 1, 2010, and a commencement date ninety days later. Neither date was

contingent on the date that the lease was executed. Put another way, even if Dr. Herst had executed the Vitamin Lease in May 2010, there is no evidence that Vitamin Shoppe's obligation to pay rent would have commenced any sooner.

To the contrary, it is clear, from the outset of the negotiations, that Vitamin Shoppe did not intend to effectuate the terms of the lease until, at the earliest, the end of 2010. The letter of intent submitted by Bialow on behalf of Vitamin Shoppe, dated November 30, 2009 (Defendants' Exhibit 1), stated that "it is anticipated that delivery of the premises will occur on or about January 3, 2011." In addition, testimony adduced at trial indicated that Vitamin Shoppe did not budget for the opening of a store in 2010. Therefore, any delay in the execution of that lease is of no moment in the context of this case.

Defendants' counsel suggested in closing that Dr. Herst made too many concessions [*42] to Vitamin Shoppe to obtain the lease, and that Vitamin Shoppe essentially got everything that it sought. But, as the evidence indicated, Vitamin Shoppe agreed to pay rent for the first five years of the lease on the basis of $ 36 per square foot, in contrast to the rate that BTG had paid of $ 28.90 per square foot. Mr. Coakley, the defense expert, characterized the rate of $ 36 per square foot as a "very good rate." Moreover, several witnesses testified to extensive product available on the market in the Frederick area and the generally poor economic conditions that prevailed in late 2009 through 2010. Nevertheless, the new rent paid by Vitamin Shoppe represented an increase of approximately 25% over what had been paid by BTG. Mr. Coakley also acknowledged that a landlord has discretion in regard to the terms of the reletting of the premises, and that it is ordinary business custom to provide incentives to secure a tenant, as a cost of reletting. Under the BTG Lease, the Landlord had no contractual obligation to seek the approval of the defaulting Tenant with respect to the terms of a lease for a replacement tenant.

Further, it is simply implausible that Dr. Herst would seek to rent the [*43] Property at less than the best rate he thought he could obtain. Dr. Herst could not be assured that he would be able to recover his losses from BTG, as the evidence suggests that BTG was in a financially precarious position at the time of its breach. Moreover, defendants presented no basis to conclude that the time it took to finalize the Vitamin Lease or the

amount of rent to be received under it were commercially unreasonable, or otherwise violated plaintiffs' duty to mitigate.

### 3. Ninety-Day "Build-Out" Period

Defendants challenge the reasonableness of the ninety-day "build-out" period under the Vitamin Lease, between the Delivery Date (September 1, 2010) and the Commencement Date (December 1, 2010). I see no merit in this contention. Notably, defendants enjoyed a build-out period twice as long (180 days) under the BTG Lease. Moreover, the expert testimony indicated that such a build-out period was routine in the context of retail commercial leasing.

### 4. Amount of the Tenant Improvement Allowance

The evidence showed that the tenant improvement allowance was calculated by the allowance of $ 25 per square foot multiplied by the size of the premises, 3500 square feet. This calculation yielded [*44] a tenant improvement allowance of $ 87,500. According to the defendants' expert, Mr. Coakley, the sum of $ 25 per square foot was on the "high side." In his view, an allowance based on $ 5 to $ 10 a square foot would have been reasonable.

In my view, the evidence readily supported a tenant improvement allowance based on $ 25 per square foot. Plaintiffs' expert, Mr. Manhoff, testified that a tenant improvement allowance is a common incentive and that the allocation of $ 25 per square foot was in line with market deals at the time of the transaction, as well as the present time. He also explained that it is often configured as a rent abatement in order to enable a landlord to avoid expending a large sum at the time of the execution of the lease to cover the tenant's cost of improvements.

The amount of the tenant improvement allowance was, in my view, fair and reasonable and appropriate in view of the market conditions. Based on custom and market conditions, it is clear that a tenant improvement allowance of $ 25 per square foot, amounting to $ 87,500, was reasonable in an effort to secure a branded, national tenant.

### 5. Dr. Herst's Administrative Costs

Paragraph 7.2.5 of the BTG Lease permits plaintiffs [*45] to recover "a reasonable allowance for Landlord's administrative costs attributable to Tenant's Default." Although defendants concede that, pursuant to the terms of the Lease, plaintiffs are entitled to recover administrative costs attributable to their breach, they vigorously challenge the sum sought by plaintiffs.

In particular, Dr. Herst claims 152.5 hours of time devoted to this matter as a result of the Tenant's breach, and he selected a rate of $ 250 per hour for his time, totaling $ 38,125 in administrative costs since the breach on September 1, 2009. Plaintiffs' Exhibit 47, an itemized log of Dr. Herst's time allegedly expended in administrating the Property since the default, was prepared by Dr. Herst after he attempted to make a careful review of his diaries to ascertain the time he expended. It includes items such as driving time to inspect the Property, inspection of the premises, working with prospective tenants, meetings with brokers, meetings with legal counsel, and time devoted to the litigation that ensued. [19]

> [19] Defense counsel pointed out inconsistencies with the representations made by Dr. Herst in the affidavit submitted in support of a motion for summary judgment at [*46] an earlier juncture in the case. See ECF 20. Dr. Herst explained the discrepancies as a mistake.

In his testimony, Dr. Herst explained that he is the manager of the properties that he owns, and has managed this Property since he purchased it. He claimed that he is qualified as a property manager, because he holds a Master's degree in real estate from Johns Hopkins University, and became a licensed real estate agent in the early 1980s. Although his license has since lapsed, he practiced as a real estate agent for some 10-12 years. [20]

> [20] Dr. Herst, who is 73 years of age, is also a novelist and a Rabbi.

Dr. Herst assigned a "value" of $ 250 per hour for his time based on his understanding of what others charge. For example, he pointed to the identical rate charged by his expert, Mr. Manhoff. Notably, plaintiffs communicated to defendants that Dr. Herst would charge $ 250 per hour for his time as early as October 2009, in a letter from plaintiffs' counsel to defendants' counsel. See Plaintiffs' Exhibit 18, at 2.

Scott Manoff, plaintiffs' expert, recognized that the Lease does not define "administrative costs." In his view,

it refers to efforts to get the building re-leased, legal costs, and [*47] necessary travel time and expenses. Moreover, he opined that Dr. Herst is entitled to compensation for the time he expended in connection with the legal proceedings initiated to recover damages, noting that Dr. Herst's time is as valuable as anyone else's. In Mr. Manoff's view, the hourly rate of $ 250 is "very fair," and consistent with what others charge for their time. Nevertheless, he characterized the expenditure of 152.5 hours since September 2009 as "excessive" and "high."

I am satisfied that the hourly rate of $ 250 is a reasonable rate for the value of Dr. Herst's time. However, I agree with defendants that plaintiffs are not entitled to recover payment for all 152.5 hours expended by Dr. Herst. As defense counsel put it in closing argument, Dr. Herst was certainly in control of how he chose to spend his time. Moreover, I have carefully reviewed Plaintiff's Exhibit 47. Without belaboring the point, there are many expenditures of time that either appear unnecessary, given that Dr. Herst hired competent professionals to undertake some of the tasks for which he also charged, or simply seem inflated.

To illustrate, on October 23, 2009, Dr. Herst expended one hour reviewing correspondence [*48] from Allen Fox, who was then counsel for defendants. By that point in time, he already had capable legal counsel, whose time he has also claimed. On November 13, 2009, he spent an hour reviewing correspondence from opposing counsel. On February 10, 2010, he spent one hour in connection with the title search. On March 30, 2010, he spent one hour "in review" of BTG's "failure to meet deadlines." On June 17, 2010, he charged a half hour for a visit to the zoning attorney about signage, yet that visit is not reflected on the bill submitted by the zoning attorney. See Plaintiff's Exhibit 22-G. On July 15, 2010, Dr. Herst allegedly spent three hours in "drafting and transmission of Late Payment for previous months." Yet, the amounts of BTG's late payments were the same for every month until August 2011. On September 22, 2010, he spent 1.5 hours in connection with redrafting the complaint, notwithstanding that he hired capable counsel to perform the legal work. On February 28, 2011, he spent 1.5 hours reviewing federal court procedures. And, throughout Plaintiffs' Exhibit 47, Dr. Herst did not itemize his time in less than half-hour increments. Thus, on several occasions, Dr. Herst claimed [*49] a full half hour to pay a bill associated with the Property.

Nevertheless, I reject defendants' apparent contention that Dr. Herst is not entitled to recover the costs of time spent in attending to matters involving this case that required the attention of a party representative, such as attending depositions (particularly his own), responding to interrogatories, and attending settlement conferences. To be sure, [HN9] it is the "'general rule'" in Maryland that "'costs and expenses of litigation, other than the usual and ordinary Court costs, are not recoverable in an action for damages,'" in the absence of a contractual provision to the contrary. *Collier v. MD-Individual Practice Ass'n, Inc., 327 Md. 1, 11, 607 A.2d 537, 542 (1992)* (citation omitted); *see, e.g., Harry's Thrifty Tavern, Inc. v. Pitarra, 224 Md. 56, 61-63, 166 A.2d 908, 911-12 (1961)* (disallowing recovery, in a breach of contract claim, for "fees and expense incident to the incorporation" of a business, in absence of contractual provision). In this case, however, Section 17.2.5 of the BTG Lease authorized Landlord to recover the "administrative costs attributable to Tenant's default," to the extent reasonable. That language [*50] is sufficiently broad to encompass the value of the time Dr. Herst was required to devote to litigation by reason of defendants' default, albeit not to include duplicative payments for Dr. Herst's time in performing work that others were hired to do.

Upon careful scrutiny of Plaintiffs' Exhibit 47, I will reduce by approximately one third the number of hours for which Dr. Herst is entitled to compensation. Therefore, I conclude that plaintiffs are entitled to reimbursement for 100 hours of administrative time, at the rate of $ 250 per hour, for a total of $ 25,000 in administrative costs.

*6. Rate of Brokers' Commission*

Section 17.2.5 of the BTG Lease makes the defaulting Tenant liable to pay "all expenses incurred by Landlord in reletting the Premises (including . . . brokerage fees . . .)." As noted, Dr. Herst initially agreed to pay a real estate commission of 5% for the reletting of the Property, but later agreed to increase it to 6.5%. Any challenge to the reasonableness of that commission rate is completely without merit. The evidence established that, at the outset, plaintiffs anticipated that only two real estate agencies would be involved: StreetSense and a tenant's broker. Moreover, [*51] the initial commission rate of 5%, which Dr. Herst negotiated with StreetSense, was below the prevailing market rate. When Dr. Herst later agreed to increase the rate to 6.5%, that figure was

still within the prevailing norm. And, it was completely justifiable by the fact that a third broker, Bialow, became involved in locating a new tenant for the subject premises. Of the 6.5% total commission, 4% was allocated to the brokers acting on behalf of Vitamin Shoppe, and 2.5% was allocated to StreetSense, the Landlord's broker.

According to Dr. Herst, he essentially had no choice but to pay the increased rate of 6.5% because of the presence of the third broker, Bialow. Vitamin Shoppe's two brokers, KLNB and Bialow, were unwilling to work for their respective one-half shares of a 2.5% commission. And, the prospective tenant's brokers suggested that they would take the tenant to another building if Dr. Herst did not agree. Dr. Herst was also mindful of the restrictions on the use of the building, related to the fact that it is situated in a shopping center and the use of the Property cannot compete with some of the other stores in the center, thereby limiting the range of potential tenants. [*52] Moreover, Dr. Herst characterized the retail market in Frederick as "terrible" and "very weak." Given the poor economy, and the number of vacancies in Frederick, coupled with restrictions on the use of the building and signage issues, Dr. Herst concluded that it was appropriate and necessary for him to agree to the increase. Describing himself as "very aggressive" in trying to relet the premises, Dr. Herst was willing, under the circumstances, to pay a commission on the high side.

Lee Engle of StreetSense, who was involved on behalf of the Landlord as a real estate agent in reletting the premises, was received, without objection, as an expert real estate agent, specializing in commercial retailing leases. He testified that the usual and customary rate for a real estate commission is 6%, and claimed that initially Dr. Herst was adamant in insisting on a rate below 6%. According to Engle, the commission rate was increased because Vitamin Shoppe had another broker who refused to take less than 2%, KLNB was also unwilling to work for less than 2%, and StreetSense was not going to cut its rate below 2.5%. Mr. Engle explained that there was a lot of "product" on the market in Frederick, the [*53] economic times were difficult, and there was a need to incentivize the brokers, particularly to secure a national tenant like Vitamin Shoppe. For this reason, he talked to Dr. Herst about the demand for a higher commission, and Dr. Herst agreed to it. As a result, 4% was allocated to the Landlord's two brokers

and StreetSense was to be paid 2.5%. The total commission of $ 81,218 was paid, in full, by Dr. Herst, pursuant to a verbal agreement by Dr. Herst to pay the higher commission rate.

Scott Manhoff also testified as an expert on behalf of plaintiffs, in the area of commercial real estate and leasing. Mr. Manhoff has been involved in real estate as an occupation since 1988. He is the de facto manager of the Baltimore office of Grubb & Ellis, where he is a senior Vice President. He also owns an office building in Frederick, and has retail and industrial clients, as well as landlords, tenants, and developers. According to him, commission rates for real estate agents typically range between 6% and 8%. In his view, the commission of 6.5% was fair and consistent with the market rate. He explained that, in order for the owner to compensate all who were involved, there was a need to increase [*54] the commission from 5% to 6.5%.

Rory Coakley testified as an expert for the defense, in the area of commercial leasing and management. In his view, the commission of 6.5% was a little more than normal but "not outlandish." He acknowledged that, with three brokers involved in the transaction, it was the Landlord's decision whether to increase the commission rate from 5% to 6.5%. Moreover, he understood that there would be a concern on the part of Dr. Herst that the prospective tenant, Vitamin Shoppe, could have been shepherded elsewhere to consider another property if the commission rate was not appropriate for three separate brokers/real estate agents.

Defendants also seem to suggest that they are entitled to a reduction of the commission because they alerted Bialow to the availability of the Property, and thus were a "procuring cause" of the execution of the replacement lease. The emails between Tanguay and Mr. Bialow that were introduced in evidence indicate that defendants contacted Mr. Bialow in the hope that Bialow could find a replacement tenant. However, the same emails also indicate that BTG did not intend to involve itself in the reletting of the premises. If anything, BTG's [*55] involvement more than justified the increase in the commission rate, because a third broker was introduced into the transaction. This did not entitle defendants to a reduction in the broker's commission, however.

Based on the evidence, I readily conclude that the commission rate of 6.5% was eminently fair and reasonable.

*7. Calculation of Brokers' Commission*

It is undisputed that Dr. Herst paid a total commission of $ 81,218. However, the parties disagree on the underlying sum to which the commission rate of 6.5% should have been applied.

According to the evidence, the commission was to be predicated on the total anticipated rent for the ten-year term under the Vitamin Lease. However, Vitamin Shoppe and the Landlord agreed to apply the tenant improvement allowance of $ 87,500 as a credit against the rent obligation of Vitamin Shoppe, in lieu of having Dr. Herst tender payment to Vitamin Shoppe in the sum of $ 87,500 to cover the cost of improvements. As a result, although the rental obligation of Vitamin Shoppe technically commenced on December 1, 2010, Vitamin Shoppe did not actually pay rent to Dr. Herst for the ensuing 8 1/3 months. In that time period, the tenant improvement allowance [*56] was applied as a credit to Vitamin Shoppe's monthly rental obligation. In August 2011, Vitamin Shoppe paid a partial rent for that month in the sum of $ 7,000, representing two thirds of one month's rent.

Moreover, under the Vitamin Lease, there was no rental obligation for the period between the delivery date (September 1, 2010) and the commencement date (December 1, 2010). Because no rent was due during that period, plaintiffs did not receive rental income for that period. Although the evidence suggested that the three month period was "backed out" from the calculation of the brokerage commission, there was no basis to have included the build-out period in the rental calculation on which the commission was based; no money was ever intended to flow during that period.

For the period beginning on the commencement date (December 1, 2010), and ending on the last day of the fifth lease year, the expected rental income, at the rate of $ 10,500 per month, would yield $ 126,000 per year, for a five-year total of $ 630,000. For the next five-year period, based on a monthly rent of $ 11,550, the anticipated rent would total $ 138,600 per year, for a total five-year rent of $ 693,000. Therefore, the [*57] first five years of the Lease term were expected to generate $ 630,000 in rental income, and the next five years would generate $ 693,000, resulting in a total rental income of $ 1,323,000 over the entire initial term of the Vitamin Lease.

In calculating the $ 81,218 commission, seven months of rent were deducted or "backed out." In other words, the rent for the ten-year term was reduced by seven months, and the commission was calculated as 6.5% of the balance. Of the "backed out" months, three months ostensibly were for the build-out period, *i.e.*, the period between the delivery date and the commencement date, and the remaining four months represented approximately half of the total 8 1/3 months of rent-free months due to the tenant improvement allowance. It is undisputed that Dr. Herst paid the commission on this basis.

According to defendants, they are not liable for the full amount of the commission, because the calculation should not have included the rental obligation of 8 1/3 months, as no rent was collected in that time. However, in calculating the commission, seven months were backed out. To be sure, only four of those months were intended to represent a portion of the 8-1/3-month [*58] "free rent" period attributable to the tenant improvement allowance. But, the other three months were intended to "back out" rental payments that were never included in the ten-year rent. The bottom line is that seven months were deducted from the calculation on which the commission was based.

The evidence supports the finding that a tenant improvement allowance is customary in the industry as an incentive to secure a tenant in a difficult marketplace. And, as Lee Engle put it, the tenant improvement allowance here was "necessary to make this deal." Moreover, he explained that the tenant was willing to take the tenant improvement allowance in the form of free rent, as opposed to requiring an up-front payment from Dr. Herst, in the amount of $ 87,500. He explained that it was a benefit to Dr. Herst that the new tenant was willing to take the money over time, in the form of free rent, rather than requiring him to make a large up-front payment. Further, he testified that Dr. Herst wanted StreetSense to back out the free rent-tenant improvement allowance in its entirety in calculating the real estate commission period, to reduce his obligation as to the commission.

Engle observed that, if [*59] the "deal" had been structured differently, the real estate agents would have received a commission on rent for the 8-1/3-month period. In other words, if Dr. Herst had paid the tenant for the tenant improvement allowance, rather than paying it by way of free rent, the commission would have been

based on the rent for those 8 1/3 months. Therefore, in his view, it was appropriate to include the phantom income in connection with the calculation of the broker's commission. Mr. Manhoff and Mr. Coakley disagreed. In their opinion, if no income was generated for that period, the brokers' commission should not include any sum of money for that period. In any event, Engle stated that StreetSense was willing to back out the 90-day build-out period and four months of the 8 1/3 months of free rent, as a "compromise."

In my view, Dr. Herst acted reasonably in this matter. It is undisputed that he paid the commission and, under the Lease, it is an expense attributable to the breach. It is plain that, at most, 8 1/3 months of rent should have been "backed out" of the calculation of the commission. In fact, seven months were deducted. Dr. Herst argued for a further reduction, but the brokers would [*60] not agree. Ultimately, plaintiffs made a reasonable compromise and should be compensated based on their actual expenditure. Accordingly, I will factor the full amount of the commission, $ 81,218, into the award of damages (subject to proration, as discussed, *infra*).

### 8. Attorneys' Fees

Plaintiffs seek to recover attorneys' fees in connection with reletting the premises. Most of those fees were charged by Robert M. McCarthy, Esquire. Defendants stipulated to the reasonableness and necessity of McCarthy's fees, and agreed to the total amount of McCarthy's fees to the extent supported by the evidence. 21 However, they dispute the necessity of $ 1,530 in fees paid by plaintiffs to the firm of Garson | Claxton LLC ("Claxton") for legal work performed between June 14, 2010 and June 18, 2010, in an attempt to address a zoning restriction on the signage that could be erected at the Property. Claxton charged a total of $ 1,530 for 3.6 hours of work, at a rate of $ 425 per hour, although the work did not resolve the signage issue.

> 21  Defendants also argue that the entire amount of the attorneys' fees (as well as several other charges) should be prorated to reflect the fact that plaintiffs' substitute [*61] tenant, Vitamin Shoppe, agreed to a lease term that extended beyond the expiration of the BTG Lease. I address that contention in a separate section, *infra*.

In Plaintiffs' Exhibit 8, and also in testimony,

plaintiffs claim a total of $ 5,798.68 in legal fees generated in connection with the reletting, inclusive of the $ 1,530 attributed to Claxton. In support of that sum, plaintiffs introduced their Exhibits 22-A through 22-G. Only one exhibit (22-G) pertains to Claxton. Exhibits 22-A through 22-F reflect work performed by Mr. McCarthy between October 31, 2009 and May 31, 2010, at an hourly rate of $ 280. His bills totaled $ 3,100.34. In particular, Mr. McCarthy charged $ 280 for work through October 2009 (Ex. 22-A); $ 784 for work through February 2010 (Ex. 22-B); $ 672 for work in March 2010 (Ex. 22-C); $ 952 for work in April 2010 (Ex. 22-D); $ 216.34 for work in May 2010 (including $ 196 for services rendered and a UPS charge of $ 20.34) (Ex. 22-E); and $ 196 for work in June 2010 (Ex. 22-F).

When Mr. McCarthy's bills totaling $ 3,100.34 are coupled with the bills of $ 1,530.00 charged by Claxton, the total sum of legal fees amounts to $ 4,630.34, rather than the $ 5,798.68 reflected on Plaintiffs' [*62] Exhibit 8. The discrepancy of $ 1,168.34 appears to have resulted from what presumably is an inadvertent double counting of Mr. McCarthy's bills dated April 30, 2010 ($ 952, Plaintiffs' Ex. 22-D) and May 31, 2010 ($ 216.34, Plaintiffs' Ex. 22-E), which total $ 1,168.34. On Exhibit 8, an extra bill in the amount of $ 1,168.34 is listed for June 2010, but this appears to represent a "Previous Balance" (from the April and May 2010 bills, for which plaintiffs also separately accounted in Exhibit 8) that was listed on Mr. McCarthy's bill dated June 30, 2010 (Plaintiffs' Ex. 22-F). The Court will award, as damages, the $ 3,100.34 in legal fees actually incurred in connection with the services of Mr. McCarthy.

As to the services of Claxton, I am satisfied that the effort to explore the signage issue was a necessary and reasonable attempt to address a concern of the prospective tenant, which would not have occurred in the absence of the defendants' default. Although the hourly rate of $ 425 is not inexpensive, I am satisfied that it is not an unusual rate for a lawyer in Bethesda, Maryland. Nor is there any dispute that Dr. Herst paid those fees. Therefore, I will also award those legal fees to plaintiffs. [*63] 22

> 22  I reject defendants' contention that plaintiffs eventually would have had to incur these fees for another tenant. There is no indication that every prospective tenant would have shared Vitamin Shoppe's concern regarding signage. Indeed, there

was no evidence that signage was an issue for BTG.

Accordingly, a total amount of $ 4,630.34 in attorneys' fees will factor into the award.

*9. Title Search, Real Estate Taxes, Messenger Services and Utilities*

Plaintiffs also seek reimbursement for the costs of a title search performed at Vitamin Shoppe's request, fees for messenger services allegedly incurred by Dr. Herst, and real estate taxes and utility bills paid by plaintiffs while the Property was unoccupied.

With respect to the title search, which was billed to plaintiffs in the amount of $ 862, *see* Plaintiffs' Ex. 26, defendants suggest that there was no question of title to the Property. To the extent that they argue this was not a reasonable cost of reletting, I disagree. Dr. Herst explained that Vitamin Shoppe insisted on assurance that plaintiffs possessed clean title to the Property. Agreeing to provide the replacement tenant with such assurance was within plaintiffs' discretion.

Plaintiffs [*64] claim they should recover $ 150 for messenger services. However, Dr. Herst candidly testified that this sum represented nothing short of sheer speculation on his part. Accordingly, the Court will deny plaintiffs' request to recover $ 150 for messenger expenses.

Defendants do not oppose plaintiffs' demand for reimbursement for real estate taxes and utilities. But, they ask the Court to review for accuracy the bills submitted by plaintiffs. Table A, attached to this Memorandum of Decision, itemizes the bills submitted into evidence by plaintiffs. In sum, the evidence showed that plaintiffs paid $ 9,283.87 for real estate taxes (for the period from July 2010 through June 2011); $ 402.05 in water and sewer charges from Frederick County; and $ 3,380.15 in electric bills (which includes a $ 250 security deposit for initiation of a new account when Tenant vacated the premises). I will, however, reduce the recovery for the amount of the electric bills by $ 5.96, which represents a late fee applied on the July 2010 bill, because Dr. Herst did not timely pay the bill for June 2010. Otherwise, all of the real estate taxes and utilities, in the total amount of $ 13,060.11, will be awarded.

*10. Proration*

At [*65] the time of BTG's breach, approximately seven years remained on the BTG Lease; it was to expire July 31, 2016. BTG vacated the premises on August 31, 2009, and ceased paying rent as of September 1, 2009. Thus, 83 months remained on the Lease at the time of the breach.

The replacement tenant, Vitamin Shoppe, signed a ten-year (*i.e.* 120-month) lease, the term of which began on December 1, 2010, and will expire November 30, 2020. Thus, Vitamin Shoppe's lease term overlaps with the remaining term of the BTG Lease for five years and eight months (*i.e.*, 68 months), and extends the rental of the Property four years and four months (*i.e.* 52 months) beyond the expiration of defendants' Lease on July 31, 2016.

According to defendants, in calculating damages, they are entitled to proration of various expenses incurred by plaintiffs in the reletting of the premises, to account for the additional 52 months of tenancy obtained by plaintiffs. In particular, defendants seek proration of the brokers' commission, the tenant improvement allowance, attorney costs, and the cost of the title search.

As support for their proration argument, defendants cite *Wilson v. Ruhl, 277 Md. 607, 356 A.2d 544 (1976).* In [*66] that case, the Maryland Court of Appeals prorated a broker's commission, which a landlord paid to procure a replacement tenant and then sought to recover from the defaulting tenant. The Court stated, *id. at 613, 356 A.2d at 548:*

> The property was ultimately rented for a term of one year on 1 December 1974. While we regard the brokerage commission paid by [the landlord] as a necessary expense in mitigation, we are of the opinion that the [defaulting tenants] are liable for only two-thirds of that commission because the property was leased for their account only for the eight month period from 1 December 1974 to 31 July 1975 . . . .

Plaintiffs suggest that *Wilson* is inapplicable, because it concerned a residential lease. They also argue that *Wilson* was later overruled by *Millison v. Clarke, supra, 287 Md. 420, 413 A.2d 198.* Plaintiffs do not explain why the defaulting tenant's entitlement to proration should

turn on whether a lease is residential or commercial, and I view this as a distinction without a difference. With respect to *Millison*, that decision overruled *Wilson* on a different point. The *Wilson* Court suggested in *dicta* that "reletting for a term longer than the original term is [*67] so inconsistent with the tenant's estate as to allow for no other interpretation than that the landlord had reentered in order to accept a surrender." *Wilson*, 277 Md. at 611, 356 A.2d at 547. The *Millison* Court rejected *Wilson's* dictum and held that [HN10] "a reletting beyond the original term is not the acceptance of a surrender as a matter of law where there is evidence from which the trier of fact could find that the landlord did not intend that result." *Millison*, 287 Md. at 436, 413 A.2d at 206. However, *Millison*did not affect the validity of the *Wilson* Court's holding with regard to proration of a broker's commission.

Plaintiffs also point Section 17.2.3 of the BTG Lease, which requires a defaulting tenant to "be immediately liable to Landlord for *all* costs Landlord incurs in reletting the Premises, *including brokers' commissions,* expenses of remodeling the Premises required by the reletting, and like costs." (Emphasis added.) In my view, this language clearly obligates the Tenant to pay for the commission but, without more, does not justify disregarding the Court of Appeals's holding in *Wilson*. To the extent that the Landlord obtained a replacement lease term that extended beyond the [*68] term of the defaulting Tenant's lease, that cost was not "incur[red] in reletting the Premises" for the account of Tenant, within the meaning of the BTG Lease.

With respect to the broker's commission of $ 81,218, paid to the real estate agents, I agree that defendants are entitled to proration. It is true that, but for the breach, plaintiffs would not have incurred this expense. However, to the extent that plaintiffs' new lease extends beyond the term of the Lease, they will have additional revenue. As *Wilson*teaches, it is reasonable to conclude that a portion of the commission pertains to the extended term of the new lease, *i.e.*, to the period of Vitamin Shoppe's tenancy that extends beyond the period of time for which BTG was obligated under the BTG Lease. Notably, the amount of the commission is linked directly to the duration of the Vitamin Lease: it is calculated as a percentage of the total rent that Landlord will receive over the entire term of the lease, including both the portion of the Vitamin Lease term that overlaps with the remainder of BTG's tenancy, and the later portion of the term that does not overlap.

Given that the amount of the commission was based on the total [*69] rent over the ten-year term, it is certainly reasonable to prorate the commission, allocating solely to plaintiffs the portion of the commission applicable to Vitamin Shoppe's tenancy beyond the remaining portion of the BTG Lease term.

Therefore, the total commission of $ 81,218 will be reduced by 43.33%, representing a reduction allocable to the portion of the 120-month lease with Vitamin Shoppe that extends beyond the term of the BTG Lease. [23] This correlates to the following: of the total commission of $ 81,218, defendants are responsible for 56.67%, or $ 46,023.53.

> [23] In closing argument, defendants' counsel suggested that the appropriate reduction was 47.225%, but I am unable to discern how counsel calculated that figure. The Court is satisfied that the appropriate reduction is 43.33%, which is equal to the number of months that the replacement tenancy extends beyond expiration of the defaulting tenant's term (in this case, 52 months), divided by the total number of months of the replacement tenant's term (in this case, 120 months). This is the same fraction applied by the *Wilson*Court.

Nevertheless, I disagree with defendants' position that they are also entitled to the proration of [*70] the expenses for the tenant improvement allowance, attorney costs, and the title search. These costs are fixed, and were not linked by the evidence to the length of the term of the replacement lease. For example, the attorney costs incurred by plaintiffs for work performed with respect to the reletting of the premises would have been the same without regard to the length of the term of the new lease. The same applies to the title search. Moreover, there was no evidence that the amount of the tenant improvement allowance corresponded to the length of the lease term. [24] Therefore, I find no merit in defendants' request to prorate these particular costs.

> [24] Indeed, the evidence made clear that the amount of the tenant improvement allowance was based on the square footage of the Property. Because plaintiffs did not actually expend funds to satisfy the tenant improvement allowance, but rather went without rental income for 8 1/3 months, defendants' "payment" for the tenant improvement allowance is captured by the fact

that BTG is liable for unpaid rent for those 8 1/3 months. Accordingly, plaintiffs appropriately have not sought to recover the tenant improvement allowance, and the defendants [*71] will not be charged separately to "reimburse" plaintiffs for the tenant improvement allowance.

*11. Credit for "Surplus" Rent*

As defendants point out, plaintiffs will receive a substantially higher monthly rent from Vitamin Shoppe than BTG was obligated to pay under the BTG Lease. For the months of September and October 2011, plaintiffs have already received two months' worth of "surplus" rent, and it is anticipated that plaintiffs will continue to receive surplus rent throughout the remainder of the BTG Lease. BTG's monthly obligation, until the expiration of the BTG Lease at the end of July 2016, is $ 9,271.16. In contrast, Vitamin Shoppe's monthly rent is presently $ 10,500 (*i.e.*, $ 1,228.84 more than BTG's monthly rent) and, as of December 1, 2015, that sum will increase to $ 11,550 (*i.e.*, $ 2,278.84 more than BTG's monthly obligation).

Accordingly, defendants argue that they are entitled to a credit against the damages they owe plaintiffs, in the amount of the surplus rent already received and the surplus that plaintiffs are expected to receive through the end of the BTG Lease term. They cite no cases that are directly on point, but rely on *M & R Contractors & Builders, Inc. v. Michael, 215 Md. 340, 138 A.2d 350 (1958)*, [*72] and a few cases from other jurisdictions, for the general proposition that gains made by a plaintiff "by reason of opportunities he would not have had but for the other party's breach, are deductible from the amount he is otherwise entitled to recover." *Id. at 355, 138 A2.d at 358; see also Canady v. Crestar Mortg. Corp., 109 F.3d 969, 972 (4th Cir. 1997)* (applying North Carolina law and stating: "In order to prevent a double recovery, courts offset any amount that mitigates damages from the damage award.").

Plaintiffs insist that defendants are not entitled to credit for any anticipated rental surplus. They, too, cite no applicable case law. However, they suggest that the entire "surplus" would be swallowed by interest accruing on the unpaid amounts owed by defendants at the rate of 5.25%. Moreover, they argue that, although Landlord has not sent BTG written notice of termination, it could do so at any time, at which point no further rental obligation

would be due from BTG (and thus, in their view, there would be no surplus).

As indicated, neither party has cited a Maryland case addressing a defaulting tenant's entitlement to the benefit of "surplus" rent received from a replacement [*73] tenant, and the Court's research has uncovered none. However, several such cases from other jurisdictions are collected in an ALR annotation. *See* James Timothy Payne, *Landlord and tenant: respective rights in excess rent when landlord relets at higher rent during lessee's term*, 50 A.L.R.4th 403 (1986, 2009 Supp.).

In a few of the cases cited in that annotation, [HN11] courts have held that a defaulting tenant is not entitled to credit for excess rent. For instance, in *N.J. Industrial Properties, Inc. v. Y.C. & V.L., Inc., 100 N.J. 432, 495 A.2d 1320 (N.J. 1985)*, the New Jersey Supreme Court held that "a landlord who relets property during the unexpired period of a breaching tenant's lease, for rent in excess of that due under the original lease . . . is entitled to the excess rent," and "need not credit such excess rent against the unpaid rent owed by the defaulting tenant for the period when the property was vacant, prior to the subsequent tenant's occupancy." *Id. at 1330*. The New Jersey court reasoned: "If [*74] there is an inequity that . . . must fall on either of the parties, we have decided that it should fall on the party who breached the lease. The defaulting tenant should not get the benefit of his breach." *Id. at 1329*.

In contrast, other decisions have taken the view that a landlord is "required to credit the first tenant with the amount of the excess rent realized from a substitute tenant to whom landlord had relet the abandoned property." *Truitt v. Evangel Temple, Inc., 486 A.2d 1169, 1172-73 (D.C. 1984)*. In *Truitt*, the District of Columbia Court of Appeals reaffirmed its prior holding that, "'once a landlord does relet the abandoned premises, he can no longer hold the original tenant for the full amount of the rent, rather only for the deficiency; he must credit him with the amount received from the reletting.'" *Id. at 1172* (citation omitted). The *Truitt* Court relied upon the compensatory purposes underlying contract damages, quoting WILLISTON ON CONTRACTS for the proposition that, "'[i]n fixing the amount of damages, the general purpose of the law is, and should be . . . to give compensation, that is, to put the plaintiff in as good a position as he would have been had the defendant [*75] kept his contract.'" *Id. at 1173* (citation omitted). In its

view, fair compensation "'involves not only assessment of gains prevented by the breach but also of losses ensuing which would not have occurred had the contract been performed. From these must be deducted any saving to the plaintiff due to the non-performance of the contract.'" *Id.* (citation omitted). *See also Dalamagas v. Fazzina, 36 Conn. Supp. 523, 414 A.2d 494, 494 (Conn. App. 1979)* ("Were we to refuse to credit the defendant with the excess rents which were received by the plaintiffs following the defendant's breach, the plaintiffs would be in a better position than they would have been had there been no breach."). *See also* 3 DAN B. DOBBS, LAW OF REMEDIES § 12.15, at 359-61 (2d ed. 1993) ("DOBBS").

One notable and frequently cited case on point is *Hermitage Co. v. Levine, 248 N.Y. 333, 162 N.E. 97 (N.Y. 1928),* an opinion authored for the New York Court of Appeals by then-Chief Judge Benjamin Cardozo. In that case, the court held that, [HN12] in the absence of a lease provision to the contrary, a defaulting tenant was entitled to the benefit of any excess rent realized from reletting, but reasoned that contract damages for breach of a lease could only be "ascertained [*76] when the term is at an end," resulting in a judgment that was "single and entire, not multiple and several." *Id. at 98.* In the *Hermitage* Court's view, "a damage clause can be drawn in such a way as to make a tenant responsible for monthly deficits after the re-entry of his landlord . . . without charging the landlord with a duty to account for a surplus in other seasons," but a "liability so heavy may not rest upon uncertain inference." *Id.*

In this case, the parties agreed to two principal alternatives available to the Landlord if the Tenant defaulted. Under Section 17.2.2 of the BTG Lease, the Landlord could give the Tenant written notice of termination. In that scenario, the Tenant's rent obligation would cease; however, the Landlord would be entitled to receive as damages "the worth at the time of the award of the amount by which the unpaid rent for the balance of the term after the time of the award exceeds the amount of the loss of rent that Tenant proves reasonably could have been avoided." BTG Lease § 17.2.2(ii). The parties all agree, however, that no written notice of termination was given.

The alternative provision, Section 17.2.3, which is applicable here, expressly authorizes [*77] the Landlord to relet the Property without terminating the Lease. However, in that event, the parties agreed that "any rent

received will be applied *to the account of Tenant*, not to exceed Tenant's *total indebtedness to Landlord*." BTG Lease § 17.2.3 (emphasis added). The same section also states: "Tenant shall have no right to or interest in the rent or other consideration received by Landlord from reletting *to the extent it exceeds Tenant's total indebtedness to Landlord.*" *Id.* (emphasis added).

In *Hermitage*, Judge Cardozo held that a tenant was entitled to the benefit of surpluses from reletting, "in the absence of a provision that points with reasonable clearness to a different construction." *Hermitage, 162 N.E. at 98.* Here, the BTG Lease points with "reasonable clearness" in the opposite direction: it points in favor of Tenant's entitlement to the surplus. The Lease expressly states that any rent received from a replacement tenant must be applied to Tenant's account. Moreover, the Lease states that Tenant is not entitled to the rent received from reletting "to the extent it exceeds Tenant's total indebtedness to Landlord," which logically implies that Tenant is entitled to the benefit [*78] of excess rent up to the amount of its total indebtedness. By its plain language, the BTG Lease contemplates that where, as here, the Landlord elected to relet the Property for the account of the defaulting Tenant, the Tenant is entitled to offset any surplus rent against its "total indebtedness" to the Landlord.

Plaintiffs' argument that the amount of any rental surplus will be offset by interest accruing on plaintiffs' debt at the contractual rate of 5.25% is both beside the point and incorrect in any event. Even if the surplus will go entirely toward payment of interest, Tenant remains entitled to the benefit of the surplus. Further, plaintiffs are incorrect that interest will continue to accrue at 5.25% per annum, post-judgment, so as to swallow the surplus. The parties contractually agreed to the rate of 5.25% for pre-judgment interest. [HN13] Once the Court enters judgment, however, "the underlying contract [will be] merged into final judgment and [will] cease[] to exist as an independent cause of action." *SunTrust Bank v. Goldman, 201 Md. App. 390, 29 A.3d 724, 731, 2011 Md. App. LEXIS 135, *17, 2011 WL 4506382, at *6 (2011); see also AccuBid Excavation, Inc . v. Kennedy Contractors, Inc., 188 Md. App. 214, 233, 981 A.2d 727, 738 (2009).*

After [*79] entry of judgment, interest will accrue at the federal post-judgment interest rate. [HN14] That rate, established by *28 U.S.C. § 1961,* is "a rate equal to the

weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment," *id.* *§ 1961(a)*, and is "compounded annually." *Id.* *§ 1961(b)*. [25] *See, e.g., Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 633 (4th Cir. 1999)* ("Federal law, rather than state law, governs the calculation of post-judgment interest in diversity cases."); *see also In re Riebesell, 586 F.3d 782, 794 (10th Cir. 2009)* ("'[P]arties may contract to, and agree upon, a post-judgment interest [rate] other than that specified in *§ 1961*.' But to do so, they must specifically contract [using 'clear, unambiguous and unequivocal language'] around the general rule that a cause of action reduced to judgment merges into the judgment and the contractual interest rate therefore disappears for post-judgment purposes.") (internal citation omitted).

> [25] At the time that my original Memorandum of Decision was issued, that rate was 0.12% per annum. *See* Federal Reserve Statistical Release H.15 (Selected Interest [*80] Rates) (Oct. 24, 2011), *available at* http://www.federalreserve.gov/releases/h 15/20111024/h15.pdf. At the time of this writing, the rate is 0.11%. *See* Federal Reserve Statistical Release H.15 (Selected Interest Rates) (Dec. 12, 2011) *available at* http://www.federalreserve.gov/releases/h 15/current/h15.pdf.

Plaintiffs also argue that, in order to give defendants the benefit of a projected future surplus, one must assume that Vitamin Shoppe will never default on its lease. They suggest that, especially in light of defendants' default, that is not a safe assumption. However, plaintiffs have executed a comprehensive lease agreement with Vitamin Shoppe that provides ample remedies to plaintiffs in the event of the tenant's default.

Moreover, I reject plaintiffs' contention that application of the surplus to offset the amounts owed by defendants effectively deprives Landlord of its "right" to "terminate the Lease in the future." ECF 58 at 2. Plaintiffs contend: "Choosing to terminate before amassing the maximum possible future 'surplus' credit would permit Landlord to avoid such credits. But the Court's ruling precludes such right and remedy to the benefit of the defaulting party." *Id.* In essence, plaintiffs seek the opportunity to maximize their recovery by

manipulating the timing of the termination of the BTG Lease. Such a result would represent an inequitable end run around Tenant's contractual right to benefit from a lease of the Property "to the account of Tenant," up to the amount of "Tenant's total indebtedness to Landlord." BTG Lease *§ 17.2.3.* It would also violate the compensatory principle of contractual damages that "no one shall profit more from the breach of an obligation than from its full performance." *Dennison v. Head Constr. Co., 54 Md. App. 310, 322, 458 A.2d 868, 875* (citation omitted), *cert. denied,* 296 Md. 653 (1983).

I conclude that defendants are contractually entitled to benefit from the excess rents received by plaintiffs. In my view, however, determination of the appropriate amount of the excess rent to be credited to defendants cannot be based simply on subtraction of BTG's rental obligation from the rent due from Vitamin Shoppe. Rather, any credit of excess rent to defendants must be reduced to present value, because it is based on monthly surpluses that will accrue in future months. [26]

> [26] As I see it, discounting the surplus to present value obviates the need for either party to wait until the end of the term of the BTG Lease for a unitary damages calculation to be made. *Cf. Hermitage, supra, 162 N.E. 97* (holding that landlord's damages claim for unpaid rent could not be adjudicated until the end of the breaching tenant's lease term).

[HN15] Discounting to present value the sums of money that are anticipated to accrue in the future is a familiar methodology. In Maryland, discounting to present value is most commonly at issue in wrongful death and personal injury cases, in which the amounts that must be discounted to present value include the loss of the earning capacity of the decedent or the plaintiff. *See, e.g., Walston v. Sun Cab, 267 Md. 559, 298 A.2d 391 (1973)* (holding that it is reversible error in a wrongful death case to refuse to instruct the jury regarding discounting to present value, where evidence as to discounting is presented); [*81] *Lewin Realty III, Inc. v. Brooks, 138 Md. App. 244, 287-98, 771 A.2d 446, 472-77 (2001)* (holding that the trial court need not instruct jury as to discounting to present value when party with burden of production has not introduced evidence as to discounting); *Dennis v. Blanchfield, 48 Md. App. 325, 428 A.2d 80 (1981)* (extending *Walston* to personal injury cases), *aff'd on other grounds,* 292 Md. 319, 438 A.2d 1330 (1982).

In the landlord-tenant context, discounting to present value has been endorsed by the Supreme Court, which held, in the context of a proceeding between a landlord and a tenant's trustee in bankruptcy, that "[t]he amount of the landlord's claim for the loss of his lease necessarily is the difference between the rental value of the remainder of the term and the rent reserved, *both discounted to present worth*. This, we have said, is a method of liquidation familiar and fair." *City Bank Farmers Trust Co. v. Irving Trust Co., 299 U.S. 433, 443, 57 S. Ct. 292, 81 L. Ed. 324 (1937)* (emphasis added). Other landlord-tenant cases discussing the discounting of an award of future rent or surplus rent to present value include *Jack Burton Mgmt. Co., 77 F. Supp. 2d at 1108-10 (E.D. Mo. 1999)*, and *Admae Enterprises, Ltd. v. 1000 Northern Blvd. Corp., 104 A.D.2d 919, 480 N.Y.S.2d 537, 537 (N.Y. App. Div. 1984)*.

In [*82] order to discount a future amount to present value, an appropriate discount rate must be selected. In his treatise on remedies, Professor Dobbs explains the purpose of the discount rate: "Reduction to present value requires a mathematical computation. Its aim is to find and award a sum of money which, when invested safely, will suffice to pay all of the future damages as they occur by using both the award itself and the interest it earns." 2 DOBBS, § 8.5(3), at 469. In my view, the most appropriate discount rate in this case is the contractual rate of 5.25% per annum chosen by the parties. As noted, the BTG Lease specifically provided: "Landlord and Tenant agree that this sum is reasonable to compensate Landlord for the loss of the use of funds." BTG Lease § 17.3. There is no suggestion that this is a compound interest rate, nor does the Lease specify any compounding period. Accordingly, I will discount based on a simple interest rate of 5.25% per annum.

In addition, I take judicial notice of the formula for discounting to present value based on a simple interest rate, or "discount rate." It is:

Present Value = Future Value ÷ (1 + (Rate × Time))

*See, e.g.,* SUNIL K. PARAMESWARAN, INTEREST [*83] RATES AND TIME VALUE OF MONEY 29 (2007). [27]

27  [HN16] The mathematical formula for discounting to present value is a proper subject of judicial notice. *See, e.g., Russell v. City of*

*Wildwood, 428 F.2d 1176, 1183 (3d Cir. 1970)* (holding that trial judge may take judicial notice of formula for discounting to present value); *Energy Capital Corp. v. United States, 47 Fed. Cl. 382, 421 (2000)* ("[T]he Court can take judicial notice of the formula for calculating the present value."), *aff'd in part, rev'd in part on other grounds, 302 F.3d 1314, 1330-34 (Fed. Cir. 2002)* (affirming trial court's judicial notice of formula, but reversing trial court's choice of discount rate). In contrast to the formula for a simple interest rate, the formula for discounting to present value based on a compound discount rate is: Present Value = Future Value ÷ ((1 + Rate) Time). *See, e.g.,* PARAMESWARAN, *supra*, at 30; 2 DOBBS, § 8.5(3), at 470 n.11; 9 PAUL M. DEUTSCH & FREDERICK A. RAFFA, DAMAGES IN TORT ACTIONS, § 108.12, at 108-9 (2010). A compound rate of interest is often assumed but, as noted, I view the parties' bargained-for contractual simple interest rate as appropriate here.

I have applied [*84] a reduction to present value of the projected surplus rents to be received from Vitamin Shoppe over the remaining term of the BTG Lease. The calculation is set forth in greater detail in Table B, appended hereto. The result of the calculation is that defendants will be entitled to a credit in the amount of $ 71,678.02, inclusive of the excess rent already received for September and October 2011 and the projected future rent for the remainder of BTG's term. Pursuant to Section 17.2.3 of the BTG Lease, this surplus will be applied "to the payment of: (i) first, any indebtedness from Tenant to Landlord other than rent due from Tenant; (ii) second, all costs, including maintenance, incurred by Landlord in reletting; and (iii) third, rent due and unpaid under the Lease." As demonstrated, *infra*, the surplus is only sufficient to offset part of the indebtedness in the first two categories discussed in § 17.2.3, and thus does not affect the third category, consisting of the rent due and unpaid under the Lease.

*12. Prejudgment Interest*

[HN17] The Fourth Circuit has held that "state law applies to questions involving prejudgment interest in diversity cases." [*85] *United States v. Dollar Rent A Car Systems, Inc., 712 F.2d 938, 940 (4th Cir. 1983)*. In Maryland, prejudgment interest accrues at the constitutionally established "legal rate" of 6% simple

interest per annum, *see MD. CONST., art. III, § 57*, unless otherwise specified in the parties' contract or a superseding statute. *See, e.g., Md. Nat. Bank v. Cummins, 322 Md. 570, 600, 588 A.2d 1205, 1219 (1991)* ("Absent a contractual stipulation or a statute, the rate of prejudgment interest may not exceed the general legal rate of six percent."); *Noyes Air Conditioning Contractors, Inc. v. Wilson Towers Ltd. P'ship, 122 Md. App. 283, 293, 712 A.2d 126, 131 (1998)*. As noted, the BTG Lease provided for simple interest of 5.25% per annum on any unpaid sums. Accordingly, any interest awarded will be simple interest at the rate of 5.25% per annum.

In *Buxton v. Buxton, 363 Md. 634, 770 A.2d 152 (2001)*, the Maryland Court of Appeals explained that [HN18] there are "three basic rules governing the allowance of pre-judgment interest" in Maryland. *Id. at 656, 770 A.2d at 165*. First, prejudgment interest is "allowable as a matter for right" in cases where "'the obligation to pay and the amount due had become certain, [*86] definite, and liquidated by a specific date prior to judgment.'" *Id.* (citation omitted). This category of cases in which prejudgment interest is awarded "as of course" includes cases involving "written contracts to pay money on a day certain," as well as actions for "sums payable under leases as rent." *Id.* (citing *I.W. Berman Props. v. Porter Bros., Inc., 276 Md. 1, 16-17, 344 A.2d 65, 75 (1975))*. Second, prejudgment interest is not allowed "in tort cases where the recovery is for bodily harm, emotional distress, or similar intangible elements of damage not easily susceptible of precise measurement." *Id.* Finally, "[b]etween these poles of allowance as of right and non-allowance is a broad category of contract cases in which the allowance of pre-judgment interest is within the discretion of the trier of fact." *Id. at 657, 770 A.2d at 165*. However, the *Buxton* Court cautioned that, within the third category of case, it is an abuse of discretion to award prejudgment interest where the "precise damages" are "unpredictable and incapable of estimation prior to verdict." *Id. at 658, 770 A.2d at 166*.

It is clear that the unpaid rent and unpaid late fees due under the BTG Lease fall into the [*87] first category articulated by the *Buxton* Court. They are "sums payable under leases as rent" and have been capable of precise calculation from the date they were due. Therefore, plaintiffs are entitled to prejudgment interest on those sums at the contractual rate of 5.25% simple interest per annum, beginning on the date due. The

interest calculation is set forth in detail in Table C, appended hereto. The total principal amount of accrued unpaid rent and late fees is $ 202,560.86. As of October 26, 2011 (the date of the original Memorandum of Decision), $ 12,998.20 in prejudgment interest was due and payable, and the principal has accrued and will continue to accrue daily interest at the rate of 5.25% per annum, or $ 29.14 per day ($ 202,560.86 multiplied by 5.25%, divided by 365), from October 26, 2011, until it is reduced to judgment. [28]

> [28]   Judgment could not be entered in this case until the matter of litigation attorneys' fees was resolved, because [HN19] "attorney's fees recoverable pursuant to a contract are part of the damages claim." *AccuBid, supra, 188 Md. App. at 231; see also SunTrust, supra,   Md. App.   , 2011 Md. App. LEXIS 135 at *17*. As noted, the parties agreed to bifurcate the trial with regard to litigation counsel fees.

The other damages, including the brokers' [*88] commission, the attorneys' fees, Dr. Herst's administrative costs, and the other various bills, could not have been determined precisely as of any date certain prior to trial of the case. With the exception of Dr. Herst's invoice dated September 10, 2009, *see* Plaintiffs' Exhibit 21-A, which listed a $ 25 charge for water and sewer service, there was no evidence that plaintiffs ever billed defendants for these amounts. Aside from the single $ 25 charge in Plaintiff's Exhibit 21-A, the invoices sent to defendants by Dr. Herst only included billing for the unpaid rent and late fees. Moreover, as the foregoing discussion has indicated, plaintiffs inaccurately calculated some of these amounts. Accordingly, as to the damages exclusive of unpaid rent and late fees, I will only award prejudgment interest running from the date of the Court's original Memorandum of Decision until entry of judgment.

Those amounts include $ 13,060.11 for taxes and utilities; $ 46,023.53 for BTG's prorated share of the brokers' commission; $ 4,630.34 in non-litigation attorneys' fees; $ 862 for the title search; and $ 25,000 for Dr. Herst's administrative costs. These sums total $ 89,575.98. That sum will be reduced by the credit for "surplus" [*89] rent of $ 71,678.02, resulting in an adjusted total of $ 17,897.96 in damages, exclusive of unpaid rent and late fees. That principal amount has accrued and will continue to accrue daily interest at the

rate of 5.25% simple interest per annum, or $ 2.57 per day ($ 17,897.96 multiplied by 5.25%, divided by 365), from October 26, 2011 (the date of the original Memorandum of Decision) until reduced to judgment.

## Conclusion

For the foregoing reasons, I conclude that defendants breached the Lease and Guaranty and are jointly and severally liable to plaintiffs for the principal amount of $ 220,458.82 (including $ 202,560.86 in unpaid rent and late fees, and $ 17,897.96 in other damages), plus accrued prejudgment interest on unpaid rent and late fees of $ 12,998.20 as of October 26, 2011 (the date of the Court's original Memorandum of Decision), plus additional

prejudgment interest accruing at $ 31.71 per day (*i.e.*, $ 29.14 in daily interest on unpaid rent and late fees plus $ 2.57 in daily interest on other damages), from October 26, 2011, until reduced to judgment. These rulings, along with the Court's determination as to attorneys' fees, are reflected in the Order that follows.

Date: December 20, 2011

/s/ Ellen Lipton Hollander

United  [*90] States District Judge

**TABLE A: Reimbursable Taxes and Utility Payments**

| Date | Amount | For | Source (Plaintiffs' Exhibit #) |
|------|--------|-----|-------------------------------|
| Sep 10, 2009 | $ 25.00 | *Water/Sewer** | *Ex 21-A* |
| Oct 28, 2009 | $ 250.00 | *Sec'y Dep for Electricity* | *Ex 25-A* |
| Nov 13, 2009 | $ 95.59 | *Water/Sewer* | *Ex 24-A* |
| Dec 3, 2009 | $ 198.78 | *Electricity* | *Ex 25-B* |
| Jan 5, 2010 | $ 197.45 | *Electricity* | *Ex 25-C* |
| Feb 3, 2010 | $ 185.49 | *Electricity* | *Ex 25-D* |
| Feb 18, 2010 | $ 93.94 | *Water/Sewer* | *Ex 24-B* |
| Mar 4, 2010 | $ 153.55 | *Electricity* | *Ex 25-E* |
| Apr 6, 2010 | $ 203.41 | *Electricity* | *Ex 25-F* |
| May 5, 2010 | $ 226.02 | *Electricity* | *Ex 25-G* |
| May 10, 2010 | $ 93.76 | *Water/Sewer* | *Ex 24-C* |
| Jun 4, 2010 | $ 421.10 | *Electricity*** | *Ex 25-I p6* |
| Jul 1, 2010 | $ 9,283.87 | **Real Property Taxes*** | *Ex 23 & Ex 25-I p11* |
| Jul 6, 2010 | $ 554.47 | *Electricity*** | *Ex 25-H* |
| Aug 3, 2010 | $ 512.57 | *Electricity* | *Ex 25-I p3* |
| Aug 11, 2010 | $ 93.76 | *Water/Sewer* | *Ex 25-I p13* |
| Sep 1, 2010 | $ 471.35 | *Electricity* | *Ex 25-I p2* |
| **TOTAL:** | **$ 13,060.11** | | |

\* Billed on an invoice from Dr. Herst to BTG - no utility bill submitted

\*\* Plaintiffs sought to recover $ 981.53 for July 2010 Electricity, representing the June and July 2010 payments and a $ 5.96 late fee for the June 2010 balance, which evidently was paid late. I have disallowed the late fee.

\*\*\* Real Property Taxes of $ 9,366.35 were charged for July 2010 - June 2011, but plaintiffs took advantage of a prepayment discount to pay only $ 9,283.87

\*\* Plaintiffs sought to recover $ 981.53 for July 2010 Electricity, representing the June and July 2010 payments and a $ 5.96 late fee for the June 2010 balance, which evidently was paid late. I have disallowed the late fee.

**TABLE [\*91] B: Adjusted Surplus Rent (Adjustment by Reduction to Present Value)**

| Date | BTG Rent | Vitamin Rent | Surplus (Vitamin Rent - BTG Rent) | Surplus Reduced to Present Value* |
|------|----------|--------------|-----------------------------------|-----------------------------------|
| Sep 2011 \*\* | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,228.84 |
| Oct 2011 \*\* | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,228.84 |
| Nov 2011 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,223.49 |
| Dec 2011 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,218.18 |
| Jan 2012 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,212.92 |
| Feb 2012 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,207.71 |
| Mar 2012 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,202.53 |
| Apr 2012 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,197.41 |
| May 2012 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,192.33 |
| Jun 2012 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,187.29 |
| Jul 2012 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,182.29 |
| Aug 2012 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,177.33 |
| Sep 2012 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,172.42 |
| Oct 2012 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,167.54 |
| Nov 2012 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,162.71 |
| Dec 2012 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,157.92 |
| Jan 2013 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,153.16 |
| Feb 2013 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,148.45 |
| Mar 2013 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,143.77 |
| Apr 2013 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,139.13 |
| May 2013 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,134.53 |
| Jun 2013 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,129.97 |
| Jul 2013 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,125.44 |
| Aug 2013 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,120.95 |

| | | | |
|---|---|---|---|
| Sep 2013 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,116.49 |
| Oct 2013 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,112.07 |
| Nov 2013 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,107.69 |
| Dec 2013 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,103.34 |
| Jan 2014 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,099.02 |
| Feb 2014 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,094.73 |
| Mar 2014 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,090.48 |
| Apr 2014 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,086.27 |
| May 2014 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,082.08 |
| Jun 2014 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,077.93 |
| Jul 2014 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,073.81 |
| Aug 2014 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,069.72 |
| Sep 2014 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,065.66 |
| Oct 2014 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,061.63 |
| Nov 2014 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,057.64 |
| Dec 2014 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,053.67 |
| Jan 2015 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,049.73 |
| Feb 2015 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,045.82 |
| Mar 2015 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,041.94 |
| Apr 2015 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,038.09 |
| May 2015 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,034.27 |
| Jun 2015 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,030.47 |
| Jul 2015 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,026.71 |
| Aug 2015 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,022.97 |
| Sep 2015 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,019.26 |
| Oct 2015 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,015.57 |
| Nov 2015 | $ 9,271.16 | $ 10,500 | $ 1,228.84 | $ 1,011.91 |
| Dec 2015 *** | $ 9,271.16 | $ 11,550 | $ 2,278.84 | $ 1,869.82 |
| Jan 2016 | $ 9,271.16 | $ 11,550 | $ 2,278.84 | $ 1,863.13 |
| Feb 2016 | $ 9,271.16 | $ 11,550 | $ 2,278.84 | $ 1,856.49 |
| Mar 2016 | $ 9,271.16 | $ 11,550 | $ 2,278.84 | $ 1,849.90 |
| Apr 2016 | $ 9,271.16 | $ 11,550 | $ 2,278.84 | $ 1,843.35 |
| May 2016 | $ 9,271.16 | $ 11,550 | $ 2,278.84 | $ 1,836.85 |
| Jun 2016 | $ 9,271.16 | $ 11,550 | $ 2,278.84 | $ 1,830.39 |
| Jul 2016 | $ 9,271.16 | $ 11,550 | $ 2,278.84 | $ 1,823.98 |
| TOTALS: | | | $ 80,901.56 | $ 71,678.02 |
| | | | | =Adjusted Surplus |

2011 U.S. Dist. LEXIS 124430, *91

---

*   Present Value of Monthly Surplus = Future Monthly Surplus ÷ (1 + ((0.0525 ÷ 12) x Num. of Months After Oct 2011))

**   Surplus for Sep 2011 and Oct 2011 is not reduced to present value because surplus for those months has already been received

**   Surplus for Sep 2011 and Oct 2011 is not reduced to present value because surplus for those months has already been received

***   Per Vitamin Lease, Vitamin Shoppe's rent increases to $ 11,550 as of Dec. 1, 2015

**TABLE** [*92] **C: Unpaid Rent and Late Fees with Prejudgment Interest**

| Date | Rent | Late Fee (3% of Rent) | Rent Plus Late Fee | Cumulative Rent Plus Late Fees | Interest (5.25% simple int. per annum)* | Cumulative Interest |
|------|------|------|------|------|------|------|
| Sep 2009 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 8,681.18 | $ 37.98 | $ 37.98 |
| Oct 2009 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 17,362.36 | $ 75.96 | $ 113.94 |
| Nov 2009 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 26,043.54 | $ 113.94 | $ 227.88 |
| Dec 2009 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 34,724.72 | $ 151.92 | $ 379.80 |
| Jan 2010 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 43,405.90 | $ 189.90 | $ 569.70 |
| Feb 2010 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 52,087.08 | $ 227.88 | $ 797.58 |
| Mar 2010 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 60,768.26 | $ 265.86 | $ 1,063.44 |
| Apr 2010 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 69,449.44 | $ 303.84 | $ 1,367.29 |
| May 2010 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 78,130.62 | $ 341.82 | $ 1,709.11 |
| Jun 2010 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 86,811.80 | $ 379.80 | $ 2,088.91 |
| Jul 2010 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 95,492.98 | $ 417.78 | $ 2,506.69 |
| Aug 2010 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 104,174.16 | $ 455.76 | $ 2,962.45 |
| Sep 2010 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 112,855.34 | $ 493.74 | $ 3,456.19 |
| Oct 2010 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 121,536.52 | $ 531.72 | $ 3,987.92 |
| Nov 2010 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 130,217.70 | $ 569.70 | $ 4,557.62 |
| Dec 2010 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 138,898.88 | $ 607.68 | $ 5,165.30 |
| Jan 2011 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 147,580.06 | $ 645.66 | $ 5,810.96 |
| Feb 2011 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 156,261.24 | $ 683.64 | $ 6,494.61 |
| Mar 2011 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 164,942.42 | $ 721.62 | $ 7,216.23 |
| Apr 2011 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 173,623.60 | $ 759.60 | $ 7,975.83 |
| May 2011 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 182,304.78 | $ 797.58 | $ 8,773.42 |
| Jun 2011 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 190,985.96 | $ 835.56 | $ 9,608.98 |
| Jul 2011 | $ 8,428.33 | $ 252.85 | $ 8,681.18 | $ 199,667.14 | $ 873.54 | $ 10,482.52 |
| Aug 2011 ** | $ 2,809.44 | $ 84.28 | $ 2,893.73 | $ 202,560.86 | $ 886.20 | $ 11,368.73 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Sep 2011 | ---- | ---- | ---- | $ 202,560.86 | $ 886.20 | $ 12,254.93 |
| Oct 2011 *** | ---- | ---- | ---- | $ 202,560.86 | $ 743.27 | $ 12,998.20 |
| TOTALS : | $ 196,661.03 | $ 5,899.83 | $ 202,560.86 | | $ 12,998.20 | |

\*    Interest for each month is calculated by multiplying the Cum. Rent + Late Fees by 0.0525 ÷ 12

\*\*    Rent for August 2011 is $ 8,428.33 ÷ 3, pursuant to the parties' stipulation

\*\*\*    Interest for October 2011 is calculated through the date of the Memorandum of Decision

**ORDER**

For the reasons stated in the accompanying Amended Memorandum of Decision and Memorandum Opinion Regarding Attorneys' Fees, it is this 26th day of December, 2011, by the United States District Court for the District of Maryland, ORDERED:

1. The Court FINDS that defendants Blinds to Go (U.S.) Inc. and Blinds To Go Inc. breached the Lease and Guaranty that are at issue in this case, both dated September 21, 2000.

2. Plaintiffs' Motion for Attorneys' Fees (ECF 51) is GRANTED, in part, and DENIED, in part.

3. The Court FINDS that defendants Blinds to Go (U.S.) Inc. and Blinds To Go Inc. are jointly and severally liable to plaintiffs Roger E. Herst Revocable Trust; Dr. Roger E. Herst, Trustee of the Roger E. Herst Revocable Trust; and Joshua R. Herst, for damages in the principal amount of $ 220,458.82; plus attorneys' fees in the amount of $ 91,922.76 and expenses of $ 406.63; together with accrued prejudgment interest in the amount of $ 12,998.20 as of October 26, 2011; and additional prejudgment interest accruing at the rate of $ 31.71 per day, from October 26, 2011 until the date of this Order (55 days), totaling $ 1,744.05.

4. The Clerk is directed to ENTER JUDGMENT in favor of plaintiffs and against defendants for the total sum of $ 327,530.46, after which said judgment shall accrue post-judgment interest as specified in *28 U.S.C. § 1961*; and

5. The Clerk is directed to CLOSE this case.

/s/ Ellen Lipton Hollander

United States District Judge





Analysis
As of: Jan 13, 2012

STEVE RANDY HOLLAND, Plaintiff, vs. UNITED STATES OF AMERICA, et al.,
Defendants.

No. 06-2700-STA-tmp

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
TENNESSEE, WESTERN DIVISION

*2008 U.S. Dist. LEXIS 53017*

July 10, 2008, Decided
July 11, 2008, Filed

**SUBSEQUENT HISTORY:** Judgment entered by
*Holland v. United States, 2009 U.S. Dist. LEXIS 90445
(W.D. Tenn., Sept. 30, 2009)*

**PRIOR HISTORY:** *Holland v. United States, 2008 U.S.
Dist. LEXIS 15788 (W.D. Tenn., Feb. 29, 2008)*

**COUNSEL:** [*1] Steve Randy Holland, Plaintiff, Pro se,
Memphis, TN.

For United States of America, Defendant: Barbara M.
Zoccola, LEAD ATTORNEY, William W. Siler, U.S.
ATTORNEY'S OFFICE, Memphis, TN.

For Federal Bureau of Prisons, Defendant: William W.
Siler, U.S. ATTORNEY'S OFFICE, Memphis, TN.

**JUDGES:** S. Thomas Anderson, UNITED STATES
DISTRICT JUDGE.

**OPINION BY:** S. Thomas Anderson

**OPINION**

ORDER DENYING PLAINTIFF'S MOTION TO
TAKE JUDICIAL NOTICE

On October 3, 2007, Plaintiff Steve Randy Holland,
Bureau of Prisons ("BOP") inmate registration number
19635-001, an inmate at the Federal Correctional
Institution in Memphis, Tennessee, filed a motion,
entitled "Motion for the District Court to Take Judicial
Notice of Certain and Relevant Policies, Regulations,
Laws and Legal Maxims." (Docket Entry ("D.E.") 22.)
Defendant filed a response in opposition to the motion on
October 17, 2007 (D.E. 23 & 24) and, again, on March 7,
20008 (D.E. 28).

*Rule 201(b) of the Federal Rules of Evidence*
provides as follows:

A judicially noticed fact must be one not
subject to reasonable dispute in that it is
either (1) generally known within the
territorial jurisdiction of the trial court or
(2) capable of accurate and ready
determination by resort to sources [*2]

whose accuracy cannot reasonably be questioned.

"A court shall take judicial notice if requested by a party and supplied with the necessary information." *Fed. R. Evid. 201(d).*

Plaintiff asks the Court to take judicial notice of the following:

1. That the Federal Bureau of Prisons has promulgated a policy identified as Program Statement 5380.7, Financial Responsibility Program, Inmate, effective 1/27/2000 (a/k/a Inmate Financial Responsibility Program or "IFRP").

2. That the IFRP was designed to encourage inmates confined within the Federal Bureau of Prisons (BOP) to meet his or her legitimate financial obligations and to develop a financial plan for meeting those obligations.

3. That the IFRP follows the Attorney General's regulation for the same activities, codified and found in *§ 545.10* of the Codes of Federal Regulation (CFR).

4. That the control and management of federal penal and correctional institutions is vested in the Attorney General, who promulgates the rules and regulations for the government of the federal correctional and/or penal institutions. *18 U.S.C. § 4001(b)(1).*

5. The BOP must follow its own promulgated regulations. *United States ex rel. Wolfish v. Levi, 439 F.Supp. 114,* [*3] *affirmed Wolfish v. Levi, 573 F.2d 118, cert. Granted Bell v. Wolfish, 99 S.Ct. 76, 439 U.S. 816, 58 L.Ed.2d 107, reversed 99 S.Ct. 1861, 441 U.S. 520, 60 L.Ed.2d 447 (1977); Kentucky department of Corrections v. Thompson, 490 U.S. 454, 109 S.Ct. 1904, 104 L. Ed. 2d 506 (1989)* (policies that create liberty interests must be adhered to strictly).

6. Under BOP Program Statement

580.07, 8(a.) (2), page 5, the BOP recognizes that a defendant's obligation to pay restitution ceases on a circuit-by-circuit basis for inmates convicted prior to April 24, 1996.

7. That the United States District Court for the Northern District of Alabama found that the obligation for Plaintiff to pay restitution ceased after five years following his sentencing date. *United States v. Holland, 380 F.Supp.2d 1264 (N.D. Ala. 2005).*

8. That plaintiff's restitution obligation was ordered by the United States District Court for the Northern District of Alabama on May 8, 1995, pursuant to the Victim and Witness Protection Act ("VWPA"). *18 U.S.C. § 3663, et seq.,* and provided a five year limitation period on the restitution obligations. *See United States v. Holland, supra, at 1269.*

9. That BOP employees responsible for carrying out tasks outlined [*4] in BOP policy are trained with respect to matters contained within said policies.

10. That 18 U.S.C. § 3579(f)(2), in effect at the time of the plaintiff's sentencing, and that is applicable here, provided that the end of restitution payment obligations *shall* not be later than five years after the date of sentencing.

11. That it is a presumption in law that employees of the BOP, with respect to the duties assigned to them, are aware of the law that regulates those duties.

12. That defendants have admitted that they knew plaintiff's obligation to pay restitution was no longer an obligation at the time they decided to cause him to pay the restitution obligations.

13. That the plaintiff was threatened with institutional program and privilege restrictions if he refused to participate in

the IFRP by the institutional staff responsible for imposing the obligations upon him after the obligation had expired.

14. That the taking of property (money) is a compensable injury that the plaintiff is entitled to be compensated for when the taking was accomplished in violation of policy, regulation and/or law.

15. That the court take judicial notice of *United States v. Holland, 380 F.Supp.2d 1264 (N.D. Ala. 2005)*, [*5] and the factual statements contained therein, as well as the legal and constitutional findings.

16. That the district court in the Northern District of Alabama found, in *United States v. Holland, supra*, that the BOP should not have forced plaintiff to agree, on pretense of threats to strip him of his privileges and job opportunities within the Federal Correctional Institution at Memphis, Tennessee, to defendants unlawful taking of his property as the obligation on which the taking was premised had already expired.

17. That, insofar as defendants acts were inconsistent with clearly promulgated policies create and carried out by them, owe a duty to the plaintiff to restore to him what they caused him to be deprived of because they failed to follow the law and their own policies and regulations.

18. That plaintiff is entitled to punitive damages because defendants engaged in activities not authorized in law or in the policies and regulations governing the respective offices of the federal employees involved in the property deprivation issues at hand and, because said employees knew, or should have known, at the time of their forced taking of plaintiff's property, that they were forbidden [*6] from taking same by virtue of 18 U.S.C. § 3579(f)(2).

19. That defendants cannot take it upon themselves to collect restitution payments that have already expired without violating their own policies, regulations and the Constitution and the *Due Process Clause* thereof.

20. That defendants cannot refuse to repay monies that they unlawfully took from the plaintiff.

21. That defendants cannot make legal what by law was illegal by taking a position that the act committed by them, that resulted in an injury to the plaintiff, was taken in good faith.

22. That defendants unlawfully took plaintiff's money to pay a restitution obligation that was already expired.

23. That the Constitution forecloses the taking of property from an individual except that he be afforded due process of law; that due process of law requires a valid restitution order, not an expired one, before the taking of restitution monies may be undertaken by a government agency such as the BOP.

(D.E. 22 at 1-5).

Defendant argues that judicial notice is not appropriate for the factual and legal arguments set forth in Plaintiff's motion (D.E. 23). More specifically, Defendant disputes the accuracy of statement one (D.E. 24 at 2). Defendant [*7] contends that the Court should not take judicial notice of the reasons behind the design of the IFRP as stated in statement two because these reasons are not generally known to the trial court or capable of ready determination by resort to resources (D.E. 24 at 3). Defendant argues that the remaining "facts" listed at statements three through twenty-three constitute argument, not adjudicative fact and are not appropriate for judicial notice (*id.* at 3-7). Defendant also notes that statements seven and eight are attempts to bind this Court by the rulings of the United States District Court for the Northern District of Alabama (*id.* at 3-4).

As a general matter, judicial notice is available only for "adjudicative facts," or the "facts of the particular

case," as opposed to "legislative facts," which are facts "which have relevance to legal reasoning ..., whether in the formulation of a legal principle or ruling by a judge ... or in the enactment of a legislative body." *Toth v. Grand Trunk R.R., 306 F.3d 335, 349 (6th Cir. 2002), quoting Fed. R. Evid. 201* advisory committee's note (1972). "Adjudicative facts" are facts about the parties or the issues to which the law is applied, usually by the [*8] jury, in the trial of a case. *Marshall v. Bramer, 828 F.2d 355, 357 (6th Cir. 1987).* Adjudicative facts are usually established through the introduction of evidence such as the testimony of witnesses. *Fed. R. Evid. 201* advisory committee's note (1972). A "high degree of indisputability" is an essential prerequisite for a court to take judicial notice of a particular fact. *Id.*

Thus, judicial notice is generally not the appropriate means to establish the legal principles governing the case. *Marshall, 828 F.2d at 357; see also Fed. R. Evid. 201* advisory committee's note (1972) ("No rule deals with judicial notice of 'legislative' facts."). A legal rule may be a proper fact for judicial notice if it is offered to establish the factual context of the case, as opposed to stating the governing law. *Toth, 306 F.3d at 349.*

In the instant case, Plaintiff attempts to use judicial notice as a means for establishing his argument. The facts proposed for judicial notice in this motion are not generally known within the territorial jurisdiction of the trial court or capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Additionally, though Plaintiff [*9] references federal policies, federal regulations, and case law, these policies and legal rules do not establish the factual context for the instant case and can not be considered highly indisputable adjudicative facts.

For the foregoing reasons, Plaintiff's motion is **DENIED.**

IT IS SO ORDERED this 10th day of July, 2008.

/s/ **S. Thomas Anderson**

S. THOMAS ANDERSON

UNITED STATES DISTRICT JUDGE





Analysis
As of: Jan 13, 2012

**MAILLIARD KING, Plaintiff, vs. D. K. SISTO, et al., Defendants.**

**No. 2:07-cv-0846-FCD-JFM (PC)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
CALIFORNIA**

*2010 U.S. Dist. LEXIS 8335*

**February 1, 2010, Decided
February 2, 2010, Filed**

**PRIOR HISTORY:** *King v. Sisto, 2009 U.S. Dist.
LEXIS 70966 (E.D. Cal., Aug. 11, 2009)*

**COUNSEL:** [*1] Mailliard L. King, Plaintiff, Pro se,
VACAVILLE, CA.

For J. R. Cornell, S. Cervantes, M. D. Corioso,
Stufflebeam, Defendants: Rebecca Lynn Bach, LEAD
ATTORNEY, State of California, Attorney General's
Office, Sacramento, CA.

**JUDGES:** John F. Moulds, UNITED STATES
MAGISTRATE JUDGE.

**OPINION BY:** John F. Moulds

**OPINION**

*ORDER AND FINDINGS & RECOMMENDATIONS*

 Plaintiff is a state prisoner proceeding pro se with a
civil rights action pursuant to *42 U.S.C. § 1983*. This
action is proceeding on claims raised against defendants

S. Cervantes, M.D. Corioso, and W. Stufflebeam in
plaintiff's fourth amended complaint, filed December 16,
2008. This matter is before the court on defendants'
motion to dismiss for failure to exhaust administrative
remedies prior to suit pursuant to the unenumerated
provisions of *Fed. R. Civ. P. 12(b)* and for failure to state
a claim upon which relief may be granted pursuant to
*Fed. R. Civ. P. 12(b)(6)*. Plaintiff opposes the motion. [1]

>  1  With his opposition, plaintiff filed a document
> styled as a motion for judicial notice. The motion
> contains legal argument and case citations, which
> are not properly the subject of judicial notice.
> Plaintiff's motion will be denied.

 ALLEGATIONS OF THE FOURTH AMENDED
COMPLAINT

 Plaintiff's [*2] fourth amended complaint contains
the following allegations against defendants Cervantes,
Corioso and Stufflebeam. On March 9, 2005, a personal
alarm was activated at California State Prison-Solano
(CSP-Solano). Generally, all inmates except those with
medical chronos are required to get down on the ground

Case 8:10-cv-02822-RWT   Document 57   Filed 01/13/12   Page 62 of 107

Page 2
2010 U.S. Dist. LEXIS 8335, *2

when personal alarms are activated. On March 9, 2005, plaintiff had medical chronos which stated that plaintiff did not have to get down during an alarm. Plaintiff was approached by Correctional Officer Harris, who ordered him to get down on the ground. Plaintiff showed the Officer Harris his chronos, which were based on plaintiff's back injuries and other medical problems. Officer Harris disregarded the chronos and forced plaintiff to the ground. Officer Harris then confiscated the chronos and escorted plaintiff to the medical department to obtain verification of the chronos. When told he would have to wait, Officer Harris left the medical department without returning plaintiff's chronos.

On March 11, 2005, plaintiff filed an inmate grievance against the correctional officer. On August 1, 2005, after plaintiff had experienced "undue delays" in the return of his grievance, plaintiff [*3] filed another grievance concerning the efforts of the administration at CSP-Solano to "deliberately impede" plaintiff's right to file an inmate appeal. Fourth Amended Complaint, filed December 16, 2008, at 8.

On November 1, 2005, plaintiff was sixth in line to enter the law library. Defendant Stufflebeam told plaintiff that he used the law library too much and therefore that the library was "going to strictly adhere to an already existing but not constantly used ducating system." *Id.* After that, plaintiff was told by another inmate that he had overheard Officer Harris and defendant Stufflebeam "mentioning plaintiff's name several times during a conversation." *Id.* For that reason, plaintiff filed an inmate grievance alleging that defendant Stufflebeam had retaliated against plaintiff for filing an inmate grievance against Officer Harris by "capriciously and arbitrarily denying Plaintiff access to the Law Library." *Id.* at 9.

On March 8, 2006, while plaintiff was in the prison law library, defendant Stufflebeam confiscated two documents from plaintiff and read legal documents that belonged to plaintiff and another inmate that plaintiff was assisting. One of the documents showed that plaintiff [*4] had "transferred" preferred legal user (PLU) status. Thereafter, defendant Stufflebeam went to the law library supervisor and tried to get plaintiff's preferred legal user (PLU) status cancelled and "the PLU transferred policy discontinued." *Id.* On April 27, 2006, plaintiff submitted an inmate grievance concerning defendant Stufflebeam confiscating and reading the legal documents that belonged to plaintiff and the other inmate. Plaintiff has

also reported and complained about defendants Stufflebeam's "continual retaliatory efforts" to impede plaintiff's right to access the law library and the courts. *Id.* ON April 26, 2006, defendant Stufflebeam denied plaintiff and other inmates PLU access to the law library even though they had been granted such access before.

On May 9, 2006, defendant Stufflebeam confiscated a typewriter plaintiff was using in the law library. Plaintiff explained that he was authorized to use the typewriter as a member of the Men's Advisory Committee, but defendant Stufflebeam confiscated it anyway. There were several inmates using typewriters and plaintiff was the only inmate defendant Stufflebeam inquired about or confiscated a typewriter from.

On May 10, 2006, defendants [*5] Stufflebeam "reportedly fabricated a false report that the typewriter was stolen." *Id.* at 11. As a result of this report, two officers were sent to search plaintiff's cell. Plaintiff was subject to other acts of retaliation by defendant Stufflebeam, including acts on June 7, 2006 and September 5, 2006.

Defendants Cervantes and Corioso refused to process plaintiff's inmate grievances.

DEFENDANTS' MOTION TO DISMISS

Defendants first contend that plaintiff failed to exhaust administrative remedies for any of the claims on which this action is proceeding prior to filing the action. On October 24, 2007, the court advised plaintiff of the requirements for opposing a motion to dismiss for failure to exhaust administrative remedies pursuant to the unenumerated provisions of *Fed. R. Civ. P. 12(b). See Wyatt v. Terhune, 315 F.3d 1108, 1120 n.14 (9th Cir. 2003).*

"*Section 1997e(a) of Title 42 of the United States Code* provides: No action shall be brought with respect to prison conditions under [*42 U.S.C. § 1983*], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

This exhaustion requirement [*6] is mandatory. *Booth v. Churner, 532 U.S. 731, 741, 121 S. Ct. 1819, 149 L. Ed.*

*2d 958 (2001)." McKinney v. Carey, 311 F.3d 1198, 1199 (9th Cir. Dec. 5, 2002).* Exhaustion must precede the filing of the complaint; compliance with the statute is not achieved by satisfying the exhaustion requirement during the course of an action. *Id. at 1200.* Defendants have the burden of proving that plaintiff failed to exhaust available administrative remedies. *See Wyatt, 315 F.3d at 1120.*

California's Department of Corrections provides a four-step grievance process for prisoners who seek review of an administrative decision or perceived mistreatment. Within fifteen working days of "the event or decision being appealed," the inmate must ordinarily file an "informal" appeal, through which "the appellant and staff involved in the action or decision attempt to resolve the grievance informally." *Cal.Code Regs., tit. 15, §§ 3084.5(a), 3084.6(c).* [Footnote omitted.] If the issue is not resolved during the informal appeal, the grievant next proceeds to the first formal appeal level, usually conducted by the prison's Appeals Coordinator. *Id. §§ 3084.5(b), 3084.6(c).* Next are the second level, providing review by the institution's head or a regional [*7] parole administrator, and the third level, in which review is conducted by a designee of the Director of the Department of Corrections. [Footnote omitted.] *Id. § 3084.5(e)(1)-(2).*

*Brown v. Valoff, 422 F.3d 926, 929-30 (9th Cir. 2005.)*

Defendants contend that plaintiff failed to exhaust administrative remedies with respect to any of the claims raised in this action before the action was filed on October 18, 2006. In support of this contention, defendants have presented evidence that between the time the events that gave rise to the allegations in the fourth amended complaint occurred and the time this action was commenced, plaintiff submitted a total of twelve inmate grievances. Declaration of T. Moore, filed April 14, 2009, (Moore Declaration) at P 3. One concerned the November 1, 2005 incident and was withdrawn by plaintiff. *Id.* and Ex. 1 to Moore Declaration. Of the five other grievances filed by plaintiff that arguably relate to the incidents at bar, none were resolved at the third and final level of administrative review prior to the time this action was filed. *Id.* and Exs. 1-12 of Moore Declaration.

Plaintiff does not dispute that he failed to exhaust administrative remedies prior [*8] to commencing this action. Instead, he argues that the alleged ongoing retaliation and reprisals forced him to proceed to court before exhausting his administrative remedies. This argument is without merit.

For the foregoing reasons, this court finds that plaintiff failed to exhaust administrative remedies for any of his claims against defendants Stufflebeam, Cervantes or Corioso prior to filing this action. For that reason, this action must be dismissed without prejudice. [2]

> 2   In light of this finding, the court will not reach the remaining arguments in defendants' motion to dismiss.

In accordance with the above, IT IS HEREBY ORDERED that plaintiff's September 23, 2009 motion for judicial notice is denied; and

IT IS HEREBY RECOMMENDED that:

1. Defendants' April 14, 2009 motion to dismiss be granted; and

2. This action be dismissed without prejudice for failure to exhaust administrative remedies prior to suit.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of *28 U.S.C. § 636(b)(1).* Within fourteen days after being served with these findings and recommendations, any party may file written objections with the [*9] court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).*

DATED: February 1, 2010.

/s/ John F. Moulds

UNITED STATES MAGISTRATE JUDGE





Analysis
As of: Jan 13, 2012

**HEKYONG PAK, Plaintiff, v. DOLORES RIDGELL, et al., Defendants.**

**Civil No. RDB-10-01421**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

*2011 U.S. Dist. LEXIS 84057*

**August 1, 2011, Decided**

**PRIOR HISTORY:** *Business Loan Express, LLC. v. Pak, 2004 U.S. Dist. LEXIS 12807 (D. Md., July 9, 2004)*

**COUNSEL:** [*1] Hekyong Pak, Plaintiff, Pro se, Lincoln, RI.

For Delores Ridgell, Assistant Bar Counsel for ATTORNEY GRIEVANCE COMMISSION OF MARYLAND, Attorney Grievance Commission of Maryland, Defendants: H Scott Curtis, LEAD ATTORNEY, Office of the Attorney General, Courts and Judicial Affairs, Baltimore, MD.

**JUDGES:** Richard D. Bennett, United States District Judge.

**OPINION BY:** Richard D. Bennett

**OPINION**

## MEMORANDUM OPINION

This case arises out of Plaintiff Hekyong Pak's disbarment from the Maryland state bar and the prosecuting bar counsel's conduct in those proceedings.

Plaintiff has asserted two distinct claims. First, Plaintiff seeks to have this court declare her disbarment null and void due to bar counsel's allegedly fraudulent conduct. Second, Plaintiff asserts a *42 U.S.C. § 1983* claim against Defendant Dolores Ridgell for damages. Defendants Ridgell and the Attorney Grievance Commission of Maryland now move to dismiss Plaintiff's claims. The parties' submissions have been reviewed and no hearing is necessary. *See Local Rule 105.6* (D. Md. 2011). For the reasons that follow, Defendants Dolores Ridgell and the Attorney Grievance Commission of Maryland's Motion to Dismiss (ECF No. 15) is GRANTED.

BACKGROUND

In ruling on a motion [*2] to dismiss, the factual allegations in the plaintiff's complaint must be accepted as true and those facts must be construed in the light most favorable to the plaintiff. *Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999)*. A court may also rely on the contents of any documents referred to in the complaint that are integral to the allegations. *Philips v. Pitt County Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009)*. A court may also consider "matters of public record" that are appropriate for judicial notice. *Id.*; *Q Int'l Courier, Inc. v. Smoak, 441 F.3d 214, 216 (4th Cir. 2006)*

. A court is not required to accept as true "allegations that contradict matters properly subject to judicial notice." *Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002)*.

The disciplinary proceedings against Plaintiff arose out of Plaintiff's involvement in a series of property transfers. These transfers -- which all concerned Plaintiff's parents' properties -- were made after Business Loan Express, LLC ("BLE") sued Plaintiff's parents in this Court to collect on a defaulted debt. *Business Loan Express, LLC v. Hekyong Pak, JFM-040634, 2004 U.S. Dist. LEXIS 12807, 2004 WL 1554395 at *1 (D. Md. July 9, 2004)*. After prevailing in that [*3] litigation against Plaintiff's parents, BLE sued Plaintiff and H & K Family Trust, LLC [1] for a monetary judgment against Plaintiff and for declaratory judgment setting aside a transfer between Plaintiff's parents and H & K Family Trust. *2004 U.S. Dist. LEXIS 12807, [WL] at *1*. Ultimately, United States District Judge Frederick Motz of this Court set aside the transfer and assessed money damages against Hekyong Pak because the Court found that she had aided her parents in fraudulently conveying the property. [2] *2004 U.S. Dist. LEXIS 12807, [WL] at *2*.

> 1   H & K Family Trust, LLC was a limited liability company set up by the Plaintiff for her parents. In *Business Loan Express, LLC v. Hekyong Pak*, the Court made the following factual findings at the summary judgment stage:

> > On July 15, 2003, approximately one week after the motion to dismiss [the suit against her parents] was filed by Mr. and Mrs. Pak, Hekyong Pak caused to be formed H & K, which she admits she controls.

> *No. Civ. JFM-04-634, 2004 U.S. Dist. LEXIS 12807, 2004 WL 1554395, at *1 (D. Md. July 9, 2004)*.
> 2   Plaintiff contends that "[d]uring the course of the litigation it was *alleged* that Plaintiff had aided her parents in divesting their personal real estate holdings in order to avoid judgment from [a separate suit against [*4] her parents] being attached to those holdings." Am. Comp. ¶ 6 (emphasis added). However, as is clear from Judge Motz's ruling, this Court actually *found* that Plaintiff fraudulently conveyed property. *Business*

*Loan Express, LLC, 2004 U.S. Dist. LEXIS 12807, 2004 WL 1554395, at *2*. As the basic information regarding the filing and holding of *Business Loan Express, LLC v. Pak* is a matter of public record, it has been included when necessary.

On July 29, 2004, Plaintiff received a formal investigation letter from Defendant Dolores Ridgell ("Ridgell"), Assistant Bar Counsel. Plaintiff contacted Ridgell and Joel Aronson, the collection attorney for Business Loan Express. Plaintiff alleges that during the conversations (1) Ridgell suggested Judge Motz was the complainant and (2) both Ridgell and Aronson denied that Aronson was the complainant. Am. Comp. ¶ 6.

On September 7, 2005, Plaintiff appeared before the Peer Review Panel. [3] Plaintiff alleges that when Ridgell was asked about the origin of the complaint, she "falsely and affirmatively" stated the complaint was initiated by Judge Motz. Am. Comp. ¶ 10. In addition, Plaintiff states that when asked about the authenticity of a promissory note, Ridgell definitively stated [*5] that the note's authenticity was not in doubt. *Id.* ¶ 13. After the hearing, Plaintiff states that "the Peer Review panel unanimously dismissed all charges against the Petitioner." [4] *Id.* ¶ 8. Plaintiff claims that the "Attorney Grievance Commission with no legislative authority disregarded their precedence [sic] by moving forward with charges when the case was unanimously dismissed by the Peer Review panel." *Id.* ¶ 16.

> 3   See MD R CTS J AND ATTYS *Rule 16-713, 742*, and *743* and discussion *infra* for detailed discussion of the purpose and role of the Peer Review Panel. To summarize, when a complaint against an attorney is filed in Maryland, bar counsel conducts an investigation. After the investigation, bar counsel may recommend a Peer Review. The Peer Review serves as the initial hearing to determine whether further disciplinary proceedings should be recommended.
> 4   The Peer Review's recommendation for dismissal was undoubtedly quite hesitant:

> > It is with great reluctance that the Panel recommends dismissal of all charges asserted by Bar Counsel against the Respondent, because all of the Panel Members believe that

there was, indeed, a plan or scheme, managed by the Respondent, to avoid the payment [*6] of any monies to the judgment creditor mentioned in these proceedings,. However, we believe we have no choice.

Pl.'s Opp'n, Ex. AA, pp. 5-6.

After charges were formally filed in the Court of Appeals of Maryland, the case was assigned to Judge Timothy Martin in the Circuit Court for Baltimore County. At the evidentiary hearing in front of Judge Martin, Joel Aronson, Business Loan Express' collection attorney, stated that he had sent a letter and a copy of Judge Motz's opinion in *Business Loan Express, LLC v. Pak* to the Attorney Grievance Commission. *Id.* ¶ 11. Plaintiff alleges Ridgell had removed that information from the case file. [5] *Id.*

5   Plaintiff adds in her brief opposing the Defedants' Motion to Dismiss that this removal was done "[w]ith undisputable malice." Pl.'s Opp'n 6. While Plaintiff cites to "Exhibit C -- Evidentiary Hearing Transcript at 82-83" for this proposition, this Court sees no language in that attachment that could plausibly support this claim.

On February 22, 2007, Judge Martin delivered his findings of fact and conclusions of law. Judge Martin determined that the transfers had been fraudulently made and that Plaintiff's actions constituted a violation of *Maryland Rules of Professional Conduct 3.3(a)(1) and (2), 4.1(a)(1) and (2), 5.5(a)(b), 8.4(c), and 8.4(d).* [*7]

Plaintiff's case was then taken before the Court of Appeals of Maryland, where Plaintiff alleges Ridgell committed further misconduct. Specifically, Plaintiff claims that while Ridgell allegedly did not dispute the validity of the note during the Peer Review, *id.* ¶ 13, Ridgell (1) suggested the note might be false in a post-hearing brief, *id.* ¶ 13, and (2) then told the Court of Appeals of Maryland that the note was fabricated and that she had never admitted the note was legitimate or valid. *Id.* ¶ 15.

On August 7, 2007, the Court of Appeals disbarred Plaintiff. *Id.* ¶ 17. Plaintiff then filed a writ of certiorari to the Supreme Court of the United States seeking review of her disbarment which was subsequently was denied.

*Id.*

Plaintiff then filed suit in this Court, seeking declaratory and monetary relief. The Defendants moved to dismiss Plaintiff's claims under *Federal Rule of Civil Procedure 12(b)(6).* ECF No. 4. Although both parties submitted briefs on the first motion, Plaintiff filed an Amended Complaint on November 8, 2010, seeking: (1) a declaration that the Court of Appeals of Maryland's [*8] decision to disbar Plaintiff is void, Am. Comp. ¶ 20; and (2) compensatory and punitive damages against Defendant Ridgell pursuant to *42 U.S.C. § 1983* "for fraud upon the Peer Review Panel and the rendering court acting under color of law in the investigative stage." *Id.* ¶ 21. The Defendants subsequently filed a Motion to Dismiss the Amended Complaint on November 16, which is now ripe for decision.

STANDARD OF REVIEW

Under *Federal Rule of Civil Procedure 8(a)(2)*, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Rule 12(b)(6) of the Federal Rules of Civil Procedure* authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted; therefore, a *Rule 12(b)(6)* motion tests the legal sufficiency of a complaint. *Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999).* When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997).*

A complaint must be dismissed if it does [*9] not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); see also Simmons v. United Mort. and Loan Inv., LLC, 634 F.3d 754, 768 (4th Cir. Jan. 21, 2011); Andrew v. Clark, 561 F.3d 261, 266 (4th Cir. 2009).* Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly, 550 U.S. at 555.* Well-pleaded factual allegations contained in the complaint are assumed to be true "even if [they are] doubtful in fact," but legal conclusions are not entitled to judicial deference. *See id.* (noting that "courts are not bound to accept as true a legal conclusion couched as a factual allegation") (internal quotation marks omitted).

Thus, even though *Rule 8(a)(2)* "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. at 1937, 1950 (2009).*

In deciding a motion to dismiss, a court may rely not only on the allegations of the complaint, [*10] but also on the contents of any documents it refers to that are integral to the allegations or "matters of public record" that are appropriate for judicial notice. *Philips v. Pitt County Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009); Q Int'l Courier, Inc. v. Smoak, 441 F.3d 214, 216 (4th Cir. 2006).* A court is not required to accept as true "allegations that contradict matters properly subject to judicial notice." *Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002).*

To survive a *Rule 12(b)(6)* motion, the legal framework of the complaint must be supported by factual allegations that "raise a right to relief above the speculative level." *Twombly, 550 U.S. at 555.* The Supreme Court has explained that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim. *Iqbal, 129 S. Ct. at 1949.* The plausibility standard requires that the pleader show more than a sheer possibility of success, although it does not impose a "probability requirement." *Twombly, 550 U.S. at 556.* Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the [*11] defendant is liable for the misconduct alleged." *Iqbal, 129 S. Ct. at 1937.* Thus, a court must "draw on its judicial experience and common sense" to determine whether the pleader has stated a plausible claim for relief. *Id.*

ANALYSIS

Plaintiff's two claims present two discrete issues. Plaintiff's first claim raises the issue of whether a United States District Court may void the decision of a state high court to disbar an attorney for lack of due process and for the allegedly fraudulent actions of bar counsel. Plaintiff's second claim presents the issue of whether a plaintiff may assert a *§ 1983* claim against the prosecuting bar counsel for alleged misconduct in the plaintiff's disbarment proceedings. Before reaching the merits of these claims, however, this Court must first determine that it has jurisdiction.

As explained below, this Court holds that it does not have jurisdiction to hear Plaintiff's first claim to void the Court of Appeals of Maryland's ruling. On the other hand, this Court finds that is has jurisdiction over Plaintiff's *§ 1983* claim but that recovery is barred by the doctrine of prosecutorial immunity.

### I. Jurisdiction under the "*Rooker-Feldman*" Doctrine"

Under the "*Rooker-Feldman* [*12] Doctrine," [6] a federal court does not have jurisdiction to overturn state court judgments, even when the federal complaint raises allegations that the state court judgments violate a claimant's constitutional or federal statutory rights. See *Rooker v. Fidelity Trust Co., 263 U.S. 413, 415-16, 44 S.Ct. 149, 68 L.Ed. 362 (1923)* and *District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 482-86, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983).* The doctrine bars "lower courts from considering not only issues raised and decided in the state courts, but also issues that are 'inextricably intertwined' with the issues that were before the state court." *Washington v. Wilmore, 407 F.3d 274, 279 (4th Cir. 2005)* (quoting *District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 486, 103 S. Ct. 1303, 75 L. Ed. 2d 206 (1983)).* An issue is considered "inextricably intertwined" when it "was not actually decided by the state court but where success on the . . . claim depends upon a determination that the state court wrongly decided the issues before it." *Brown & Root, Inc. v. Breckenridge, 211 F.3d 194, 198 (4th Cir. 2000)* (quoted in *Washington, 407 F.3d at 279).*

> 6    The doctrine is named after *District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 486, 103 S. Ct. 1303, 75 L. Ed. 2d 206 (1983)* [*13] and *Rooker v. Fidelity Trust Co., 263 U.S. 413, 44 S. Ct. 149, 68 L. Ed. 362 (1923).*

In *Feldman*, the doctrine was specifically invoked to bar the claims of two attorneys who were denied admission to the District of Columbia bar because they had not attended accredited law schools. The Court specifically noted that United States District Courts "do not have jurisdiction over challenges to state court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional." *District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 486, 103 S. Ct. 1303, 75 L. Ed. 2d 206 (1983); see also 28 U.S.C. §1257.* On the other hand, the Court said that a challenge to the state bar rules themselves could have been brought

Case 8:10-cv-02822-RWT   Document 57   Filed 01/13/12   Page 69 of 107

Page 5
2011 U.S. Dist. LEXIS 84057, *13

in a U.S. District Court because such an attack would "not require review of a final state court judgment in a particular case. *Feldman, 460 U.S. at 486.*

## A. Plaintiff's Claim to Void the Judgment of the Court of Appeals of Maryland

Here, Plaintiff's first claim specifically requests that this Court void the Court of Appeals of Maryland's decision as unconstitutional. Plaintiff makes no claim that the various rules promulgated by the Court of Appeals of Maryland regarding [*14] disbarment proceedings are unconstitutional. In fact, Plaintiff's claim is built upon the allegation that the normal rules for disbarment were not followed. Thus, only the validity of the Court of Appeals of Maryland's decision -- and not the constitutionality of the Maryland rules -- is at issue. As Plaintiff's first claim seeks to set aside the ruling of the Court of Appeals of Maryland, her claim is barred by the *Rooker-Feldman* Doctrine. *See District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 486, 103 S. Ct. 1303, 75 L. Ed. 2d 206 (1983); see also Czura v. Supreme Court of South Carolina, 813 F.2d 644, 646 (4th Cir. 1987)* (holding that the *Rooker-Feldman* Doctrine barred plaintiff's *§ 1983* claim against members of the attorney ethics committee and the judges of South Carolina's high court for disbarring him and denying him the opportunity to rejoin the bar).

## B. Plaintiff's *§ 1983* Claim

Plaintiff's *§ 1983* claim presents a slightly different question. While the *Rooker-Feldman* Doctrine generally bars "state court losers" from seeking review of a state court proceeding in a federal district court, *Washington, 407 F.3d at 279,* a federal district court *may* have jurisdiction when "a federal plaintiff present[s] some [*15] independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party." [7] *Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 293, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (2005)* (internal quotations marks omitted). Courts have usually distinguished between claims seeking to overturn a state court decision and claims asserted against other parties in earlier proceedings:

> If a federal plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court, and seeks relief from a state court judgment based on that decision,

*Rooker-Feldman* bars subject matter jurisdiction in federal district court. If, on the other hand, a federal plaintiff asserts as a legal wrong an allegedly illegal act or omission by an adverse party, *Rooker-Feldman* does not bar jurisdiction.

*Noel v. Hall, 341 F.3d 1148, 1164 (9th Cir. 2003); see also Washington, 407 F.3d at 280.*

> 7   The jurisdictional question is, of course, not the end of the inquiry. Even if the federal district court has jurisdiction, "state law [will] determine[] whether the defendant prevails under principles of preclusion." *Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 293, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (2005)* (internal [*16] quotations marks omitted). This Court, however, does not reach the preclusion question as the claim is barred for other reasons discussed herein.

Here, Plaintiff has sued bar counsel for bar counsel's allegedly fraudulent acts during Plaintiff's disbarment proceedings. An award of damages to plaintiff would not require that this Court void the decision of the Court of Appeals of Maryland and, as such, is properly considered an "independent" claim. Thus, Plaintiff's *§ 1983* claim passes the jurisdictional hurdle and is not barred by the *Rooker-Feldman* Doctrine.

## II. Immunity of Bar Counsel

Although this Court has jurisdiction over Plaintiff's remaining claim, this action may proceed no further. Plaintiff's *§ 1983* claim is barred by the doctrine of prosecutorial immunity.

## A. Prosecutorial Immunity[8]

> 8   For the sake of clarity, this Court has adopted the term "prosecutorial immunity" to refer to the sequence of cases discussed herein. Essentially, terms refers to the absolute immunity afforded to prosecutors when they act in judicial capacity. See *Briscoe v. LaHue, 460 U.S. 325, 335, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983).* This form of immunity is sometimes also referred to as the "quasi-judicial" immunity of prosecutors.

Under [*17] common law doctrine, "all persons --

governmental or otherwise -- who [a]re integral parts of the judicial process" have "absolute immunity" from suit. *Briscoe v. LaHue, 460 U.S. 325, 335, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983); accord Gill v. Ripley, 352 Md. 754, 770, 724 A.2d 88 (1999)* ("[A]s a matter of Maryland common law . . . prosecutors enjoy absolute immunity with respect to claims arising from their role in the judicial process . . . ."). The relevant distinction is whether the prosecutor is serving in a judicial or investigational capacity at the time when the conduct occurs. *See Burns v. Reed, 500 U.S. 478, 111 S. Ct. 1934, 114 L. Ed. 2d 547 (1991)* (granting absolute immunity to prosecutor for his role in presenting evidence in a probable cause hearing but only qualified immunity for advising police officers); *see also Buckley v. Fitzsimmons, 509 U.S. 259, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993)* (denying absolute immunity for prosecutors who, before any arrest was made, allegedly fabricated evidence during preliminary investigation and allegedly made false statements at a press conference).

Prosecutorial immunity applies even when a prosecutor fabricates evidence *so long as* the prosecutor is acting in a semi-judicial capacity. *See Carter v. Burch, 34 F.3d 257, 262-63 (4th Cir. 1997).* In *Carter,* [*18] the prosecutor failed to turn over potentially exculpatory evidence to defense counsel even after realizing the relevance of that evidence. The United States Court of Appeals for the Fourth Circuit held that the prosecutor's actions were protected by absolute immunity when the prosecutor had discovered the evidence's relevance after the arrest but before the conviction. *Id.* In so concluding, the Fourth Circuit relied upon the reasoning in *Imbler v. Pachtman*:

> [T]he duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom . . . . Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence.

*424 U.S. 409, 431 n.33, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976).* Thus, prosecutorial immunity is extensive but limited to conduct pertaining to the judicial process; meanwhile, prosecutors are *not* afforded absolute immunity when they act in an investigational capacity.

**B. Absolute Immunity of Bar Counsel**

Courts that have considered the issue have extended the prosecutorial immunity to prosecutorial bar counsel as well. *See Clulow v. State of Oklahoma, 700 F.2d 1291, 1298 (10th Cir. 1983)* [*19] ("[B]ar officials charged with the duties of investigating, drawing up, and presenting cases involving attorney discipline enjoy absolute immunity from damage claims for such functions."); *Simons v. Bellinger, 643 F.2d 774, 207 U.S. App. D.C. 24 (D.C. Cir. 1980)* (granting absolute immunity to members of the Committee on Unauthorized Practice of Law, who investigate violations, determine who is prosecuted, and directs the prosecution); *see also Hirsh v. Justices of the Supreme Court of the State of California, 67 F.3d 708, 715 (9th Cir. 1995)* (granting bar counsel absolute quasi-judicial immunity for their role in attorney disciplinary system).

While the United States Court of Appeals for the Fourth Circuit has not explicitly afforded prosecutorial immunity to bar counsel, such a holding is consistent with the general jurisprudence of the Court. In *Ostrzenski v. Seigel, 177 F.3d 245 (4th Cir. 1999),* the Maryland Board of Physician Quality Assurance had assigned a peer reviewer to investigate whether charges should be brought against the plaintiff. The Court granted the peer reviewer prosecutorial immunity notwithstanding the fact that the plaintiff had alleged violations of her *Fifth* and *Fourteenth Amendments* [*20] rights and knowing or reckless inclusion of false information in the report. *Ostrzenski, 177 F.3d at 253.* Similarly, the United States District Court for the Eastern District of Virginia extended prosecutorial immunity to an assistant bar counsel in an action to enjoin bar counsel and the Virginia State Bar from continuing to pursue disciplinary action for failure to include a disclaimer on a weblog. *Hunter v. Virginia State Bar, No. 3:11-CV-216-JAG, 786 F. Supp. 2d 1107, 2011 U.S. Dist. LEXIS 49232, 2011 WL 1770469, at *2 (E.D. Va. May 9, 2011).* [9] In light of the persuasive authority in other Circuits, analogous cases in the Fourth Circuit, and the Supreme Court's jurisprudence regarding prosecutorial immunity, this Court finds that bar counsel prosecutors are afforded absolute immunity for conduct performed in a judicial capacity.

> 9   In contrast, the Fourth Circuit denied absolute immunity for officials of the Patent and Trademark Office who required the plaintiff

patent attorney to reveal privileged information during the initial investigation. *Goldstein v. Moatz, 364 F.3d 205, 219 (4th Cir. 2004).* The Court reasoned that the PTO officials had no power to recommend prosecution and did not serve as advocates in anyway. *Id. at 216.* [*21] Even defendant Moatz (who, as Director of the PTO's Office of Enrollment and Discipline, could call a meeting of the Committee of Discipline if he believed that a violation had occurred) was found to have acted in an investigatory capacity because there had been no finding of probable cause by the Committee at the time the conduct occurred. *Id.* Thus, the Fourth Circuit applied the traditional judicial-investigational distinction to determine whether the PTO officials were protected by absolute immunity.

Although Plaintiff did not cite *Goldstein*, that case does not require a different result. In *Goldstein*, none of the defendants participated in any sort of judicial proceeding; here, as discussed below, defendant Ridgell's conduct occurred in a judicial setting.

As Defendant Ridgell has absolute immunity for all conduct performed in a judicial capacity, it is clear that she has immunity for her conduct in both the evidentiary hearing in the Circuit Court for Baltimore County and in the Court of Appeals of Maryland. *See Burns, 500 U.S. 478, 111 S. Ct. 1934, 114 L. Ed. 2d 547* [*22] (granting prosecutor immunity for conduct in probable cause hearing). In those cases, Ridgell was acting in an official capacity in a courtroom proceeding.

The only remaining question is whether Defendant Ridgell acted in a judicial or investigative capacity when she appeared before the Peer Review Panel. The Maryland Rules of Courts, Judges, and Attorneys clearly delineate the purpose of the Peer Review and the procedure to be followed. Specifically, *Rule 16-734* states that "[u]pon *completion* of an investigation, Bar Counsel [may] . . . **(d)** file with the Commission a Statement of Charges with an election for peer review in accordance with *Rule 16-741.*" MD R CTS J AND ATTYS *Rule 16-734* (emphasis added). Furthermore, the purpose of the Peer Review Panel is to make an initial inquiry into the charges asserted against the accused attorney and to recommend whether the proceedings against that attorney should continue:

**(a) Purpose of Peer Review Process.** The purpose of the peer review process is for the Peer Review Panel to consider the Statement of Charges and all relevant information offered by Bar Counsel and the attorney concerning it and to determine (1) whether the Statement of Charges [*23] has a substantial basis and there is reason to believe that the attorney has committed professional misconduct or is incapacitated, and, if so, (2) whether a Petition for Disciplinary or Remedial Action should be filed or some other disposition is appropriate. The peer review process is not intended to be an adversarial one and it is not the function of Peer Review Panels to hold evidentiary hearings, adjudicate facts, or write full opinions or reports.

MD R CTS J AND ATTYS *Rule 16-743(a).* While informal, the procedures of the panel are clearly designed to allow for both sides to present their view of the case. MD R CTS J AND ATTYS *Rule 16-743(c)(1).*

Accordingly, the Maryland Rules indicate that the Peer Review Panel is a proceeding that occurs *after* investigation. Moreover, despite the informal nature of the proceeding, bar counsel clearly acts as an advocate in front of the Peer Review Panel; Defendant Ridgell presented an argument that was intended to persuade the Panel to recommend further disciplinary action. *See Imbler, 424 U.S. at 431* ("We hold . . . that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under [*24] s *1983.*") Thus, Ridgell was acting in a judicial capacity when she appeared before the Peer Review Panel. [10]

> 10    Notably, Courts routinely have held that proceedings related to bar membership are judicial in nature. *See, e.g., District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 479, 103 S. Ct. 1303, 75 L. Ed. 2d 206 (1983).*

Lastly, this Court notes that affording bar counsel absolute immunity for conduct in judicial proceedings serves an important interest. In *Imbler*, the Court justified the rationale behind absolute prosecutorial immunity:

The common law immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grant jurors acting within the scope of their duties. These include concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust.

*Imbler, 424 U.S. at 422-23* (footnote omitted). This reasoning is highly relevant to bar counsel. Indeed, the purpose of disciplinary proceedings for a lawyer's professional misconduct is "to protect the public by determining [*25] a lawyer's fitness to practice law." *Attorney Grievance Comm'n of Maryland v. Collins, 295 Md. 532, 548, 457 A.2d 1134 (1983)* (quoting *Attorney Grievance Comm'n v. Stewart, 285 Md. 251, 401 A.2d 1026 (1979))*. Such important public interest justifies the broad protection afforded bar counsel.

For the reasons stated above, Defendant Ridgell is protected by absolute prosecutorial immunity. Based on the immunity of bar counsel, this Court must dismiss Plaintiff's second claim.

### III. Dismissal with Prejudice

This Court dismisses Plaintiff's Amended Complaint (ECF No. 14) with prejudice. In *Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)*, the Supreme Court of the United States held that "repeated failure to cure deficiencies by amendments previously allowed" and "futility of amendment" are sufficient reasons for denying a request for leave to amend. *See also U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 376 (4th Cir. 2008)* (holding that the court has discretion to determine if further amendment would be futile and to dismiss with prejudice); *Cozzarelli v. Inspire Pharms., Inc., 549 F.3d 618, 630 (4th Cir. 2008)* (holding that dismissal with prejudice was warranted where "amendment would be futile in light of [*26] the [complaint's] fundamental deficiencies"); *Ganey v. PEC Solutions, Inc., 418 F.3d 379, 391, 125 Fed. Appx. 490 (4th Cir. 2005)* (affirming a denial of leave to amend

where any amendment would be futile).

Here, dismissal with prejudice is appropriate because, under these facts, Plaintiff is unable to allege a plausible claim relating to Defendants' conduct. Plaintiff's claim to invalidate the Court of Appeals of Maryland's decision may not be heard in this court because of the jurisdictional bar of the *Rooker-Feldman* Doctrine. Moreover, because Defendant Ridgell's alleged misconduct occurred while she was acting in a judicial capacity, Plaintiff's claims are barred by the absolute immunity of prosecutors. Therefore, further amendment is futile and Plaintiff's claims are dismissed with prejudice.

### IV. Other Motions

In addition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint, this Court has two other motions pending before it. This Court has not yet ruled on Defendant's initial Motion to Dismiss (ECF No. 4), and Plaintiff had also filed a Motion for Leave to File a Surreply (ECF No. 12) after Defendant's initial Motion to Dismiss and Reply. However, Plaintiff's initial Complaint (ECF No. [*27] 1) was superseded by Plaintiff's Amended Complaint (ECF No. 14). Moreover, Plaintiff attached her previously un-filed Surrpely to her Opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint. As this Court now rules on amended versions of the pleadings, Defendant's first Motion to Dismiss (ECF No. 4) and Plaintiff's Motion for Leave to File a Surreply (ECF No. 12) must be DENIED as moot.

### CONCLUSION

For the reasons stated above, Defendant Delores Ridgell and the Attorney Grievance Commission of Maryland's Motion to Dismiss (ECF No. 15) is GRANTED and this case is dismissed with prejudice. Defendant's Motion to Dismiss (ECF No. 4) and Plaintiff's Motion for Leave to File a Surreply (ECF No. 12) are DENIED as moot.

A separate Order follows.

Dated: August 1, 2011

/s/ Richard D. Bennett

United States District Judge

Case 8:10-cv-02822-RWT   Document 57   Filed 01/13/12   Page 73 of 107

2011 U.S. Dist. LEXIS 84057, *27                    Page 9

## ORDER

For the reasons stated in the foregoing Memorandum Opinion, it is this 1st day of August, 2011, ORDERED that:

1. The Defendants Ridgell and the Attorney Grievance Commission of Maryland's Motion to Dismiss Amended Complaint (ECF No. 15) is GRANTED;

2. This Case is DISMISSED WITH PREJUDICE;

3. Defendant's Motion to Dismiss (ECF No. 4) is DENIED as moot;

4. Plaintiff's [*28] Motion for Leave to File a Surreply (ECF No. 12) is DENIED as moot;

5. The Clerk of the Court transmit copies of this Order and accompanying Memorandum Opinion to counsel for the Defendants and *pro se* Plaintiff; and

6. The Clerk of the Court CLOSE THIS CASE.

/s/ Richard D. Bennett

United States District Judge





Analysis
As of: Jan 13, 2012

DONALD M. REYNOLDS, Petitioner, v. UNITED STATES OF AMERICA, Respondent.

CV 109-061,(Formerly CR 106-081)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF GEORGIA, AUGUSTA DIVISION

*2010 U.S. Dist. LEXIS 24685*

March 17, 2010, Decided
March 17, 2010, Filed

**PRIOR HISTORY:** *Reynolds v. United States, 2010 U.S. Dist. LEXIS 24699 (S.D. Ga., Jan. 26, 2010)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Petitioner inmate filed a *28 U.S.C.S. § 2255* motion. A magistrate recommended that the motion be denied and that the inmate's pending motions, including two motions for judicial notice, be denied as moot. The inmate objected to the magistrate's report and recommendation and also filed a motion to amend his *§ 2255* motion, as well as a motion to incorporate his judicial notice motions.

**OVERVIEW:** The inmate asserted the following as grounds for relief: his attorney rendered constitutionally ineffective assistance of counsel by failing to introduce certain evidence at trial, and the trial court violated his right to counsel by answering a question submitted to the jury without first consulting his attorney. The magistrate found the first claim failed on the merits and the second claim was procedurally defaulted. As the inmate was

simply attempting to re-characterize a claim already rejected by the magistrate, he could not amend his *§ 2255* motion to add a proposed fraudulent misrepresentation claim. The second proposed claim that his rights under the *Confrontation Clause of the Sixth Amendment* were violated did not arise out of the same transactions or occurrences giving rise to any of inmate's original claims; accordingly, he was not permitted to amend his original *§ 2255* motion to add the second proposed claim. The evidence against inmate was so overwhelming that it rendered harmless several alleged errors the inmate challenged.

**OUTCOME:** The inmate's *§ 2255* motion was denied without an evidentiary hearing, the other pending motions were denied as moot, the case was closed, and a final judgment was entered in favor of respondent. The court denied the inmate a certificate of appealability.

**LexisNexis(R) Headnotes**

*Criminal Law & Procedure > Habeas Corpus > Procedure > Court Rules*

[HN1] The Federal Rules of Civil Procedure are applicable to habeas corpus proceedings to the extent that the practice in those proceedings is not specified in a federal statute, the Rules Governing Section 2254 Cases, or the Rules Governing *Section 2255* Cases. *Fed. R. Civ. P. 81(a)(4)*. In addition, R. Governing *§ 2255* Proc. U.S. Dist. Cts. 12 provides that the Federal Rules of Civil Procedure, to the extent that they are not inconsistent with any statutory provision or these rules, may be applied to a proceeding under these rules.

*Criminal Law & Procedure > Habeas Corpus > Procedure > Filing of Petition > Time Limitations > Accrual Period*

[HN2] The one-year statute of limitations applicable to *28 U.S.C.S. § 2255* motions begins to run on the date on which the judgment of conviction becomes final. *28 U.S.C.S. § 2255(f)(1)*.

*Criminal Law & Procedure > Appeals > Procedures > Time Limitations*

[HN3] A judgment of conviction becomes final when the time expires for filing a petition for certiorari contesting the appellate court's affirmation of the conviction.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Relation Back*

[HN4] Under *Fed. R. Civ. P. 15(c)*, an amended claim relates back to the date of the original pleading if it arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading. *Fed. R. Civ. P. 15(c)(1)(B)*. Rule 15(c) is narrow; it does not contemplate the addition of an entirely new claim based on a different set of facts. Thus, to relate back, an untimely claim must have more in common with the timely filed claim than the mere fact that they arose out of the same trial or sentencing proceeding. The key consideration is that the amended claim arises from the same conduct and occurrences upon which the original claim was based. This may be the case even if one or both claims do not explicitly state supporting facts. When the nature of the amended claim supports specifically the original claim, the facts there alleged implicate the original claim, even if the original claim contained insufficient facts to support it. One purpose of an amended claim is to fill in facts missing from the original claim.

*Evidence > Judicial Notice > Adjudicative Facts > General Overview*

[HN5] A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. *Fed. R. Evid. 201(b)*. Stated differently, legal arguments and conclusions subject to more than one interpretation are not the types of statements that are the proper subject of judicial notice.

*Criminal Law & Procedure > Habeas Corpus > Procedural Default > Actual Innocence & Miscarriage of Justice > General Overview*
*Criminal Law & Procedure > Habeas Corpus > Procedural Default > Cause & Prejudice Standard > General Overview*

[HN6] Generally, a claim is procedurally defaulted if it was not raised on direct appeal. In order to overcome procedural default, a petitioner must demonstrate (1) cause for the default and actual prejudice suffered as a result of the alleged error, or (2) that a constitutional violation has probably resulted in the conviction of one who is actually innocent.

*Criminal Law & Procedure > Counsel > Effective Assistance > Tests*
*Criminal Law & Procedure > Habeas Corpus > Cognizable Issues > Ineffective Assistance*

[HN7] Under Strickland, a petitioner must demonstrate that (1) counsel's representation fell below an objective standard of reasonableness and (2) the petitioner suffered prejudice by showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Notably, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.

*Criminal Law & Procedure > Habeas Corpus > Appeals > Certificate of Appealability*

[HN8] A certificate of appealability may issue only if a petitioner makes a substantial showing of the denial of a constitutional right. *28 U.S.C.S. § 2253(c)(2)*.

Case 8:10-cv-02822-RWT   Document 57   Filed 01/13/12   Page 77 of 107

2010 U.S. Dist. LEXIS 24685, *                                          Page 3

**COUNSEL:** [*1] For Alvin L. Price, Defendant (1:06-cr-00081-DHB-WLB): Daniel Gregory Leopard, LEAD ATTORNEY, Fleming, Ingram & Floyd, PC, Augusta, GA.

Donald M. Reynolds, Defendant (1:06-cr-00081-DHB-WLB): Pro se, Pekin, IL.

Donald M. Reynolds, Defendant (1:06-cr-00081-DHB-WLB): Davis A. Dunaway, LEAD ATTORNEY, Hull Barrett, PC, Augusta, GA.

For USA, Plaintiff (1:06-cr-00081-DHB-WLB): Nancy Colleen Greenwood, LEAD ATTORNEY, U.S. Attorney's Office - Augusta, Augusta, GA; James Christian Stuchell, U.S. Attorney's Office - Savannah, Savannah, GA.

Donald M. Reynolds, Petitioner (1:09-cv-00061-DHB-WLB): Pro se, PEKIN, IL.

For UNITED STATES OF AMERICA, Respondent (1:09-cv-00061-DHB-WLB): James Christian Stuchell, LEAD ATTORNEY, James Christian Stuchell, U.S. Attorney's Office - Savannah, Savannah, GA.

**JUDGES:** DUDLEY H. BOWEN, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** DUDLEY H. BOWEN

**OPINION**

**ORDER**

After a careful, *de novo* review of the file, the Court concurs with the Magistrate Judge's Report and Recommendation, to which objections, (doc. no. 42), have been filed. Petitioner has also filed a motion to amend and a motion to "incorporate" his motions for judicial notice (doc. nos. 41-1, 41-2), which Respondent opposes, (see doc. no. 43).

In [*2] addressing Petitioner's objections and these recently filed motions, a brief factual and procedural history of this case will be helpful. Petitioner was charged with armed robbery, discharge of a firearm during a crime of violence, and possession of a firearm by a convicted felon in connection with the robbery of a bank. See Price v. United States, CR 106-081, doc. no. 11 (S.D. Ga. May 2, 2006). Petitioner was convicted by a jury on

all counts and was sentenced to a total term of imprisonment of 420 months. Id., doc. nos. 148, 156. Petitioner's conviction and sentence were affirmed on appeal by the Eleventh Circuit, with the appellate court specifically finding that the overwhelming evidence against Petitioner at trial rendered any error at the district court level harmless. See generally *United States v. Price, 298 Fed. App'x 931 (11th Cir. 2008)*. This overwhelming evidence included testimony about Petitioner's presence and actions while in the "getaway car;" items from the bank that were found in the back of the car, including the stolen money; and the identification of Petitioner by bank employees as the person who robbed the bank. *Id. at 940-41.*

Petitioner timely filed his *§ 2255* [*3] motion, asserting the following as grounds for relief: (1) his attorney rendered constitutionally ineffective assistance of counsel by failing to introduce certain evidence at trial, and (2) the Court violated his right to counsel by answering a question submitted to the jury without first consulting Petitioner's attorney. (See generally doc. no. 1). After directing a response from the government, the Magistrate Judge recommended that Petitioner's *§ 2255* motion be denied because his first claim failed on the merits and his second claim was procedurally defaulted. (See doc. no. 38, pp. 5-15). The Magistrate Judge further recommended that Petitioner's pending motions, including two motions for judicial notice, be denied as moot. (Id. at 15 & n.3).

As noted above, in addition to filing objections to the Magistrate Judge's Report and Recommendation (doc. no. 42), Petitioner has also filed a motion to amend his *§ 2255* motion, as well as a motion to "incorporate" his judicial notice motions. (Doc. nos. 41-1, 41-2). The Court begins by addressing the motion to amend, in which Petitioner requests to add two claims, one for "fraudulent misrepresentation" and the other for an alleged violation [*4] of the *Confrontation Clause of the Sixth Amendment.* (Doc. no. 41, p. 2). Respondent argues that Petitioner's request to amend should be denied because both of Petitioner's proposed claims are simply re-characterizations of the claims he previously asserted in his *§ 2255* motion. (See doc. no. 43). Petitioner has also filed a reply. (Doc. no. 44). The Court resolves the matter as follows.

As noted above, in his original *§ 2255* motion, Petitioner contended that the Court erred in answering a

Case 8:10-cv-02822-RWT   Document 57   Filed 01/13/12   Page 78 of 107

Page 4
2010 U.S. Dist. LEXIS 24685, *4

question submitted by the jury without first consulting Petitioner's attorney. (See doc. no. 1, pp. 4-5, 18-22). Petitioner now seeks to add a claim for "fraudulent misrepresentation," based on his contention that the "trial court fraudulently misrepresented the substance of the jury note . . . ." (Doc. no. 41, p. 2). Notably, Petitioner made similar representations elsewhere in his filings with the Court in support of his claim challenging the actions of the Court with respect to the jury note. (See doc. no. 33, p. 3). Thus, the Court agrees with Respondent that this first proposed claim is simply a variation on Petitioner's claim that the Court erred in answering a question submitted by the jury [*5] without first consulting Petitioner's attorney. As Petitioner is simply attempting to re-characterize a claim already rejected by the Magistrate Judge, he may not "amend" his *§ 2255* motion to add this first proposed claim.

However, the Court does not agree that Petitioner's second proposed claim is merely a re-characterization of previously asserted claims. Indeed, in this second proposed claim, Petitioner argues that his rights under the *Confrontation Clause of the Sixth Amendment* were violated when the Court admitted at trial portions of testimony given by Petitioner's co-defendant at his Rule 11 hearing. Petitioner did not make any such contentions in his original *§ 2255* motion. Accordingly, the Court must determine whether the amendment is appropriate under *Rule 15(c) of the Federal Rules of Civil Procedure.* 1

    1  [HN1] The Federal Rules of Civil Procedure are applicable to habeas corpus proceedings "to the extent that the practice in those proceedings . . . is not specified in a federal statute, the Rules Governing *Section 2254* Cases, or the Rules Governing *Section 2255* Cases." *Fed. R. Civ. P. 81(a)(4).* In addition, *Rule 12 of the Rules Governing Section 2255 Proceedings* provides that "[t]he [*6] Federal Rules of Civil Procedure . . . , to the extent that they are not inconsistent with any statutory provision or these rules, may be applied to a proceeding under these rules."

Turning to the *Rule 15(c)* analysis, the Court begins by noting that [HN2] the one-year statute of limitations applicable to *§ 2255* motions begins to run on "the date on which the judgment of conviction becomes final." See *28 U.S.C. § 2255(f)(1).* 2 The Eleventh Circuit affirmed Petitioner's conviction and sentence on November 3,

2008. *Price, 298 Fed. App'x at 941.* Petitioner did not file a petition for a writ of certiorari in the United States Supreme Court within the ninety day time limit set by *United States Supreme Court Rule 13(1).* Thus, Petitioner's convictions became final ninety days after November 3, 2008, or on February 1, 2009. See *Close v. United States, 336 F.3d 1283, 1285 (11th Cir. 2003)* ([HN3] "'[A] judgment of conviction becomes final when die time expires for filing a petition for certiorari contesting the appellate court's affirmation of the conviction.'") (citing *Clay v. United States. 537 U.S. 522, 525, 123 S. Ct. 1072, 155 L. Ed. 2d 88 (2003));* *Kaufmann v. United States, 282 F.3d 1336, 1337-38 (11th Cir. 2002).* Accordingly, Petitioner [*7] had one year from February 1, 2009, to file all his claims that he wished to be considered as a basis for his *§ 2255* motion. Petitioner executed his original *§ 2255* motion on June 1, 2009, well within the one-year statute of limitations. However, he did not execute his motion to amend until February 12, 2010. (See doc. no. 41, p. 3). Accordingly, the Court must determine whether the untimely second proposed claim relates back to Petitioner's original claims that were timely filed.

    2  In certain circumstances, the statutory period begins to run on a date other than the date upon which the conviction became final. See *28 U.S.C. § 2255(f)(2)-(4).* However, Petitioner has outlined no basis upon which to suppose that any of these circumstances apply in his case.

[HN4] Under *Federal Rule of Civil Procedure 15(c),* an amended claim relates back to the date of the original pleading if it "arose out of the conduct, transaction, or occurrence set out -- or attempted to be set out -- in the original pleading . . . ." *Fed. R. Civ. P. 15(c)(1)(B).* Rule 15(c) is narrow; it does not contemplate the addition of "an entirely new claim based on a different set of facts." *Farris v. United States, 333 F.3d 1211, 1215 (11th Cir. 2003)* [*8] *(per curiam)* (citing *Pruitt v. United States, 274 F.3d 1315, 1318 (11th Cir. 2001) (per curiam)).* Thus, "to relate back, an untimely claim must have more in common with the timely filed claim than the mere fact that they arose out of the same trial or sentencing proceeding." *Farris, 333 F.3d at 1215* (citing *Davenport v. United States, 217 F.3d 1341, 1344 (11th Cir. 2000)).* As the Eleventh Circuit has explained:

        The key consideration is that the amended claim arises from the same

conduct and occurrences upon which the original claim was based. This may be the case even if one or both claims do not explicitly state supporting facts. When the nature of the amended claim supports specifically the original claim, the facts there alleged implicate the original claim, even if the original claim contained insufficient facts to support it. One purpose of an amended claim is to fill in facts missing from the original claim.

*Dean v. United States, 278 F.3d 1218, 1222 (11th Cir. 2002) (per curiam).* In other words, at issue here is whether the amended claims are merely an attempt to "flesh out" an original claim, or if the amended claims rely upon different facts.

Here, the Court concludes that Petitioner [*9] is attempting to add a claim that relies upon an entirely different set of facts from the claims asserted in his original *§ 2255* motion, and therefore the proposed claims do not relate back under *Rule 15(c).* As noted above, Petitioner's second proposed amended claim contends that his rights under the *Confrontation Clause* were violated when the Court admitted at trial portions of testimony given by Petitioner's co-defendant at his Rule 11 hearing. While Petitioner raised the issue of the admission of the Rule 11 testimony on appeal, see *Price, 298 Fed. App'x at 940,* he did not raise this issue in his *§ 2255* motion. As noted above, in his original *§ 2255* motion, Petitioner asserted the following as grounds for relief: (1) his attorney rendered constitutionally ineffective assistance of counsel by failing to introduce certain evidence at trial; and (2) the Court violated his right to counsel by answering a question submitted to the jury without first consulting Petitioner's attorney. While Petitioner did make reference to the fact that the jury note concerned a request for a transcript of the Rule 11 testimony, Petitioner made clear that his concern was not with the admission of the testimony, [*10] but rather with the fact that the Court did not consult his attorney before answering the question. Notably, Petitioner's original claim regarding the jury note concerned events that occurred after the jury began its deliberations, while his second proposed claim concerns events that occurred during the trial, before the case was submitted to the jury. Moreover, while Petitioner's other claim asserted in his original *§ 2255* motion regarding evidence that Petitioner contends his attorney should have admitted concerned

events that occurred during trial, this evidence did not concern the Rule 11 testimony. Thus, the Court finds that the second proposed claim does not arise out of the same transactions or occurrences giving rise to any of Petitioner's original claims. Accordingly, Petitioner is not permitted to amend his original *§ 2255* motion to add this second proposed claim, and his motion to amend is **DENIED.** (Doc, no. 41-1).

The Court next turns to Petitioner's motion to "incorporate" his motions for judicial notice, in which he essentially requests that the Court consider the merits of his motions for judicial notice that the Magistrate Judge recommended be denied as moot. (See doc. [*11] no. 41, p. 2). In his Report and Recommendation, the Magistrate Judge recommended that these motions be denied as moot because the claims raised in Petitioner's *§ 2255* motion were either procedurally defaulted or without merit. While the Court finds that the Magistrate Judge appropriately recommended that these motions be denied as moot, given Petitioner's motion requesting that his judicial notice motions be addressed on the merits, the Court briefly does so here.

In his motions for judicial notice, Petitioner requests that the Court take judicial notice of what he describes as "adjudicative facts." (Doc. no. 20, p. 2; see also doc. no. 34). Respondent submits that these motions are without merit and should be denied because the "adjudicative facts" are not subject to judicial notice. (Doc. nos. 22, 36). [HN5] "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Fed. R. Evid. 201(b).* For example, the price of a stock on a particular day is a judicially noticeable [*12] fact. See *La Grasta v. First Union Sec. Inc., 358 F.3d 840, 842 (11th Cir. 2004).* On the other hand, an assertion "that veteran grand juries are less captive to the prosecutor than newly impaneled grand juries" is not subject to judicial notice because it does not meet either prong of the test under *Rule 201(b).* See *United States v. Pabian, 704 F.2d 1533.1538 (11th Cir. 1983).* Stated differently, legal arguments and conclusions subject to more than one interpretation are not the types of statements that are the proper subject of judicial notice.

Here, the Court finds that the "adjudicative facts"

Petitioner seeks to have judicially noticed are more properly characterized as legal arguments and conclusions that he submits in support of his claims for relief. Indeed, by way of example, Petitioner requests that the following statement be accepted as a judicially noticed fact: "Donald M. Reynolds was deprived of counsel by government action during a critical stage of his trial [on] March 7, 2007, and reversal of his sentence and conviction is required ...." (Doc. no. 20, p. 3). The Court finds that such "adjudicative facts" do not meet the requirements of *Rule 201(b)*. Rather, they consist [*13] of legal arguments and conclusions that Petitioner wants to Court to accept as true. In any event, Petitioner submitted these "adjudicative facts" in support of his claims raised in his § 2255 motion. Although the Magistrate Judge denied as moot the motions for judicial notice, he did consider the arguments and representations made therein in making his recommendation on Petitioner's claims, which the Magistrate Judge ultimately found were either procedurally defaulted or without merit. (See doc. no. 38, pp. 8, 15). Having addressed Petitioner's motions for judicial notice, his motion to "incorporate" these judicial motions is **MOOT**. (Doc. no. 41-2).

Finally, the Court addresses Petitioner's argument that his claim regarding the alleged error committed by Court in answering a question submitted by the jury without consulting Petitioner's attorney is not procedurally defaulted. (Doc. no. 42, pp. 2-3). Specifically, Petitioner appears to contend this claim should have been construed as a claim for ineffective assistance of counsel (id.), and Petitioner correctly notes that such claims are generally excepted from the procedural default rules, see *Lynn v. United States. 365 F.3d 1225, 1234 n.17 (11th Cir. 2004)* [*14] (citing *Massaro v. United States, 538 U.S. 500, 123 S. Ct. 1690, 155 L. Ed. 2d 714 (2003)*). [3] While the basis for Petitioner's argument is unclear at best, it appears that Petitioner is seeking to blame his attorney for not being present when the Court answered a question submitted by the jury outside the presence of counsel. Notably, elsewhere in his filings in this case, Petitioner faults the Court for not notifying counsel that the jury had submitted a question during the course of their deliberations and not allowing his attorney to view the note. (See, e.g., doc. no. 1, pp. 4-5; doc. no. 6, p. 2; doc. no. 34, p. 2). Indeed, at one point, Petitioner describes his counsel as "helpless" because of Court's actions in this regard. (Doc. no. 6, p. 2). Stated differently, Petitioner's

contention that his attorney erred by not being present at the reading of the jury note is contradicted by his own statements elsewhere in his filings in this case. Furthermore, it strains credulity to find that counsel erred in this regard when the Court did not notify counsel that the jury had a question. Accordingly, this argument is without merit, and the objection is due to be overruled on this basis alone.

> 3   [HN6] Generally, a claim is procedurally [*15] defaulted if it was not raised on direct appeal. *United States v. Montano, 398 F.3d 1276, 1279-80 (11th Cir. 2005) (per curiam)* (citing *Mills v. United States, 36 F.3d 1052, 1055 (11th Cir. 1994))*. In order to overcome procedural default, a petitioner must demonstrate (1) cause for the default and actual prejudice suffered as a result of the alleged error, or (2) that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id. at 1280* (citation omitted).

However, even assuming *arguendo* that Petitioner's first claim should have been construed as a claim for ineffective assistance of counsel, this claim would still fail. As explained in the Report and Recommendation, Petitioner must meet a two-part test to state a claim for ineffective assistance of counsel. [HN7] Under *Strickland v. Washington. 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)*, Petitioner must demonstrate that (1) "counsel's representation fell below an objective standard of reasonableness" and (2) Petitioner suffered prejudice by showing "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland, 466 U.S. at 687, 688*. Notably, "[a] court [*16] need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . ." *Smith v. Wainwright, 777 F.2d 609, 616 (11th Cir. 1985)*.

As noted above and discussed repeatedly by the Magistrate Judge in his recommendation, the Eleventh Circuit has found that the evidence against Petitioner was so overwhelming that it rendered harmless several alleged errors Petitioner challenged on appeal. This overwhelming evidence included: (1) testimony that Petitioner was in the back seat of the "getaway" car; (2) the presence of the clothes and wig in the back seat of the car that were identified by the bank employees at trial as

items worn by the robber; (3) shotgun shells, a knit cap, black gloves, the $ 6,650 stolen from the bank, and a wallet and purse belonging to bank employees found in the back seat of the car; (4) the bank employees' identification of Petitioner as the robber an hour after the robbery and at trial; (5) the fact that Petitioner was wearing the same clothes as the robber and had the same distinctive teeth; (6) Officer An's identification of Petitioner as the man who fired the shot in [*17] the direction of his vehicle; and (7) the testimony of Petitioner's co-defendant that after hearing a loud noise, he saw Petitioner holding a shotgun in the back seat of the car. *Price, 298 Fed. App'x at 940-41*. Similarly, assuming *arguendo* that Petitioner's counsel can be faulted for not being present for the reading of the jury note that requested a transcript of the Rule 11 testimony, the Court finds that no prejudice inured to Petitioner as a result of this alleged error because of this overwhelming evidence against him. Accordingly, this objection is without merit and is **OVERRULED**. [4]

4   The remainder of Petitioner's objections are likewise without merit and are also **OVERRULED**.

Accordingly, the Magistrate Judge's Report and Recommendation is **ADOPTED** as the opinion of this Court. Therefore, Petitioner's *§ 2255* motion is **DENIED** without an evidentiary hearing, the other pending motions are **DENIED** as **MOOT** (doc. nos. 6, 20, 34), this case is **CLOSED**, and a final judgment shall be **ENTERED** in favor of Respondent.

Finally, [HN8] a Certificate of Appealability may issue only if Petitioner makes "a substantial showing of the denial of a constitutional right." *28 U.S.C. § 2253(c)(2)*. As demonstrated [*18] by the Magistrate Judge's Report and Recommendation, which is now adopted as the opinion of this Court, Petitioner has not made the requisite showing. Accordingly, the Court **DENIES** Petitioner a Certificate of Appealability.

SO ORDERED this 17 day of March, 2010, at Augusta, Georgia.

/s/ Dudley H. Bowen

UNITED STATES DISTRICT JUDGE





Analysis
As of: Jan 13, 2012

**WELLS FARGO BANK, NATIONAL ASSOCIATION, Plaintiff, v. KT
MECHANICAL CONTRACTORS, INC. et al., Defendants.**

**Civil Action No. 11-cv-00850-AW.**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND,
SOUTHERN DIVISION**

*2011 U.S. Dist. LEXIS 120059*

**October 18, 2011, Decided
October 18, 2011, Filed**

**SUBSEQUENT HISTORY:** Summary judgment
granted by *Wells Fargo Bank, N.A. v. KT Mech. Contrs.,
Inc., 2011 U.S. Dist. LEXIS 148728 (D. Md., Dec. 28,
2011)*

**COUNSEL:** [*1] For Wells Fargo Bank N.A., Plaintiff:
Craig Benson Young, Jennifer M Blunt, LEAD
ATTORNEYS, Kutak Rock LLP, Washington, DC.

For KT Mechanical Contractors, Inc., KPT, LLC,
Catherine Tsakanikas, Peter Tsakanikas, Defendants:
Ronald S Canter, LEAD ATTORNEY, The Law Offices
of Ronald S Canter LLC, Rockville, MD.

**JUDGES:** Alexander Williams, Jr., United States District
Judge.

**OPINION BY:** Alexander Williams, Jr.

**OPINION**

**Memorandum Opinion**

Plaintiff Wells Fargo Bank N.A. ("Wells Fargo")
brings this action against Defendants KT Mechanical
Contractors, Inc. ("KT"), KPT, LLC ("KPT"), Catherine
Tsakanikas, Peter Tsakanikas, and George Tsakanikas to
collect on three loans made by Wells Fargo. Currently
pending before the Court is Plaintiff's motion for
summary judgment against all Defendants but George
Tsakanikas, who has not yet been served with process.
*See* Doc. No. 14. Additionally, Defendants KT, KPT,
Catherine and Peter Tsakanikas have moved to strike
Plaintiff's Affidavit of James P. Buffington, a Portfolio
Manager for Wells Fargo. *See* Doc. No. 16. The Court
has reviewed the entire record, as well as the pleadings
and exhibits, and finds that no hearing is necessary. *See
Local Rule 105.6* (D. Md. 2010). For the reasons set [*2]
forth below, the Court GRANTS Plaintiff's motion for
summary judgment and DENIES Defendants' motion to
strike as moot.

**I. FACTUAL & PROCEDURAL BACKGROUND**

The following facts are taken from the pleadings,
admissions on file, and affidavits. All reasonable

inferences are drawn in a light most favorable to Defendants. Three Promissory Notes are the subject of this lawsuit: (1) a $350,000 Promissory Note dated November 7, 2006, ("Note 1") executed by KTM in favor of Wachovia Bank, N.A. ("Wachovia"); (2) a $250,000 Promissory Note dated November 7, 2006 executed by KTM in favor of Wachovia ("Note 2"); and (3) a $205,790.29 Promissory Note dated August 2, 2006 executed by KPT and made payable to Wachovia ("Note 3"). KPT unconditionally guaranteed payment and performance of all loans. The first two loans, the KTM loans, were also secured by all the personal property of KTM pursuant to a Security Agreement dated November 7, 2006. All three individual defendants personally and unconditionally guaranteed repayment of the KTM Loans and the KPT Loan. The borrowers and Guarantors have not paid the amounts due under the Loans.

The Court takes judicial notice of the fact that on or around September [*3] 1, 2001, First Union merged with Wachovia, and on or around March 20, 2010, Wachovia merged with Wells Fargo. As a result of these mergers, Wells Fargo is the successor to First Union and Wachovia with respect to the loan documents evidencing the obligations of Defendants.

In their Answers, KTM and Guarantors Catherine and Peter Tsakanikas admit they executed the respective Notes, Guaranties, and Security Agreement. *See* KTM Answer at ¶¶ 10, 11, 12; Peter Tsakanikas Answer at ¶¶ 10-13, 16-17; Catherine Tsakanikas Answer at ¶¶ 10-12, 14, 16-17.

Note 1 is payable on demand. *See* Doc. No. 1 Ex. 1 at 3. Borrowers and Guarantors admit that Wells Fargo made a demand for payment, KTM Answer ¶¶ 20, 25; KPT Answer ¶¶ 20, 25; Peter Tsakanikas Answer ¶ 25; Catherine Tsakanikas Answer ¶ 25, and they do not assert satisfaction on Note 1.

Note 2 states that if KTM fails to timely pay any obligation due to Wells Fargo, the Loan is in default. *See* Doc. No. 1 Ex. 2 at 3. The Guaranties of the KTM loans provide that:

> Guarantor hereby absolutely, irrevocably and unconditionally guarantees to Bank and its successors, assigns and affiliates the timely payment and performance of all liabilities and obligations [*4] of Borrower to Bank and its affiliates,

> including, but not limited to, all obligations under any notes, loan agreements . . . however and whenever incurred or evidenced . . .

Doc. No. 1 Ex. 4 at 1; Ex. 6 at 1. The Guarantees provide that "failure of timely payment or performance of the [KTM Loans] or a default under any Loan Document" results in the KTM loans being immediately due and payable to Wells Fargo. *See* Doc. No. 1 Ex. 4 at 3; Ex. 6 at 3. Wells Fargo alleges that Defendants have failed to satisfy the loan, and Defendants do not allege that they have satisfied the loan.

The KPT Note, Note 3, provides that "failure of timely performance or payment . . . any default in payment or performance of any obligation under any loans, contracts or agreements of [KPT] with [Wells Fargo] . . ." results in a default under Note 3. *See* Doc. No. 1 Ex. 5 at 3. Wells Fargo contends that the loan has not been satisfied and that the loan is in default, and Defendants do not contend that the loan is not in default or that they have satisfied the loan.

On March 31, 2011, Wells Fargo brought this action against all Defendants to collect on the loans. *See* Doc. No. 1. On September 14, 2011, Wells Fargo [*5] moved for summary judgment under *Federal Rule of Civil Procedure 56* against all Defendants but George Tsakanikas, who Wells Fargo is still attempting to serve with process. [1] In support of its motion, Wells Fargo attached the affidavit of James P. Buffington, an employee and Portfolio Manager of Wells Fargo. *See* Doc. No. 14 Ex. 1. Defendants moved to strike the affidavit, *see* Doc. No. 16, which has since been supplemented to address Defendants' concerns, *see* Doc. No. 21.

> 1 On August 13, 2011, the Court granted Wells Fargo's motion to extend the deadline for service on George Tsakanikas to October 30, 2011. Wells Fargo established that it has made as many as 12 efforts to serve process on George Tsakanikas, to no avail.

## II. STANDARD OF REVIEW

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to

judgment as a matter of law." *Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 323-25, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of [*6] the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).*

To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson, 477 U.S. at 248.* Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his or her favor, a party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985).*

## III. ANALYSIS

Wells Fargo asserts claims against Defendants for breach of contract and turnover of collateral against KTM, relating to Defendants' default on their loan obligations. After reviewing the record, the Court agrees that Defendants [2] have raised no genuine issue as to any material [*7] fact regarding their loan obligations. The pleadings, admissions, and affidavits in this case all show that KTM and the Guarantors executed the Notes, Guaranties, and Security Agreement, that failure of Defendants to satisfy the loans resulted in default on those loans, and that Defendants are jointly and severally liable under the Notes and Guaranties. Defendants do not contest the facts upon which Wells Fargo's summary judgment motion is based but rather pose certain novel arguments which the Court will dispose of briefly below.

2 From this point forward, "Defendants" refers to all defendants except George Tsakanikas. Wells Fargo is not seeking summary judgment against George Tsakanikas at this time. *See Doc. No. 14 at 2.*

First, Defendants argue that Wells Fargo's motion should be denied because it is based upon the deficient Affidavit of James P. Buffington, a Portfolio Manager for Wells Fargo. In his Affidavit, Mr. Buffington states that he is an agent of Wells Fargo and has been personally involved in efforts to collect the loans at issue. *See Doc. No. 14 Ex. 1 at 1.* Mr. Buffington goes on to state the amounts due under the loans. *See id.* Under Federal *Rule 56(c)(4),* "an affidavit [*8] . . . used to support or oppose a motion must be on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Fed. R. Civ. P. 56(c)(4).* Defendants argue that the Affidavit fails to meet the requirements of the Federal *Rule 803(6),* the business records exception to the hearsay rule. Specifically, Defendants contend that the affiant must give more information about his position at Wells Fargo, how he came to acquire personal knowledge about the loans, and information supporting the fact that Wells Fargo is successor by merger to First Union National Bank. Defendants additionally brought a motion to strike the Affidavit on the same grounds. *See Doc. No. 16.* Wells Fargo has since submitted a supplemental declaration in which Mr. Buffington addresses Defendants' contentions by providing a more thorough summary of his position at Wells Fargo and the basis of his personal knowledge. *See Doc. No. 21.* Thus, Defendants' motion to strike is rendered moot.

In their reply, Defendants contend that they will be moving to strike the supplemental Affidavit as well. In order to potentially save Defendants [*9] the further costs of filing such a motion, the Court notes that at this point it sees no meritorious basis upon which the supplemental Affidavit should be stricken. Although the affiant states that his knowledge of Defendants' loan obligations is in part due to his review of the loan documents and record-keeping system of Wells Fargo, this does not constitute hearsay where, as the affiant contends, he has gained personal knowledge of the loan obligations as the Portfolio Manager in charge of their administration, oversight and collection.

The Court also declines to give further consideration to Defendants' contention that Wells Fargo has not produced any authenticated document evidencing its standing as successor to First Union National Bank or Wachovia Bank. Both mergers were nationally publicized and are matters of public record. Furthermore, Wells Fargo has taken the additional step of including the

orders issued by the Federal Reserve approving the mergers. Neither of these contentions create a genuine dispute of material fact as to Defendants' liability for the loans in question.

Third, Defendants claim that there is a question of fact as to whether Catherine Tsakanikas is liable [*10] on the KTM Notes. The facts here are not in dispute. Catherine Tsakanikas admitted to executing a Guaranty as to the KTM loan dated June 8, 2001 in which she "absolutely, irrevocably and unconditionally guarantees to Bank and its successors, assigns and affiliates the timely payment and performance of all liabilities and obligations of [KTM] to bank . . . however and whenever incurred or evidenced . . ." *See* CT Guaranty at 1. This Guaranty provides that Catherine can terminate her obligations with respect to additional loans by simply providing written notice to Wells Fargo. *See id.* Catherine failed to do so and thus is liable as a guarantor for the two KTM notes dated November 7, 2006. Defendants contend that since the Guaranty did not impose a time limit as to Catherine's liability for additional loans, the law should impose one, and that here the five-year passage of time since Catherine's original guarantee and the additional loans is unreasonable.

Defendants' argument is without legal support. Interpretation of the language contained in the Guaranty is a matter of law. *See Mercantile-Safe Deposit & Trust Co. v. Delp & Chapel Concrete & Constr. Co.,* 44 M.D. App. 34, 41, 408 A.2d 1043 (1979). Defendants [*11] fail to provide any case law from any jurisdiction suggesting that a five-year time period like the one at issue is unreasonable. The only case cited by Defendants from a state within the Fourth Circuit Court of Appeal's jurisdiction is *Looney v. Belcher,* 169 Va. 160, 169, 192 S.E. 891 (1937), and it contradicts Defendants' contentions. In *Looney,* a bank guaranteed a customer's deposit with the bank and the guarantee did not contain a time limit. *Looney,* 169 Va. at 163. Almost fourteen years after the execution of the guarantee, the customer sought to recover from the guarantor. *Id.* at 165. The court found the guaranty enforceable, reasoning that if a party intends a guaranty to constitute a single dealing, "he should take care to say so." *Id.* at 170 (citations omitted). The Court finds that the language of Catherine's Guaranty is clear and that there is no dispute of material fact here. The Court declines to look beyond the terms of the Guaranty. Accordingly, Catherine is liable on the KTM loans.

Additionally, Defendants argue that the Court should not enter summary judgment in the absence of sufficient proof as to the amount due on the loans. Specifically, Defendants contend that on September 15, [*12] 2011, a foreclosure sale was conducted as to the property pledged by KPT to secure Loan 3. Defendants contend that a credit is due on the debt owed by KPT from the proceeds of the foreclosure sale and that Defendants need the opportunity to conduct discovery to determine the amount of the credit due. However, the deed transferring the property to Wells Fargo sets forth the credit received by Defendants and is publically available. Moreover, as explained by Wells Fargo Portfolio Manager Mr. Buffington in the Supplemental Affidavit, the sale has not been ratified and thus the proceeds received from the foreclosure have not yet been applied to the outstanding balance due under the loans. *See* Doc. No. 21 at 4. As soon as the foreclosure sale is ratified, Wells Fargo will apply the proceeds received from the foreclosure sale to the amount due under the loans. *Id.*

Defendants also argue that the Bank has not provided an itemized statement regarding the amounts claimed. However, Wells Fargo contends that Defendants have never requested an updated balance of their loan obligations and Defendants have not contended that they submitted such a request to Wells Fargo. Such contentions do not create [*13] a genuine dispute of material fact as to the amounts due, which are described in detail in Wells Fargo's Supplemental Affidavit. Accordingly, the Court finds that Defendants have failed to point to affirmative evidence showing undisputed material facts and thus summary judgment in favor of Wells Fargo is proper.

## IV. CONCLUSION

For the foregoing reasons, Wells Fargo's motion for summary judgment is GRANTED. A separate order will follow.

October 18, 2011

Date

/s/ Alexander Williams, Jr.

United States District Judge





Positive
As of: Jan 13, 2012

SIDNEY ALLEN WORTHEN, Plaintiff, vs. OKLAHOMA DEPARTMENT OF
CORRECTIONS, et al., Defendants.

Case No. CIV-07-687-R

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
OKLAHOMA

*2010 U.S. Dist. LEXIS 85606*

August 4, 2010, Decided
August 4, 2010, Filed

**SUBSEQUENT HISTORY:** Adopted by, Claim
dismissed by, As moot, Request denied by, Summary
judgment granted, in part, summary judgment denied, in
part by, Dismissed by, in part *Worthen v. Okla. Dep't of
Corr., 2010 U.S. Dist. LEXIS 85694 (W.D. Okla., Aug.
19, 2010)*

**PRIOR HISTORY:** *Worthen v. Okla. Dep't of Corr.,
2009 U.S. Dist. LEXIS 1843 (W.D. Okla., Jan. 12, 2009)*

**COUNSEL:** [*1] Sidney Allen Worthen, Plaintiff, Pro
se, Holdenville, OK.

For Warden David Parker, Rodney Redman, Deputy
Warden, Robert Denton, Chief of Security, Lisa Pruitt,
Procedures Officer, Becky Guffy, Warden's Assistant, W
Irvin, Lieutenant, Mailroom Supervisor, Shannon Reed,
Postal Clerk, Lorisa Swindler, Postal Clerk, Defendants:
Lisa E Endres, Attorney General's Ofc-OKC, Oklahoma
City, OK.

**JUDGES:** BANA ROBERTS, UNITED STATES
MAGISTRATE JUDGE.

**OPINION BY:** BANA ROBERTS

**OPINION**

**REPORT AND RECOMMENDATION**

Plaintiff, a state prisoner proceeding pro se, filed a
"Civil Rights Complaint and Habeas Corpus Petition"
[Doc. No. 21] (hereinafter, "amended complaint"),
alleging violations of his federal constitutional rights.
United States District Judge David L. Russell has referred
the matter to the undersigned Magistrate Judge for initial
proceedings consistent with *28 U.S.C. § 636(b)(1)(B)*.
Before the Court is the motion for dismissal or, in the
alternative, for summary judgment of the following
Defendants who are officers or employees of the James
Crabtree Correctional Center (JCCC): Warden David
Parker, Deputy Warden Rodney Redman, Chief of
Security Robert Denton, Procedures Officer Lisa Pruitt,
Warden's Assistant Becky Guffy, [*2] Mailroom
Supervisor Lt. W. Irvin, Postal Clerks Shannon Reed and
Lorisa Swindler, Information Technology Specialist

Betsy Hormel, and Law Library Supervisor Felicia Harris. [Doc. No. 34]. A Special Report [S.R.] pursuant to *Martinez v. Aaron, 570 F.2d 317 (10th Cir. 1978)* has also been filed. [Doc. No. 35]. Plaintiff has filed a response to the motion and an objection to the Special Report. [Doc. Nos. 36, 37]. For the following reasons, it is recommended that Defendant's motion, construed as a motion for summary judgment, (hereinafter Defendants' Motion) be granted in part and denied in part.

## Background

Plaintiff is an inmate in the custody of the Oklahoma Department of Corrections currently incarcerated at the Davis Correctional Facility in Holdenville, Oklahoma, serving a sentence of life imprisonment for a 1982 first degree murder conviction entered in the District Court of Cleveland County, in Case No. CF-82-34. S.R., Attachment (Attach.) 1 (Consolidated Record Card for Sidney Allen Worthen). Plaintiff alleges constitutional violations based on delayed delivery and/or denial of certain publications in 2007 during his incarceration at JCCC. Plaintiff also alleges constitutional convictions [*3] in connection with two disciplinary convictions at JCCC in August 2007, and prison officials' subsequent decision to transfer Plaintiff to Oklahoma State Reformatory (OSR).

## Procedural History

Plaintiff and two other state prisoners, Adam Young and George Trumpore, Jr., initiated this action by filing a five count complaint, primarily alleging the violation of the *First* and *Fourteenth Amendments*. By order dated December 20, 2007, Judge Russell found the claims of Plaintiffs Young and Trumpore were improperly joined and Plaintiffs Young and Trumpore were dismissed without prejudice to refiling their claims in separate actions. That Order also denied Plaintiff Worthen's request for class action, dismissed Defendant Oklahoma Department of Corrections (DOC), and dismissed Counts Four and Five of the complaint for failure to state a claim upon which relief may be granted. [Doc. No. 17]. Plaintiff Worthen was given time to file an amended complaint. *Id.*

Thereafter, Plaintiff filed a 63- page amended complaint. By Order dated January 12, 2009 [Doc. No. 27], Judge Russell adopted the undersigned's Report and Recommendation [Doc. No. 25] and Defendants DOC, DOC Director Justin Jones, [*4] and

DOC Deputy Director and General Counsel Mike Oakley pursuant to initial screening of the amended complaint under *28 U.S.C. § 1915A*. In addition, Plaintiff's *§ 1983* claims in Counts Three, Four and Five were dismissed for failure to state a claim on which relief may be granted. Judge Russell also dismissed Plaintiff's claim for habeas relief (included as part of Count Six) pursuant to *Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts. Id.*

The remaining *§ 1983* claims currently pending before the Court are those claims set forth in Counts One, Two, Six, and Seven of Plaintiff's amended complaint. In Count One Plaintiff alleges that the JCCC Literary Review Committee misinterpreted and misapplied prison regulations resulting in consistent delays over a two year period in the delivery of the issues of Prison Legal News (PLN), to which Plaintiff subscribes, and the denial of the February 2007 issue of PLN, in violation of his *First* and *Fourteenth Amendment* rights. Amended Complaint, pp. 16-18. In Count Two Plaintiff alleges that the JCCC prison staff delayed or denied the delivery of other publications to which he subscribes without adequate notice [*5] to Plaintiff, in violation of the *First* and *Fourteenth Amendments.*[1] *Id.*, pp. 19-22 (specifically, "National Prison Project Journal," "FAMM-GRAM," "Correctional Law Reporter," "Federal Monthly Update," and "The Journal of Criminal Law and Criminology"). In the remaining claim in Count Six, Plaintiff alleges that he was subjected to atypical and significant hardship in segregation following his August 2007 disciplinary charges and convictions, in violation of his due process rights. *Id.*, pp. 33-40. In Count Seven, Plaintiff alleges that prison officials conspired to retaliate against him for exercising his *First Amendment* rights. *Id.*, pp. 41-59. Plaintiff seeks declaratory and injunctive relief, monetary damages, the reversal and expungement of two misconduct convictions, and placement on a higher earned credit level. *Id.*, pp. 60-65.

> 1    Plaintiff also asserts that prison officials violated the *First Amendment* by failing to give notice to the publishers of the publications at issue here. This contention has not been addressed, as neither the PLN nor any other publisher is a plaintiff in the instant case.

Defendants seek dismissal, or alternatively, summary judgment with respect to all of [*6] Plaintiff's claims.

## Request for Declaratory Relief

Case 8:10-cv-02822-RWT   Document 57   Filed 01/13/12   Page 90 of 107

2010 U.S. Dist. LEXIS 85606, *6                                          Page 3

Initially, the undersigned notes that Plaintiff demands numerous forms of declaratory and injunctive relief, including the creation of prison regulations [to provide privileges and programs] to address the conditions of segregation at JCCC. Amended Complaint, pp. 61-63. Since initiating this action, Plaintiff was transferred from JCCC to OSR and then to Davis Correctional Facility, where he is currently incarcerated. Because Plaintiff is no longer in custody at JCCC, his claims for declaratory relief against Defendants, all of whom are JCCC officials or employees, are moot. *See Green v. Branson, 108 F.3d 1296, 1299-1300 (10th Cir. 1997)* (claims for injunctive and declaratory relief are moot where the prisoner has been released or transferred and is no longer subject to the conditions of confinement on which his claims are based); *Olson v. Finney, 885 F. Supp. 1480, 1485 (D.Kan. 1995)* (same). Accordingly, Plaintiff's claims for declaratory relief should be dismissed.

## Plaintiff's Requests for Judicial Notice

In four separate documents, Plaintiff requests that the Court take judicial notice of certain facts and legal arguments. [Docs. No. [*7] 9, 22, 23, and 38]. Defendants have not responded to Plaintiff's requests for judicial notice. The Federal Rules of Evidence allow courts to take judicial notice of "adjudicative facts" that fall into either of two categories - (i) facts that are "generally known within the territorial jurisdiction of the trial court;" or (ii) facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Fed. R. Evid. 201(b).* "Adjudicative facts are simply the facts of the particular case." *United States v. Wolny, 133 F.3d 758, 764 (10th Cir. 1998)* (quoting Advisory Committee Notes to *rule 201*).

Because Plaintiff's "Request to Take Judicial Notice of Possible Evidentiary Materials" [Doc. No. 9], largely contains exhibits to support Plaintiff's *§ 1983* claims, such document has been construed as and referred to hereafter as "Plaintiff's Exhibits." Plaintiff's exhibits have been considered to the extent they are relevant to the remaining claims in the amended complaint. However, because such exhibits are not the proper subject of judicial notice, Plaintiff's request to "take judicial notice" of this material should be denied.

Plaintiff's [*8] next request for judicial notice [Doc. No. 22], contains legal arguments and authority for Plaintiff's proposition that an application of *Sandin v. Conner, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995)* to his *§ 1983* claims "may not be necessary." Plaintiff's request fails to identify any adjudicative facts appropriate for judicial notice, and this request for judicial notice should also be denied. Plaintiff has also filed a "Request for Judicial Notice on the Amended Complaint/Petition" [Doc. No. 23] in which he claims that prison officials are erroneously interpreting a 1984 escape conviction to preclude his promotion to Levels 3 or 4 until after five years of clear conduct. This request should be denied because Plaintiff again fails to identify an adjudicative fact or a matter beyond reasonable controversy. Plaintiff's fourth and last request for judicial notice [Doc. No. 38], requests that the Court take notice of certain case law allegedly relevant to the issue of his 1984 escape conviction and its effect on his security status. Because Plaintiff essentially requests the Court to take notice of certain legal principles rather than facts concerning the claims remaining before the Court, such request should [*9] be denied.

## ANALYSIS

### I. Standard of Review for Defendants' Motion

Defendants move to dismiss Plaintiff's claims under *Fed. R. Civ. P. 12(b)(6)* or, in the alternative, for summary judgment under *Fed. R. Civ. P. 56.* Because Defendants have presented affidavits and evidentiary documents beyond the pleadings in support of their motion, the undersigned has considered Defendants' alternative motion for summary judgment. *Fed. R. Civ. P. 12(d); Wells v. Shalala, 228 F.3d 1137, 1140 n.1 (10th Cir. 2000).*

The purpose of summary judgment is to determine whether trial is necessary. *White v. York Int'l. Corp., 45 F.3d 357, 360 (10th Cir. 1995).* Summary judgment is appropriate when the pleadings and evidentiary materials "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* A dispute is "genuine" if the evidence permits a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* Material facts are "facts that might affect the outcome of the suit under the governing law." *Id.* In considering a motion for summary judgment, the court views the evidence [*10] and reasonable inferences drawn from the record in the light most

favorable to the nonmoving party. *Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000).*

To obtain summary judgment, the moving party need not affirmatively negate the nonmovant's claims. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* Instead, the moving party initially bears the burden only of "showing--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." *Id. at 325* (internal quotations omitted). Once the moving party has satisfied this burden, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact. *Id. at 324.* The nonmoving party "may not rest upon mere allegation" in his pleadings to satisfy this requirement. *Anderson, 477 U.S. at 256.* Rather, the nonmoving party must "go beyond the pleadings and by . . . affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex, 477 U.S. at 324* (internal quotations omitted).

A *Martinez* report is treated as an affidavit, and the plaintiff's complaint is likewise [*11] treated as an affidavit if it alleges facts based on the plaintiff's personal knowledge and has been sworn under penalty of perjury. *Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).* Furthermore, the Court must construe Plaintiff's pro se pleadings liberally but without acting as his advocate. *See Yang v. Archuleta, 525 F.3d 925, 927 n.1 (10th Cir. 2008).*

## II. Exhaustion of Administrative Remedies

Defendants essentially acknowledge that Plaintiff exhausted his administrative remedies regarding his *First Amendment* claims (Counts One and Two). Defendants' Motion, p. 5 (citing S.R., Attachs. 3, 4). However, Defendants contend that Plaintiff has failed to exhaust his administrative remedies as required by *42 U.S.C. § 1997e(a)* as to his claim in Count 6 that he was subjected to atypical and significant hardship in segregation in violation of his due process rights.[2] *Id.,* p. 14. Defendants also contend that Plaintiff has not administratively exhausted his claim of retaliation. *Id.*

2  *See Sandin v. Conner, 515 U.S. 472, 484, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995)* (due process is implicated only if a prisoner is subject to a restraint that imposes an "atypical and significant hardship . . . in relation to the ordinary

incidents [*12] of prison life").

When an affirmative defense, such as the failure to exhaust administrative remedies,[3] is asserted in a motion for summary judgment, Defendants "must demonstrate that no disputed material fact exists regarding the affirmative defense asserted." *Hutchinson v. Pfeil, 105 F.3d 562, 564 (10th Cir. 1997).* "If the defendant[s] meet[] this initial burden, the plaintiff must then demonstrate with specificity the existence of a disputed material fact." *Id.* "If the plaintiff fails to make such a showing, the affirmative defense bars his claim, and the defendant[s] [are] then entitled to summary judgment as a matter of law." *Id.*

3  Failure to exhaust administrative remedies is an affirmative defense that the defendant bears the burden to plead and prove. *Jones v. Bock, 549 U.S. 199, 216-18, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007); see also Roberts v. Barreras, 484 F.3d 1236, 1241 (10th Cir. 2007).*

The Prison Litigation Reform Act of 1995 (PLRA) directs that "[n]o action shall be brought with respect to prison conditions under *section 1983* of [*13] this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *42 U.S.C. § 1997e(a).* This provision has been interpreted by the Supreme Court to apply "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002).* Moreover, exhaustion of administrative remedies under the PLRA is required for all inmates seeking relief in federal district court regardless of the type of relief available under the institutional administrative procedure. *Booth v. Churner, 532 U.S. 731, 741, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001).* The PLRA's administrative exhaustion requirement is satisfied if the inmate complies with the prison's grievance procedures. *Jones v. Bock, 549 U.S. at 218.* "An inmate who begins the grievance process but does not complete it is barred from pursuing a §1983 claim under the PLRA for failure to exhaust his administrative remedies." *Jernigan v. Stuchell, 304 F.3d 1030, 1032 (10th Cir. 2002).* "To exhaust administrative remedies an inmate must properly [*14] comply with grievance procedures; substantial compliance is insufficient." *Fields v. Oklahoma State Penitentiary, 511*

2010 U.S. Dist. LEXIS 85606, *14

*F.3d 1109, 1112 (10th Cir. 2007)*. Any unexhausted claims must be dismissed. *Jones, 549 U.S. at 223-224*.

In determining whether Plaintiff has exhausted his available remedies, the Court must examine the relevant administrative procedure. The DOC's grievance procedure, a four-step administrative process set forth on the DOC website, governs in this case. *See* http://www.doc.state.ok.us/offtech/op090 124.htm (DOC Policy OP-090124) (accessed August 3, 2010).[4] First, an inmate must attempt to resolve the claim informally. *Id.,* OP-090124, IV(A). Second, if the prisoner is dissatisfied with the result, he must file a request to staff. *Id.,* OP-090124, IV(B). The request to staff must "stat[e] completely, but briefly the problem" and the "statement must be specific as to the complaint, dates, places, personnel involved and how the inmate/offender was affected." *Id.* OP-090124, IV(B)(1). Third, if the inmate remains dissatisfied, he must file a grievance with the facility's reviewing authority. *Id.,* OP-090124, V(A), (B), and (C). The grievance procedure permits the reviewing authority [*15] to either grant or deny a grievance, in whole or in part, and where a grievance is granted, the reviewing authority may fashion an appropriate remedy. *Id.,* OP-090124, VI(B)(5) and (C)(1). Finally, if still dissatisfied, the inmate must appeal to the administrative review authority. *Id.,* OP-090124, VII(A), (B), (C), and (D).

> 4   Although Defendants assert generically that Plaintiff must exhaust his administrative remedies "pursuant to DOC's grievance procedures," Defendants' Motion, p. 15, the relevant policy concerning DOC/JCCC grievance procedures is not attached to the motion nor is it included in the Special Report. Nevertheless, the Court can take judicial notice of the policy. *See Ray v. Aztec Well Service Co., 748 F.2d 888, 889 (10th Cir. 1984)* ("This court can take judicial notice of agency rules and regulations."); *accord Morrow v. Collins, 111 F.3d 374, 375 (5th Cir. 1997) (per curiam)* ("We take judicial notice of the recently established [Texas Department of Criminal Justice] procedures . . . .").

### Exhaustion of Due Process Segregation Claim

In a portion of Count Six and in Count Seven, Plaintiff alleges that numerous conditions he experienced upon placement in JCCC segregation [*16] on August 24, 2007, subjected him to "atypical and significant" hardships. Specifically, in Count Six Plaintiff alleges that he was held in restrictive housing for an excessive amount of time before and after the twenty-day punishment imposed for his disciplinary convictions and during that time he was ineligible for promotion beyond earned credit level one. Amended Complaint, p. 33. In Count Seven Plaintiff recites a litany of what he characterizes as atypical and significant hardships he endured in the segregated housing unit (SHU):

> 1) the cell temperatures in SHU were cold and he had inadequate clothing;
>
> 2) Plaintiff not given SHU rules and regulations so no exercise was provided;
>
> 3) Plaintiff was not provided a water cup to drink from for several days;
>
> 4) Plaintiff was provided an inadequate diet, which required him to eat a snack of peanut butter and crackers nightly to maintain his blood sugar levels;
>
> 5) Plaintiff was forced to stay in bed to maintain body temperature and no exercise resulted in impaired circulation;
>
> 6) Plaintiff was refused implements to trim his fingernails or toenails;
>
> 7) Plaintiff was subjected to impaired physical and psychological conditions due to constant exposure [*17] to lights, no privacy, 24-hour lockdown in cell, no phone, no haircut, denial of access to the law or leisure library, being handcuffed when being taken out of cell, showers only provided every third day, failure to provide emergency glucose tables to counter low-blood sugar episodes at night in his cell;
>
> 8) Although Plaintiff was punished with 20 days of segregation, he was kept in segregation an excessive period of time, from August 24, 2007 to October 18, 2007;
>
> 9) Plaintiff was denied parole consideration "due to parole investigator Carla D. Johnston refusing to conduct a parole interview;"
>
> 10) Without due process Plaintiff was "labeled as a recalcitrant prisoner" based on his two misconducts and prison officials' "wrong interpretation" of a 1984 escape misconduct offense;

11) In response to Plaintiff's filing grievances, filing lawsuits and helping other prisoners with legal matters, Plaintiff was retaliated against with bogus misconducts, transfer to a more severe facility with inadequate medical care, numerous shake-downs and lockdowns, excessive SHU placement, and dismissal from his prison job.

Amended Complaint, pp. 52-55.[5]

5 Although he also refers to and complains about certain [*18] conditions of confinement at the OSR, the prison facility to which he was transferred on October 19, 2007, Amended Complaint, pp. 55-56, Plaintiff fails to name any OSR officials as a defendant in his amended complaint, and, therefore, as Plaintiff recognizes, any claims concerning the conditions of confinement at OSR "are issues for a later case." *Id.*, p. 14.

Although Defendants contend that Plaintiff has failed to exhaust his administrative remedies as to any of these claims, the undersigned finds that Plaintiff has exhausted his administrative remedies with respect to four of the above claims concerning segregation conditions. Following two disciplinary charges, Plaintiff was placed in the JCCC SHU on August 24, 2007, where he remained until his transfer to OSR on October 19, 2007. S.R., Attach 1, p. 5, (Plaintiff's Consolidated Record Card). On October 7, 2007, Plaintiff submitted a Request to Staff, requesting a drinking cup and more water for taking his medications, items for a diabetic sack, warmer cell temperatures and nail clippers. S.R., Attach. 16. In response, Plaintiff was informed by JCCC Warden Parker that he would be allowed to keep one styrofoam cup and one diabetic [*19] meal sack in his cell, that the temperature of the SHU would be checked and that nail clippers were available upon request from on-duty SHU officers. *Id.* It appears Plaintiff was thus granted relief on these four requests.

Although Defendants contend that Plaintiff has not completed his administrative remedies with respect to these claims, nowhere have Defendants articulated what other types of relief were still available from the administrative process for Plaintiff to pursue after Warden Parker's response setting forth a remedy for each

complaint. Nor does it appear that any further procedures existed. The DOC grievance process only requires an inmate to appeal a grievance if their "appeal [is] not resolved at [the] second level." DOC Policy OP-090124, VII(A), (B), (C), and (D). Plaintiff makes no contention that the remedies provided by the warden left the issues unresolved. Thus, with respect to these four claims, there is no evidence that further exhaustion was required. *See Ross v. County of Bernalillo, 365 F.3d 1181, 1186-87 (10th Cir. 2004)* (where prison facility responded to inmate's informal pre-grievance complaint about a dangerous condition and provided a remedy, inmate [*20] was not required to do more to exhaust administrative remedies as to that claim), *overruled on other grounds by Jones v. Bock, 549 U.S. 199, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007)*; *Coleman v. City and County of Denver, 197 Fed. Appx. 764, 2006 WL 2709680, at *3 (10th Cir. 2006)* (unpublished op.) (where prison facility took remedial action in response to inmate's grievance about conditions in his cell, inmate was deemed to have exhausted his administrative remedies as to that claim); *Malone v. Franklin, 113 Fed. Appx. 364, 2004 WL 2407228, at *2 (10th Cir. 2004)* (unpublished op.) (when the plaintiff's requests were granted by the warden, he was not required to appeal or institute a new grievance to obtain the same relief).

The undersigned finds that Defendants have not demonstrated the absence of disputed material facts as to whether Plaintiff exhausted the administrative remedies available to him with respect to these four claims. Accordingly, Defendants are not entitled to summary judgment based on a failure to exhaust.

However, with respect to the exhaustion of Plaintiff's remaining due process claims concerning segregation conditions of confinement, the undersigned finds that Defendants have met their burden. [*21] A review of all the administrative documents submitted by the parties demonstrates that Plaintiff did not initiate the DOC grievance process with respect to these other claims regarding conditions in SHU. Thus, the record demonstrates that there are no disputed factual issues with regard to Plaintiff's failure to comply with the JCCC grievance procedures as to the remaining due process claims. Accordingly, the undersigned finds that the Defendants are entitled to summary judgment as requested on these claims. Such claims should be dismissed without prejudice. *Fitzgerald v. Corr. Corp. of America, 403 F.3d 1134, 1139 (10th Cir. 2005)*.

## Exhaustion of Conspiracy/Retaliation Claim

In Count Seven Plaintiff alleges that "Defendants Becky Guffy, Betsy Hormel, Felicia Harris, and other named and unnamed [JCCC[ staff acted in concert together each with the others to retaliate, issue bogus misconduct offenses and subject Plaintiff to atypical and significant hardships which started on August 24, 2007, and continue to date at the Oklahoma State Reformatory . . . ." Amended Complaint, p. 41.

Defendants first contend that Plaintiff did not exhaust his claim of retaliation because the appeals of both [*22] misconduct convictions were ultimately returned unanswered due to Plaintiff's failure to follow disciplinary appeal procedures. Defendants' Motion, p. 15 (citing Attachs. 10a-10e). Plaintiff responds that "both misconducts were fully exhausted" and moreover, "mere technical deficiencies do not cancel exhaustion efforts." Plaintiff's Objection, pp. 3-4. Although the parties disagree over whether Plaintiff completed his administrative and judicial remedies with respect to his misconduct convictions, resolution of that dispute does not resolve the issue of exhaustion with respect to Plaintiff's claim of retaliation. *See Kikumura v. Osagie, 461 F.3d 1269, 1282-85 (10th Cir. 2006)* ("[W]e hold that a grievance satisfies *§ 1997e(a)*'s exhaustion requirement [only] so long as it provides prison officials with enough information to investigate and address the inmate's complaint internally.").

The record demonstrates that Plaintiff did exhaust his administrative remedies with respect to his claim of retaliation and conspiracy. Although Defendants contend that Plaintiff "has never filed a separate grievance asserting retaliation against any of the named Defendants," Defendants' Motion, p. 16, the [*23] administrative materials in the Special Report reflect that on September 13, 2007, Plaintiff submitted a Request to Staff to Warden Parker alleging "[r]etaliation/reprisals by Becky Guffy, Betsy Hormel, Felicia Harris and others," and inquiring as to whether this issue could be grieved other than through a misconduct appeal. S.R., Attach. 12, p. 5. In response, the warden referred Plaintiff to prison operation policy relevant to appeals and further found that Plaintiff's "allegations of retaliation are unsubstantiated" and "there is no evidence of retaliation." *Id.*, p. 7. On October 19, 2007, Plaintiff submitted an Inmate/Offender Grievance Report Form to Warden Parker alleging that he was being held in SHU an

extended time due to retaliation by Defendants Guffy, Hormel and Harris because of Plaintiff's "civil litigation." *Id.*, p. 3 (Grievance JCCC-07-155). In a response dated October 26, 2007, the warden stated there was "no evidence to substantiate [Plaintiff's] claims of retaliation," that Plaintiff was to be transferred to another facility upon the availability of bed space, and that he had been placed on transit detention status for Plaintiff's safety as well as the security of [*24] the facility. *Id.*, p. 14. Plaintiff submitted an appeal of the grievance response, and on November 19, 2007, in a response designated Grievance 07-2352, DOC Director's Designee Morton responded that the grievance was being returned to Plaintiff unanswered because it was procedurally deficient; specifically, the grievance improperly included more than one issue. *Id.*, p. 2. Plaintiff was advised in this correspondence that he had ten calendar days from the date of receipt of the grievance appeal to properly resubmit the grievance. *Id.* According to the JCCC Special Report writer, Plaintiff resubmitted his appeal on November 20, 2007. S.R., p. 6.

Plaintiff argues that the Special Report contains evidence showing that his retaliation claim is exhausted. The undersigned agrees. On December 11, 2007, in a final response to Grievance JCCC 07-155, Director's Designee Morton affirmed the reviewing authority's response to Plaintiff's grievance. S.R., Attach. 12, p. 11 (affirming denial of grievance JCCC-07-155). The Director's Designee added "The inmate will have satisfied the exhaustion of administrative remedies required by *57 O.S. § 564*." Although the state exhaustion statute (*57 O.S. § 564*) [*25] and the PLRA's exhaustion requirement (*42 U.S.C. § 1997e(a)*) are distinct, the "available administrative remedies" under the state and the PLRA exhaustion statutes are both determined by reference to the DOC's grievance policy. *Compare Hicks v. State ex rel. Oklahoma Dept. of Corrections, 2009 OK CIV APP 91, 227 P.3d 1097, 1099-1100 (Okla.Civ.App. 2009)* (to meet exhaustion requirement prisoner required to exhaust DOC's four-step grievance process prior to filing state lawsuit) *with Jones v. Bock, 549 U.S. 199, 218, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007)* (to properly exhaust administrative remedies prisoners must comply with the applicable procedural rules defined by the prison grievance process itself). Defendants do not address the December 11, 2007, appeal response nor its statement that the exhaustion requirement has been satisfied. On this record, the undersigned finds that contrary to Defendants' assertion, Plaintiff did exhaust his

administrative remedies on his claim of retaliation. Consequently, Defendants are not entitled to summary judgment based on the alleged failure to exhaust this claim.

## II. *Eleventh Amendment* Immunity

Plaintiff has sued Defendants in their individual and official capacities. Amended Complaint, p. 1. Defendants [*26] contend that to the extent they are being sued in their official capacities, they are immune from suit on the basis of *Eleventh Amendment* immunity. Defendants' Motion, p. 27.

The *Eleventh Amendment* grants states immunity from suits brought pursuant to *§1983* unless such immunity is specifically waived or overridden by Congress. *See Welch v. Texas Dept. of Highways and Public Transp., 483 U.S. 468, 472-74, 107 S. Ct. 2941, 97 L. Ed. 2d 389 (1987)* (finding federal courts barred from considering *§1983* actions against states unless state's sovereign immunity is specifically waived or overridden by Congress). Congress did not abrogate the states' *Eleventh Amendment* immunity through the enactment of *42 U.S.C. §1983. See Quern v. Jordan, 440 U.S. 332, 345, 99 S. Ct. 1139, 59 L. Ed. 2d 358 (1979)*. Neither has the State of Oklahoma waived its sovereign immunity except in limited circumstances not applicable here. *See Ramirez v. Oklahoma Dep't of Mental Health, 41 F.3d 584, 589 (10th Cir. 1994)* (noting that "Oklahoma has not waived its *Eleventh Amendment* immunity"). Further, an officer or official acting in his official capacity is not a "person" subject to liability under *42 U.S.C. §1983. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 66-67, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989)* (noting [*27] that nothing in *§1983* suggests that Congress intended that the term "person" should include a state). Therefore, to the extent Plaintiff seeks money damages against Defendants in their official capacities, Defendants are entitled to summary judgment. However, Plaintiff's claims against Defendants in their individual capacities have been considered hereafter.

## III. *First Amendment* Claims - Counts One and Two

Plaintiff alleges in two related claims that Defendants have violated his *First* and *Fourteenth Amendment* rights by delaying, denying, and/or seizing publications to which he had subscribed without notice to Plaintiff. Amended Complaint, pp. 16-22. In Count One, Plaintiff alleges that "[t]he publication Prison Legal News

has been delayed thirty days or more for over two years by the JCCC Literary Review Committee and the February 2007 issue was denied and seized without justification, no notice to the publisher . . . ." *Id.*, p. 16. In Count Two, Plaintiff alleges that several other publications to which he subscribes "have been delayed, denied, and seized by the Defendants without notice. . . ." *Id.*, p. 19.

Defendants contend that they are entitled to summary judgment on these claims [*28] because Plaintiff has failed to establish a violation of his due process rights or his rights under the *First Amendment*.[6]

> 6   Defendants also contend that Plaintiff has failed to establish a property interest in any of the publications at issue here, noting that Plaintiff's prison trust account records do not reflect any payment for a subscription to the PLN, the National Prison Projects Journal, Oklahoma Criminal Defense Weekly, FAM-GRAMM, Correctional Law Reporter, Federal Monthly Update or the Journal of Criminal Law and Criminology. Defendants' Motion, p. 9; S.R., Attachs. 5 (DOC/JCCC Inmate Trust Accounting System record) and 17 (Affidavit of Becky Guffy, JCCC Administrative Programs Officer I). However, Plaintiff has provided copies of checks reflecting his payments to University of Illinois Press ($45.00), East Publishing Company ($27.00), NPP ACLU ($10.00), Cure International ($10.00), FAMM ($10.00) and Civic Research Institute ($169.95). Plaintiff's Exhibits [Doc. No. 9], Ex. 16. Thus, whether or not Plaintiff has property interest in these publications remains a disputed fact.

## A. *First Amendment* Legal Framework

Inmates have a *First Amendment* right to receive information while in [*29] prison to the extent the right is not inconsistent with prisoner status or the legitimate penological objectives of the prison. *Pell v. Procunier, 417 U.S. 817, 822, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974)*. "Although the Court has continually recognized (1) the difficulty of running a prison, (2) the separation of powers concerns when a federal court assumes a function (prison administration) entrusted to the legislative and executive branches, and (3) the need for federal courts to accord deference to state prison authorities, those factors do not mean that every prison regulation is insulated from

review no matter what the facts may be." *Jacklovich v. Simmons, 392 F.3d 420, 426 (10th Cir. 2004)* (citing *Turner 482 U.S. at 84-85*). *See also Bell v. Wolfish, 441 U.S. 520, 562, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)* (cautioning federal courts to review prison policies and practices for constitutional error only and not to substitute its judgment on prison management for that of prison officials); *Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 126, 97 S. Ct. 2532, 53 L. Ed. 2d 629 (1977)* (stating that "because the realities of running a penal institution are complex and difficult, we have also recognized the wide-ranging deference to be accorded the decisions of prison [*30] administrators").

To determine whether Plaintiff's *First Amendment* rights have been violated, the Court applies the standard set forth in *Turner v. Safley, 482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987)*.[7] *See Thornburgh v. Abbott, 490 U.S. 401, 413, 109 S. Ct. 1874, 104 L. Ed. 2d 459 (1989)* (holding *Turner* analysis applies to prison regulations affecting the sending of a publication to an inmate, *i.e.*, incoming publications). Under *Turner*, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner, 482 U.S. at 89*. The four factors to be considered in making this determination are: (1) whether a valid and rational connection exists between the regulation and the asserted legitimate governmental interest; (2) whether alternative means of exercising the constitutional right remain available to inmates; (3) any effect accommodating the right would have on guards and inmates, and (4) the absence of ready alternatives. *Jacklovich, 392 F.3d at 426* (citing *Turner, 482 U.S. at 89-90*). The burden is on the plaintiff to disprove the validity of the prison regulation and prison officials' application of that regulation to him. *Overton v. Bazzetta, 539 U.S. 126, 132, 123 S. Ct. 2162, 156 L. Ed. 2d 162 (2003)*; [*31] *Steffey v. Orman, 461 F.3d 1218, 1222 (10th Cir. 2006)*.

7   Plaintiff challenges individual acts of prison officials and contends that they misinterpreted and misapplied prison policy. Whether plaintiff challenges an official policy or the action of a prison official, the analysis is the same. *Boles v. Neet, 486 F.3d 1177, n. 4 (10th Cir. 2007)*.

**B. Applicable Regulation - OP-030117**

Attached to the Special Report is a copy of OP-030117, which sets out the JCCC/DOC regulations

governing Correspondence, Publications, and Audio/Video Medica Guidelines. Special Report, Attach. 2 (OP-030117, effective November 9, 2007). The regulation states:

> [JCCC] is not authorized to implement a prohibition on any materials that inmates may receive by subscription, such as a magazine, newspaper, or other similar type of periodical. Each issue has to be received and reviewed to determine whether or not it violates the correspondence restrictions of this agency.

S.R., Attach. 2, pp. 2-3.[8] The regulation governs inmates' access to written publications as follows:

   B. Prohibited Correspondence

   1. Correspondence will not include anything of a threatening nature, contraband, or anything that suggests plans for escape, [*32] illegal, or unauthorized activity.

   . . . .

   5. Publications will be prohibited that:
      a. Contain instructions for the manufacture of drugs, explosives, other unlawful substances that is of a threatening nature, or anything that suggests plans for escape, illegal activity, or tattoos of any type;
      b. Advocate the overthrow of the U.S., or Oklahoma or other state government;
      c. Advocate terrorism, criminal behavior, racial, religious, or national hatred or any material that creates an unsafe environment for the inmates or staff;

*Id.*, p. 2. The regulation provides that when a publication is rejected, the intended inmate recipient shall be notified of the decision, including the reasons, on a Prohibited Correspondence Notification. *Id.*, p. 3. Upon notification, the inmate may appeal such decision through the offender grievance procedure. *Id.*

8   The effective date of the JCCC Field Memorandum concerning OP-030117 attached to

the Special Report is November 9, 2007, although the alleged constitutional violation occurred in February through April of 2007. S.R., Attach. 2. Plaintiff points out this fact, but he does not assert that different language was in place at the time Defendants denied his receipt [*33] of the February issue of PLN. Plaintiff's Objection, p. 14. In fact, Plaintiff's grievance concerning the denial of the February 2007 PLN publication reflects his knowledge of the policy's prohibition of certain materials. S.R., Attach. 3, pp. 3-5. Moreover, the undersigned takes judicial notice that the prior DOC regulation concerning prohibited correspondence and publication, OP-030117, with an effective date of September 16, 2004, set forth the same criteria for determining whether a publication is prohibited. Thus, the undersigned finds there is no issue of material fact as to the applicable policy regarding prohibited correspondence and publications at the time of the events at issue in this case.

## C. Denial/Nondelivery of Publications

Plaintiff alleges the February 2007 issue of the publication Prison Legal News (PLN),[9] to which he subscribed and had previously received without incident, was "denied and seized without justification, no notice to the publisher violating the *First and Fourteenth Amendments*." Amended Complaint, p. 16. Plaintiff also claims that JCCC officials failed to deliver his March and April issues of PLN because of a "blanket denial" of PLN. *Id.*, p. 18.

9 PLN is [*34] "a monthly magazine containing news articles regarding inmate litigation, including litigation trends and recent court decisions," published and distributed by Prisoner's Legal News, a non-profit Washington corporation. *Jones v. Salt Lake County, 503 F.3d 1147, 1160 (10th Cir. 2007)*.

## February 2007 PLN Issue

The relevant record shows that on March 1, 2007, Plaintiff was notified that he had received an issue of PLN which violated the prison's policy on inmate correspondence guidelines and delivery to him was being denied by JCCC Warden Parker. Plaintiff's Exhibits [Doc. No. 9], Ex. 1. Plaintiff submitted a Request to Staff to Defendant Reed (a JCCC postal clerk) asking whether

the February 2007 issue was being denied by the warden and whether other DOC facilities were likewise denying that issue.[10] S.R., Attach. 3, p. 4. In response, Reed informed Plaintiff that the PLN issue had been processed by the Literary Review Committee and had been "determined by the warden to be a security risk." *Id.* Plaintiff then filed a grievance which was denied. Warden Parker advised Plaintiff that "[t]he February 2007 edition of the [PLN] was found by the literary review board to contain material that is [*35] not conducive to the security of the facility." *Id.*, p. 6. Plaintiff's appeal was denied by the DOC Director's Designee. *Id.*, p. 2.

10 Plaintiff told officials that he had read the entire February 2007 PLN publication (obtained from inmates transferring from other facilities) and could find nothing that could serve as a threat to JCCC security. S.R., Attach 3, p. 5. Plaintiff alleged that the prison's denial of the PLN issue was an "exaggerated response to security needs." *Id.* Plaintiff has provided a copy of the challenged 47-page February 2007 PLN publication. Plaintiff's Exhibits [Doc. No. 9], Ex. 2.

Defendants have argued only the first of the four factors under the *Turner* analysis. *See Turner, 482 U.S. at 89* ("[T]here must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it.") (quotation omitted). Defendants contend that the justification for the ban of the February 2007 issue of PLN was based on "a threat to security." Defendants' Motion, p. 12. Generally, the security of a prison is considered reasonably related to a valid penological interest. *See, e.g., Thornburgh, 490 U.S. at 415* (protecting prison [*36] security is a purpose central to all other corrections goals). Plaintiff argues, as he did in his grievances, that "no security reason exists" for the seizure of the February 2007 PLN publication. Plaintiff's Objection, p. 6.

Other than the general conclusion that the publications represented a "threat to security," Defendants have submitted no affidavit or other evidence in support of the rejection of the February 2007 PLN publication as a security threat. Defendants do not cite any particular article, advertisement, or any specific page numbers as violative of the policy as set froth in OP-030117B. Therefore, the undersigned finds that Defendants have not met their "relatively limited burden

of identifying the legitimate penological interests that justif[ied] the impinging conduct." *Boles v. Neet, 486 F.3d 1177, 1182 (10th Cir. 2007)* (citation omitted). *See also McCormick v. Werholtz, No. 07-2605-EFM, 2009 U.S. Dist. LEXIS 119878, 2009 WL 5210845, at \*4-5 (D.Kan. Dec. 23, 2009)* (unpublished op.) (finding prison official's affidavit failed to show a rational connection between censor of two books ordered from bookseller and the prison's interest in security).

Viewing the evidence in the light most favorable to Plaintiff, [*37] the undersigned concludes that there are genuine issues of material fact regarding whether Defendants' denial of Plaintiff's February 2007 PLN issue is reasonably related to a legitimate penological interest. *Boles, 486 F.3d at 1183* ("Without record support, we cannot conclude that Warden Neet's actions were justified by security concerns or any other valid penological objectives."). Because Defendants have failed to satisfy the mandatory first prong of the *Turner* test, it is not necessary to analyze the other *Turner* factors. *See Parkhurst v. Lampert, 339 Fed. Appx. 855, 860-861 (10th Cir. July 16, 2009).* Accordingly, Defendants are not entitled to summary judgment on Plaintiff's claim in Count One that the denial of the February 2007 issue of PLN violated his rights under the *First Amendment*.

**Defendants Hormel and Harris**

It is recommended that Defendants Hormel and Harris be dismissed from this remaining claim for failure to allege personal participation in the alleged constitutional violation.[11] *See Trujillo v. Williams, 465 F.3d 1210, 1227 (10th Cir. 2006)* ("[F]or liability to arise under *§ 1983*, a defendant's direct personal responsibility for the claimed deprivation of a constitutional [*38] right must be established."). To establish personal liability, a plaintiff must show that the official caused the deprivation of a federal right. *Kentucky v. Graham, 473 U.S. 159, 166, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985).* There must be an affirmative link between the alleged constitutional violation and each defendant's participation, control or direction, or failure to supervise. *See Butler v. City of Norman, 992 F.2d 1053, 1055 (10th Cir. 1993).* "Because vicarious liability is inapplicable to . . . *§ 1983* suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal, U.S. , 129 S.Ct. 1937, 1948, 173 L. Ed. 2d 868 (2009).*

11   Although Defendants have not sought summary judgment on the basis of lack of personal participation, the Court is obligated to dismiss a prisoner's cause of action where it fails to state a claim upon which relief may be granted. *28 U.S.C. § 1915A.*

Although Defendants Hormel and Harris are named in the amended complaint, neither is identified or mentioned in Plaintiff's *First Amendment* claims. Amended Complaint, pp. 16-22. Rather, Plaintiff identifies Defendant Hormel as an information technology specialist [*39] who maintains JCCC computer systems and alleges her involvement in charging Plaintiff with having unauthorized files on the law library computer. *Id.,* p. 8. Similarly, Plaintiff identifies Defendant Harris as JCCC law library supervisor and alleges her involvement in the misconduct charges brought against Plaintiff. *Id.,* p. 9. Plaintiff's failure to allege personal participation by these two Defendants in any of the alleged unconstitutional conduct concerning his *First Amendment* rights, however, requires their dismissal from this action. Therefore, it is recommended that to the extent that Plaintiff's *First Amendment* claims survive, Defendants Hormel and Harris should be dismissed pursuant to *28 U.S.C. § 1915A* for failure to state a claim upon which relief may be granted.

**Nondelivered Publications**

Plaintiff alleges that the March and April 2007 PLN issues were not delivered to him, nor was he notified that these issues had been denied by the Literary Review Committee. Amended Complaint, p. 18; Plaintiff's Objection, p. 6. In the administrative grievances submitted by Plaintiff regarding this claim, he asserted that prison officials were imposing a "blanket denial" of his legal publications [*40] received by bulk mail postage. *See* Plaintiff's Exhibits, Ex. 7.

Defendants state that Plaintiff "received copies of the March and May 2007 issues of the Prison Legal News, which shows there is no blanket denial of this periodical." Defendants' Motion, p. 5, ¶7. In support of this assertion, Defendants refer to forms completed by the Literary Review Committee authorizing the delivery of the March and May 2007 PLN issues to Plaintiff. S.R., Attach. 7. Defendants claim further that "there is no record of the April 2007 issue of the Prison Legal News being sent to the prison for the Plaintiff and this issue was not rejected

or denied by the Literary Review Committee . . . ." Defendants' Motion, p. 5, ¶8.[12] In his objection, Plaintiff asserts that the March and April issues of PLN "were sent," "seized" and/or "thrown away" by "a party that makes up the Literary Review Committee, probably Lt. W. Irvin." Plaintiff's Objection, p. 6. Plaintiff also alleges that other publications subscribed to by him, specifically, National Prison Projects Journal and Federal Monthly Update, were not delivered to him by JCCC officials, nor was he given notice or justification for the failure to deliver these [*41] publications. Amended Complaint, pp. 19 & 21.

> 12   Defendants have also submitted evidence that the April 2007 PLN issue was received and authorized for delivery to two other JCCC inmates. S.R., Attach. 6 (JCCC literary review form, authorizing delivery of April 2007 PLN to inmates Trumpore and Church).

Plaintiff's claim that these publications were "sent," "seized" or "thrown away" is purely speculative. In civil-rights actions against individual government actors, the factual allegations should "make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008). Here, other than speculating that Lt. Irvin "probably" threw away the undelivered issues, Plaintiff does not allege that the Literary Review Committee or any other named Defendant denied delivery of these publications based on policy or otherwise censored the publications. Rather, Defendants have submitted evidence to the contrary. Thus, Plaintiff's conclusory allegations fail to satisfy his burden of showing that there [*42] is a genuine issue of material fact for trial regarding this *First Amendment* claim, and Defendants are entitled to judgment on this claim. *See Shupe v. Wyoming Dept. of Corrections*, 290 Fed. Appx. 164, 166 (10th Cir. 2008) (finding prisoner's allegations that prison did not treat inmate correspondence with the media as privileged mail failed to state a claim for censorship in violation of *First Amendment*; complaint did not specify what the alleged censorship entailed, who engaged in it, or whether it even involved any of prisoner's mail).[13]

> 13   Even assuming that these publications were mailed to Plaintiff at the prison but not delivered,

at most, Plaintiff may have a complaint of negligent or intentional deprivation of personal property. However, Plaintiff has not set forth a claim based on a violation of his due process property rights. Even if Plaintiff's claim is liberally construed as required by *Haines v. Kerner*, 404 U.S. 519, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972), to allege a negligent or intentional deprivation of his property, his complaint fails to state a claim. Where a plaintiff has adequate state post-deprivation remedies neither negligent nor intentional deprivations of a prisoner's property that [*43] are random and unauthorized give rise to a § 1983 claim. *Hudson v. Palmer*, 468 U.S. 517, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984) (intentional deprivation); *Daniels v. Williams*, 474 U.S. 327, 328, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986) (concluding the *Due Process Clause* is "not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property").

Accordingly, to the extent the alleged loss of his property was not pursuant to any policy or authorized act, in order to state a § 1983 claim, Plaintiff was required to plead the inadequacy or unavailability of a post-deprivation remedy. *See Durre v. Dempsey*, 869 F.2d 543, 548 (10th Cir. 1989) (affirming dismissal of plaintiff's due process deprivation of property claim, stating that "[i]n order to state a claim under § 1983, a complaint must allege facts sufficient to show deprivation, in this case the lack of an adequate state remedy"). Plaintiff has failed to allege that state law post-deprivation remedies were inadequate and "absent such an allegation, the taking of his property does not violate due process." *Harris v. Chabries*, 114 Fed. Appx. 363, 365 (10th Cir. Oct. 28, 2004) (citing *Freeman v. Dep't of Corrections*, 949 F.2d 360, 362 (10th Cir. 1991)).

In sum, [*44] it is recommended that Defendant's motion for summary judgment be denied as to Plaintiff's claim that his *First Amendment* rights were violated when Defendants denied and/or failed to deliver the February issue of PLN. It is further recommended that Defendant's motion for summary judgment on Plaintiff's *First Amendment* claim for nondelivery of the March and April 2007 issues of PLN, the National Prison Projects Journal,

and the Federal Monthly Update be granted.

## C. Delayed Delivery of Publications

In Count Two Plaintiff alleges that the JCCC prison staff delayed the delivery of various legal publications to which he subscribes, including "FAMM-GRAM," "Correctional Law Reporter," and "The Journal of Criminal Law and Criminology." Amended Complaint, pp. 19-22. Plaintiff further complains that the Oklahoma Criminal Defense Weekly was initially denied by the Literary Review Committee but then later released to Plaintiff "months after the delivery date." *Id.*, p. 20.[14]

> 14   The record shows that this publication was initially denied on April 17, 2007, because it appeared to be an article taken from the internet in violation of DOC policy OP-030117(V)(c), which prohibits the direct or indirect use [*45] of any Internet services, or the purchase or subscription of any services offered from the Internet. S.R., Attach. 8. Plaintiff appealed this ruling through the grievance procedure, and on April 27, 2007, the reviewing authority determined that upon further review, Plaintiff would be allowed to possess the challenged material, noting that although it was electronically produced, it was "legal in nature." *Id.*, p. 4. Plaintiff was reminded that "[a]ll incoming mail will be subject to the review process outlined in OP 030117." *Id.*

As previously stated, there must be a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner, 482 U.S. at 89; accord Jones v. Salt Lake County, 503 F.3d at 1153.* Defendants contend that pursuant to DOC policy, the JCCC Literary Review Committee "must scan all incoming mail to determine if it poses a security risk to the prison." Defendants' Motion, p. 13 (citing S.R., Attach. 2 (JCCC-030117)). Defendants argue that "scanning all prison mail is a daunting task that, if done properly, can cause delays in prisoners receiving their mail." *Id.* Defendants assert the prison has "legitimate [*46] penological reasons for screening the mail for security risks" and therefore, "weighing the need of security in prison against a prisoner's quick receipt of non-legal mail, a 30 - 90 day delay in receiving periodicals does not amount to an unreasonable restriction of a prisoner's *First Amendment* rights." *Id.*

The federal courts "accord deference to a prison's choice of regulations employed to implement valid penological goals." *Shabazz v. Parsons, 127 F.3d 1246, 1249 (10th Cir. 1997).* Here, the first *Turner* factor supports the policy requiring review of all incoming publications, as prison officials have advanced legitimate interests in the allotment of limited staff and time. In *Thornburgh*, the Supreme Court concluded that regulations allowing prison authorities discretion to determine whether particular reading material creates an intolerable risk of disorder under the conditions of their particular institution are rationally related to the legitimate interest of maintaining prison security. *Thornburgh, 490 U.S. at 416-17.* DOC's similar regulation, JCCC-030117, is thus reasonably related to legitimate penological objectives.

The second *Turner* factor requires the Court to determine "whether [*47] there are alternative means of exercising the right that remain open to prison inmates." *Turner, 482 U.S. at 90; Salt Lake County, 503 F.3d at 1153.* Plaintiff offers no "alternative that [would] fully accommodate" his rights at *de minimis* cost to the valid penological interests of order and security. *Shabazz, 127 F.3d at 1249.* Moreover, Plaintiff has not alleged a lack of alternative means of accessing information. This second *Turner* factor is "clearly satisfied" where the regulation at issue permits a broad range of publications to be sent, received, and read. *Thornburgh, 490 U.S. at 418.* In this case, the regulation at issue only prohibits certain specifically defined materials and does not prohibit Plaintiff from receiving a broad range of materials through the mail, as evidenced by the listed publications Plaintiff acknowledges he received following the requisite committee review. As there is no disputed issue that Plaintiff has access to a broad range of publications, this *Turner* factor is satisfied. *See Salt Lake County, 503 F.3d at 1156* (jail's ban on inmate access to "sexually explicit material" passed constitutional muster where the jail's regulations allowed a broad range [*48] of publications to enter the facility).

Next, the Court examines the impact that accommodating the asserted constitutional right would have on guards, other inmates, and prison resources. *Turner, 482 U.S. at 90; Salt Lake County, 503 F.3d at 1153.* This third factor allows prison officials "to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration," and avoid unnecessary intrusion of the judiciary into problems particularly ill suited to

"resolution by decree." *O'Lone v. Estate of Shabazz, 482 U.S. 342, 349-50, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987)* (citation omitted); *see also Bell v. Wolfish, 441 U.S. 520, 547, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)* ("Prison administrators. . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."). Here, prison officials have determined that security is undermined by circulation of publications that advocate or incite violent or illegal behavior or advocate behavior that could create an unsafe environment for the inmates or staff. Allowing the distribution of outside publications without screening [*49] for such prohibited material clearly could negatively impact the safety and security of prison personnel and other inmates. Thus, the regulation satisfies this *Turner* factor as well. *See Thornburgh, 490 U.S. at 418* ("the likelihood that such material will circulate within the prison raises the prospect of precisely the kind of 'ripple effect' with which the Court in *Turner* was concerned").

Lastly, the Court must consider "whether obvious, easy alternatives exist that fully accommodate inmates' rights at *de minimis* cost to valid penological interests. If so, the regulation may not be reasonable but an 'exaggerated response' to prison concerns." *Salt Lake County, 503 F.3d at 1154* (quoting *Turner, 482 U.S. at 90*). In determining the availability of alternatives to the regulation, courts must generally defer to the judgment of prison administrators. *See O'Lone, 482 U.S. at 350.* Thus, the Court does not require use of the "least restrictive alternative." *See Turner, 482 U.S. at 90.* Although Defendants have not addressed the existence of alternatives to the individual screening of incoming publications, "[p]rison officials do not have to set up and then shoot down every conceivable alternative [*50] method of accommodating [Plaintiff's] constitutional complaint." *Id. at 90-91.* Nonetheless, if the plaintiff "can point to an alternative that fully accommodates [his] rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id. at 91.* In this case, Plaintiff fails to offer any alternatives to the existing screening process; rather he indicates that the ban on such publications should be lifted in whole so that he may receive all subscribed publications in a more timely manner. The undersigned finds this alternative fails to meet Plaintiff's burden, and thus, the fourth factor

weighs in favor of the moving Defendants.

Although Plaintiff has a *First Amendment* right to receive information while in prison, he bears the burden of disproving the validity of the regulation infringing that right, in this instance allegedly resulting in a delay of delivery of publications. After carefully considering the record in light of *Turner*, the undersigned finds that Plaintiff has failed to meet this burden. Accordingly, the undersigned finds that Defendants are entitled to summary judgment [*51] with respect to that portion of Plaintiff's *First Amendment* claim relating to the delay of delivery of certain publications.

## IV. Segregation Due Process Claim

In Count Seven and a portion of Count Six, Plaintiff alleges a violation of due process in connection with his placement in segregation following two prison disciplinary charges in August of 2007 and the continuation of such placement until his transfer to OSR on October 19, 2007. In support of this claim Plaintiff sets forth the following facts. While he was serving as an inmate legal research assistant at JCCC, he was placed in segregation on August 24, 2007, pending investigation of an incident at the prison law library. Amended Complaint, pp. 11-12, 34. On August 30, 2007, Plaintiff was charged with the offense of "being in possession of another inmate's legal materials" on August 24. In a disciplinary hearing held September 6, 2007, Plaintiff was found guilty and received sanctions of telephone and visitation restrictions for ninety days and "discretionary revocation" of sixty days earned credits. *Id.*, pp. 13; 34-35; *see also* S.R., Attach. 10-a, pp. 1-37.[15] Plaintiff received a second misconduct charge on August 30, 2007, for [*52] "Individual Disruptive Behavior - Failure to Follow a Written Order in Law Library" on August 24. Amended Complaint, p. 36; *see also* S.R., Attach. 10-b, pp. 1-5; 31-49. At a disciplinary hearing held September 11, 2007, Plaintiff was found guilty of this misconduct charge and received ninety days of disciplinary segregation and the loss of "120 days earned credits." *Id.*[16] On September 13, 2007, pursuant to JCCC classification committee action, Plaintiff was assigned a transfer to a medium classification facility, and he was transferred to OSR on October 19, 2007. Plaintiff's Objection, Ex. 43 (Facility Assignment Form).

15    A rehearing was conducted on October 4, 2007, and a second rehearing was conducted on January 8, 2008. S.R., Attach. 10-a, pp. 10-37.

16  Defendants have submitted evidence showing that Plaintiff's attempted appeals of these disciplinary convictions ultimately were rejected for failure to follow DOC appeal procedures. S.R., Attachs. 10-c, pp. 1-8; 10-d, pp. 1-8; 10-e, pp. 1-9.

In Count Six, Plaintiff alleges:

> Plaintiff Worthen was placed into restrictive housing without due process, mandatorily dropped to Level 1 from Level 4 prior to being found guilty of an offense requiring [*53] that restrictive housing, and kept in restrictive housing after the expiration of the 20 day punishment imposed without being restored to his Level 4 status.

Amended Complaint, p. 33. Plaintiff alleges that no evidence exists to support the "bogus misconducts" and that his placement in restrictive housing from August 24 through September 10, 2007, and from October 1 through October 19, 2007, when he was transferred to OSR, was without justification and in violation of his due process rights. *Id.*, p. 37. In Count Seven Plaintiff sets out a lengthy list of "atypical and significant hardships" he endured because of his excessive period of confinement in segregation. *Id.*, pp. 52-56. As previously discussed, Plaintiff has only exhausted his administrative remedies with respect to four of these claims: inadequate heating, insufficient diabetic snack items, denial of access to a drinking cup, and denial of nail clippers. Thus, only these exhausted claims have been considered in connection with Plaintiff's due process claim.

Defendants first contend that even if Plaintiff has exhausted his administrative remedies as to his due process segregated housing conditions claim, this claim should be [*54] barred pursuant to *Edwards v. Balisok, 520 U.S. 641, 117 S. Ct. 1584, 137 L. Ed. 2d 906 (1997)* and *Heck v. Humphrey, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994)* because Plaintiff cannot show that the disciplinary proceedings which gave rise to his placement in segregation have been invalidated. Defendants' Motion, pp. 18-21. Defendants acknowledge that this Court has previously found that Plaintiff's request for monetary damages for due process violations occurring during his confinement in segregation is viable under *Muhammad v. Close, 540 U.S. 749, 124 S. Ct.*

1303, 158 L. Ed. 2d 32 (2004). Id. See Report and Recommendation [Doc. No. 25], pp. 16-17 (citing *Sandin v. Conner, 515 U.S. 472 484, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995))* and Order [Doc. No. 27] (adopting the Report and Recommendation in its entirety and dismissing *inter alia* Plaintiff's habeas claim). *See also Gaines v. Stenseng, 292 F.3d 1222, 1226 (10th Cir. 2002); Perkins v. Kansas Dep't of Corrections, 165 F.3d 803, 809 (10th Cir. 1999)).* Nonetheless, Defendants argue that "[a]lthough [he is] serving a life sentence and not eligible for early release, earned credits do effect (sic) Plaintiff's life sentence because such credits are considered during the parole process" and thus he must first demonstrate that his disciplinary convictions have been [*55] invalidated. Defendants' Motion, pp. 20-21. According to Defendants, "Plaintiff's situation is so factually different from *Muhammad* that a *Heck* analysis must be applied." *Id.*, p. 20.

Under the law of the case doctrine, a court's decision on a rule of law generally continues to govern the same issues in subsequent stages of the case. *See Salehpoor v. Shahinpoor, 358 F.3d 782, 785 n.4 (10th Cir. 2004).* However, because "[o]nly final judgments may qualify as law of the case," *Unioil, Inc. v. Elledge (In re Unioil, Inc.), 962 F. 2d 988, 993 (10th Cir. 1992)*, "district courts generally remain free to reconsider their earlier interlocutory orders." *Been v. O.K. Indus., 495 F.3d 1217, 1225 (10th Cir. 2007); see also Allison v. Bank One-Denver, 289 F.3d 1223, 1247 (10th Cir. 2002)* ("A lower court's ability to depart from its own prior decision is discretionary.").

The Court's earlier conclusion that Plaintiff's segregation due process claim may proceed in this *§ 1983* case is an interlocutory order, and the Court therefore has the discretion to revisit that conclusion. However, the undersigned finds that Defendants have failed to present persuasive evidence that this conclusion should be revisited. [*56] Defendants argue that Plaintiff lost 150 earned credits as a result of his September 2007 misconduct conviction, and therefore, he is required to show that this conviction has been invalidated before he seeks *§ 1983* relief on his segregation due process claim. Defendants' Motion, pp. 20-21. However, Plaintiff is serving a life sentence, and under Oklahoma law he is not eligible for expedited release based on earned credits. *See Okla. Stat. tit. 57, § 138(A); see also Gamble v. Evans, 165 Fed. Appx. 698, 2006 WL 293090 (10th Cir. 2006)* (unpublished op.) (Oklahoma inmate serving life

sentence has no liberty interest in earned credits and therefore due process was not implicated when earned credits were revoked from his sentence in disciplinary proceedings); *Hall v. Williams, Nos. 99-2326, 99-2362, 2000 U.S. App. LEXIS 17472, 2000 WL 990866, at * 2 (10th Cir. July 19, 2000)* (unpublished op.) ("even if true, [Mr. Hall's] allegations do not entitle him to release from confinement, nor do they appear to affect the duration of his confinement (as noted above, Hall was sentenced to life . . . [imprisonment])"); *Rowland v. Andrews, No. 98-5028, 1998 U.S. App. LEXIS 28149, 1998 WL 777390, *1 (10th Cir. Nov. 4, 1998)* (unpublished op.) (Oklahoma prisoner [*57] convicted of murder and sentenced to life imprisonment failed to establish a due process violation where earned credit provision of *Okla. Stat. tit. 57, § 138* did not apply to him). Rather, the number of recorded credits is simply one factor which the Pardon and Parole Board could consider at some point in the future in determining whether to grant parole to Plaintiff. Moreover, Oklahoma's Constitution does not create a liberty interest in obtaining parole. *See Shirley v. Chestnut, 603 F.2d 805, 807 (10th Cir. 1979); Shabazz v. Keating, 1999 OK 26, 977 P.2d 1089, 1093 (Okla. 1999).* In any event, Plaintiff's segregation-related due process claim encompasses the time he spent confined in SHU **before** his disciplinary conviction and **after** the 20-day disciplinary segregation period had been served. In sum, Defendants have failed to show that this Court's decision should be reconsidered. Thus, the undersigned finds that Plaintiff's § 1983 claim for monetary damages challenging segregation on due process grounds may proceed under *Muhammad*, and therefore, the merits of Plaintiff's exhausted due process claims have been considered. *See Muhammad, 540 U.S. 754-55* (holding that because the § 1983 action did [*58] not necessarily affect the computation of "good time" credits, it "could not therefore be construed as seeking a judgment at odds with [the prisoner's] conviction or with the State's calculation of time to be served in accordance with the underlying sentence" so as to be precluded by *Heck*).

"The *Fourteenth Amendment's Due Process Clause* protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin, 545 U.S. 209, 221, 125 S. Ct. 2384, 162 L. Ed. 2d 174 (2005).* Plaintiff's due process claim, therefore, can proceed only if he can establish that he had a protected liberty interest in avoiding the conditions of which he complains. "[A] liberty interest in

avoiding particular conditions of confinement may arise from state policies or regulations, subject to the important limitations set forth in *Sandin v. Conner, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 . . . (1995)*." *Wilkinson, 545 U.S. at 222.* Pursuant to *Sandin*, "the touchstone of the inquiry into the existence of a protected, state created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations[17] regarding those conditions [*59] but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" *Wilkinson, 545 U.S. at 223* (quoting *Sandin, 515 U.S. at 484*). Placement in administrative segregation, therefore, may implicate a protected liberty interest if it "imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *Sandin, 515 U.S. at 484*, or if it inevitably increases the duration of the sentence imposed. *Id. at 487.*

> 17  As *Sandin* and *Wilkinson* make clear, Plaintiff cannot demonstrate that a liberty interest exists based solely on the JCCC's policies and procedures. Moreover, the Defendants' alleged failure to follow those procedures does not necessarily establish a violation of Plaintiff's due process rights.

Plaintiff alleges that he was placed in segregation on August 24, 2007, without justification and without due process, pending the investigation of the misconduct charged lodged against him. Administrative segregation does not generally involve the deprivation of a liberty interest because "administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in incarceration." [*60] *Hewitt v. Helms, 459 U.S. 460, 468, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983).* Thus, under *Sandin*, Plaintiff "has no constitutional liberty interest with respect to whether he is housed in administrative segregation as long as the conditions of the segregation are not atypical of normal prison life." *James v. Wiley, No. 97-6056, 1997 U.S. App. LEXIS 27150, 1997 WL 606985, at *2 (10th Cir. Oct. 2, 1997)* (unpublished op.). Plaintiff has provided no evidence that his approximate 18-day confinement in segregation pending prison officials' investigation of both disciplinary charges amounted to an atypical and or significant hardship on Plaintiff relative to the ordinary incidents of prison life.[18] Thus, Plaintiff's transfer to administrative segregation for security purposes did not deny him due process, and he was not entitled to any

particular procedures with regard to his confinement in administrative segregation.

> 18    According to Defendants, Plaintiff was provided a copy of the JCCC Segregation Housing Unit Rules, which explains the proper procedures for requesting services and property, but Plaintiff refused to sign the form. S.R., Attach. 15, p. 1. Plaintiff disputes that he received the SHU rules. Plaintiff's Objection, p. 7. The undersigned notes [*61] that Plaintiff submitted no requests to staff or grievances during his detention in SHU during administrative segregation between August 24, 2007, and the date of his disciplinary convictions.

Following Plaintiff's second disciplinary hearing and conviction on September 11, 2007, Plaintiff was sanctioned with 20 days segregation and the loss of certain privileges. It is well settled that placing an inmate in disciplinary segregation generally does not deprive the inmate of a constitutionally-protected liberty interest where the placement does not inevitably affect the duration of the prisoner's sentence. *Sandin v. Conner, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995)*.

Moreover, the Tenth Circuit has determined on several occasions that the segregation of an inmate for a much longer period of time than Plaintiff was placed in disciplinary segregation is not unconstitutional even if privileges were restricted. *See Blum v. Fed. Bureau of Prisons, No. 99-1055, 1999 U.S. App. LEXIS 20051, 1999 WL 638232, at *3 (10th Cir. Aug. 23, 1999)* (unpublished op.) (considering disciplinary detention and concluding ninety-day confinement without store privileges, radio, and phone calls as enjoyed by other inmates in segregation did not differ in significant [*62] degree and duration from ordinary incidents of prison life to create a protected liberty interest); *Villarreal v. Harrison, No. 99-1268, 1999 U.S. App. LEXIS 30487, 1999 WL 1063830, at *2 & n.1 (10th Cir. 1999)* (unpublished op.) (concluding that conditions of prisoner's two-year administrative detention, including restricted telephone privileges and requirement that he eat all of his meals alone in his cell, were not so different as compared with normal incidents of prisoner life so as to give rise to a protected liberty interest).[19] In light of this authority, and in the absence of any other exhausted claim suggesting the existence of an atypical and significant hardship in the conditions of Plaintiff's

confinement, the undersigned finds that Plaintiff has failed to show a due process violation. *Sandin, 515 U.S. at 486*.

> 19    Other circuits have issued similar decisions. *See Jones v. Baker, 155 F.3d 810, 812-13 (6th Cir. 1998)* (determining segregation for approximately two and one half years was not "atypical" under the *Due Process Clause*, given confinement was not much different than experienced by other inmates in segregation); *Griffin v. Vaughn, 112 F.3d 703, 706-09 (3d Cir. 1997)* (concluding fifteen-month administrative [*63] segregation was within the "expected parameters of the sentence imposed on him"); *Beverati v. Smith, 120 F.3d 500, 504 (4th Cir. 1997)* (determining six-month placement in administrative segregation was not atypical compared with the general prison population even though officials denied inmates outside recreation, educational and religious services, warm or large portions of food, and clean clothing and bedding and inmates' cells were infested with vermin, were smeared with human feces and urine, were flooded with water, and were unbearably hot); *Madison v. Parker, 104 F.3d 765, 768 (5th Cir. 1997)* (holding that thirty-day commissary and cell restrictions did not implicate due process concerns); *Kennedy v. Blankenship, 100 F.3d 640, 642 (8th Cir. 1996)* (finding no liberty interest in thirty-day sanction that included restrictions on mail and telephone privileges, visitation privileges, commissary privileges, and personal possessions).

With respect to Plaintiff's allegation that he was kept in segregation an excessive period of time beyond the 20-day segregation period, the record shows that while Plaintiff was serving his 20 days of disciplinary segregation, JCCC officials determined [*64] that Plaintiff should be placed in a medium security facility. Plaintiff's Objection, Ex. 43 (DOC Facility Assignment Form, dated September 13, 2007). The Tenth Circuit has held that no federal rights were infringed by inmate's placement in administrative segregation for transit detention where there is no indication that state law or regulations limited prison authorities' discretion to do so. *See Traylor v. Denton, No. 94-6088, 1994 U.S. App. LEXIS 30461, 1994 WL 596630 (10th Cir. Nov. 1, 1994)* (unpublished op.); *see also Hornsby v. Reynolds, No.*

95-6388, 1996 U.S. App. LEXIS 15443, 1996 WL 350793 (10th Cir. June 26, 1996) (unpublished op.). In any event, Plaintiff fails to show that he was subjected to unconstitutional conditions of confinement during this time period. The undisputed record shows that while in segregation, Plaintiff submitted his first request to staff on October 7, 2007, after the 20 days of disciplinary segregation had been served, wherein Plaintiff requested "basic life necessities," specifically, a drinking cup, warmer temperature in his cell, adequate diabetic snack items and nail clippers. S.R., Attach. 16, p. 1. Warden Parker promptly responded to Plaintiff's request, advising him of the remedy with respect to [*65] each request. *Id.*, p. 4. There is nothing in the record before the Court regarding any further requests or grievances made by Plaintiff concerning these issues. Thus, Plaintiff's confinement in segregation pending transfer to OSR did not deny him due process, and he was not entitled to any particular procedures with regard to this period of detention in segregation.

Further, to the extent Plaintiff bases his due process claim on an alleged entitlement to have an opportunity to earn credits at a particular classification level, such argument fails. Oklahoma prisoners have no constitutional right to remain at any particular classification level, and no constitutional liberty interest is implicated by an inmate's reclassification, even if the reclassification adversely affects the opportunity to earn sentence credits. *See Sandin, 515 U.S. at 484; see also Davis v. Ward, 92 Fed. Appx. 634, 2004 WL 233302 at *2 (10th Cir. 2004)* ("[T]he Oklahoma statutory scheme addressing earned credits [does] not entitle [a prisoner] to remain at a specific class level, absent a misconduct conviction."); *Anderson v. Colo. Dep't of Corrections, No. 98-1477, 1999 U.S. App. LEXIS 13214, 1999 WL 387163 (10th Cir. June 14, 1999)* (finding [*66] that the loss of an opportunity to earn good time credits does not constitute any atypical or significant hardship sufficient to create a liberty interest and cannot amount to a violation of due process). *See also Hewitt v. Helms, 459 U.S. 460, 467, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983)* (stating that "incarceration brings about the necessary withdrawal or limitation of many privileges and rights" and "the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison").

For the reasons set forth above, the undersigned finds that Plaintiff's placement in segregation between August 24, 2007, and October 19, 2007, comports with the requirements of due process under *Sandin*. Therefore, the undersigned finds there is no genuine issue of material fact with respect to Plaintiff's due process claims and Defendants are entitled to judgment as a matter of law.

## V. Retaliation Claim

Plaintiff alleges that Defendants Guffy, Hormel, Harris and "other unnamed" JCCC staff violated his constitutional rights by issuing "bogus misconduct offenses" and by subjecting him to "atypical and significant hardships" beginning August 24, 2007, in retaliation for filing grievances against prison officials and assisting [*67] inmates with their legal matters. Amended Complaint, pp. 41-49. According to Plaintiff, both of the misconducts were issued in connection with his use of the prison law library as an inmate research assistant and in response to the filing of his own civil rights cases. *Id.*, p. 41-42.

It is well established that "[p]rison officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights. *Fogle v. Pierson, 435 F.3d 1252, 1264 (10th Cir.2006)*. "This principle applies even where the action taken in retaliation would be otherwise permissible." *Smith v. Maschner, 899 F.2d 940, 948 (10th Cir.1990)*. To prevail on a claim of retaliation, a prisoner must show that the challenged actions would not have occurred "but for" a retaliatory motive. *Id. at 949-50*. In this regard, Plaintiff must plead specific facts showing the retaliatory motive for the action taken by prison officials. *See Peterson v. Shanks, 149 F.3d 1140, 1144 (10th Cir. 1998)* (finding that prisoner claiming retaliation must allege specific facts showing retaliation was the result of the exercise of prisoner's constitutional rights); *Frazier v. Dubois, 922 F.2d 560, 562 n. 1 (10th Cir. 1990)* [*68] (noting that "it is imperative that plaintiff's pleading be factual and not conclusory. Mere allegations of constitutional retaliation will not suffice; plaintiffs must rather allege specific facts showing retaliation because of the exercise of the prisoner's constitutional rights.").

Evidence of temporal proximity of a chronology of events indicating suspicious time may be sufficient to support an allegation of retaliation. *Smith, 899 F.2d at 949-50*. However, assisting other inmates with filing grievances or conducting legal research is not protected activity. *Id. at 950* ("[Prisoner-plaintiff] does not have a protected interest in providing legal representation to other inmates."); *see also Northington v. Zavaras, No.*

*99-1184, 2000 U.S. App. LEXIS 19113, 2000 WL 1133128, at *2 (10th Cir. Aug. 10, 2000)* (unpublished op.) (holding that "the actions Northington ties to his aid of other inmates cannot support a claim of retaliation for the exercise of his own constitutional rights). Therefore, Plaintiff's assistant of other inmates regarding legal matters does not constitute a constitutional protected activity so as to serve as the basis for Plaintiff's retaliation claim. *See Nielander v. Bd. of County Comm'rs of Republic, Kan., 582 F.3d 1155, 1165 (10th Cir. 2009)* [*69] (stating that to establish a *First Amendment* retaliation claim, a plaintiff must first show that he was engaged in constitutionally protected activity). Moreover, where, as here, a prisoner is punished for violating a prison regulation, he is not engaged in "protected conduct" and cannot proceed with his retaliation claim. *Thaddeus-X v. Blatter, 175 F.3d 378, 395 (6th Cir. 1999)*. In short, Plaintiff fails to satisfy the first step in his retaliation claim -- that he was engaged in protected conduct at all.

For these reasons, the undersigned finds that there is no genuine issue of material that but for the retaliatory motive his placement in JCCC segregation would not have taken place. Accordingly, Defendants have met their summary judgment burden on this claim.

## RECOMMENDATION

For the reasons set forth above, the undersigned Magistrate Judge recommends that:

1) Plaintiff's claims for declaratory and injunctive relief be **dismissed as moot**;

2) Plaintiff's first request to take judicial notice [Doc. No. 9], be **denied**, as this document has been construed and considered as exhibits; Plaintiff's remaining requests for judicial notice [Doc. Nos. 22, 23, and 38 ] be **denied**;

3) Defendants' motion, [*70] construed as one for summary judgment [Doc. No.27]

-- be **granted** with respect to Plaintiff's claims against Defendants in their official capacities, due to *Eleventh Amendment* immunity;

-- be **granted** on grounds that Plaintiff failed to administratively exhaust his procedural due process segregation claims, as required by *42 U.S.C. § 1997e(a)*, with the exception of Plaintiff's due process claims

concerning Defendants' alleged failure to provide adequate heating, adequate diabetic snack items, a drinking cup and access to nail clippers;

-- be **denied** on grounds that Plaintiff failed to administratively exhaust his claim of retaliation and/or conspiracy for failure to exhaust administrative remedies;

-- be **denied** as to Plaintiff's *First Amendment* claim regarding the denial of the February 2007 PLN issue;

-- be **granted** with respect to Plaintiff's *First Amendment* claim regarding the delayed delivery of publications;

-- be **granted** as to the merits of Plaintiff's due process conditions of confinement claim;

-- be **granted** as to the merits of Plaintiff's claim of retaliation; and

4) Defendants Hormel and Harris be **dismissed** from Plaintiff's remaining *First Amendment* claim pursuant to *28 U.S.C. § 1915A* for failure [*71] to state a claim upon which relief may be granted, based on failure to allege personal participation.

These recommendations would leave no claims remaining against Defendants Hormel and Harris and would leave intact a *First Amendment* claim for monetary damages against Defendants Parker, Redman, Denton, Pruitt, Guffy, Irvin, Reed and Swindler, in their individual capacities based on the denial of delivery of February 2007 issue of PLN.

The parties are advised of their right to file an objection to the Report and Recommendation with the Clerk of this Court by the 24th day of August, 2010, in accordance with *28 U.S.C. § 636* and *Fed. R. Civ. P. 72*. The parties are further advised that failure to make timely objection to the Report and Recommendation waives the right to appellate review of both factual and legal questions contained herein. *Moore v. United States, 950 F.2d 656 (10th Cir. 1991)*. This Report and Recommendation disposes of all the issues referred to the undersigned Magistrate Judge in the captioned matter.

ENTERED this 4th day of August, 2010.

/s/ Bana Roberts

BANA ROBERTS

2010 U.S. Dist. LEXIS 85606, *71

UNITED STATES MAGISTRATE JUDGE